

1  Lee M. Gordon (SBN 174168)
   lee@hbsslaw.com
2  Elaine T. Byszewski (SBN 222304)
   elaine@hbsslaw.com
3  **HAGENS BERMAN SOBOL SHAPIRO LLP**
4  700 South Flower Street, Suite 2940
   Los Angeles, CA 90017-4101
5  Telephone: (213) 330-7150
6  Facsimile: (213) 330-7152

7
   *Additional Plaintiffs' Counsel Appear*
8  *on the Signature Page*

9          **IN THE UNITED STATES DISTRICT COURT**

10            **CENTRAL DISTRICT OF CALIFORNIA**

11                  **WESTERN DIVISION**

12  In re: LIVE CONCERT ANTITRUST          )  MDL No.:  2:06-ML-01745 SVW-
13  LITIGATION                             )  (RCx)
                                           )
14  This document relates to:             )  **THIRD AMENDED CLASS**
15  MALINDA RILEY v. CLEAR                 )  **ACTION COMPLAINT**
    CHANNEL COMMUNICATIONS,                )  **The Honorable Stephen V.**
16  INC., ET AL                            )  **Wilson**
                                           )
17  2:06-CV-02381-SVW-(RC)                 )
    (N.D. Ill. 05-c-05612)                 )
18

19          Plaintiff, Malinda Riley, for her Third Amended Class Action Complaint, upon

20  personal knowledge as to facts pertaining to herself and upon information and belief as

21  to all other matters, based on the investigation of her counsel, against Defendants Clear

22  Channel Communications, Inc., Clear Channel Entertainment, Inc., Clear Channel

23  Radio, Inc., Clear Channel Broadcasting, Inc., and Live Nation, Inc. (collectively,

24  "Clear      Channel"      or      "Defendants"),      states      as      follows:

25

26          MAY – 8

27

28                                                          **ORIGINAL**
                                           1
    ───────────────────────────────────────────────────────────
                    THIRD AMENDED CLASS ACTION COMPLAINT

## NATURE OF ACTION

1.     Plaintiff brings this regional civil antitrust class action for damages and injunctive relief on behalf of direct purchasers of tickets to live rock concerts from Clear Channel in Chicago, Illinois, and all areas of the United States within a 150 mile radius (the "Chicago Region"). This lawsuit arises out of the unlawful and anticompetitive practices of a major radio broadcasting and concert promotion conglomerate, Clear Channel Communications, Inc. - by itself and through its various subsidiaries and affiliates (including but not limited to the named Defendants herein) - to prevent competition for concert promotion services nationwide and thereby increase the cost of tickets Plaintiff and the Class purchased to live rock concerts.  Through a series of mergers valued at nearly $20 billion, and through other anticompetitive and predatory practices described below, Clear Channel has built a monopolistic, multimedia empire that has substantially harmed competition resulting in higher concert ticket prices and fewer offerings for Plaintiff and the Class.  This is true across the nation, as well as in the Chicago Region.  While the ticket prices in one city may sometimes differ from those in another city, tickets have increased in a material amount across the Chicago Region as a result of Clear Channel's monopolistic behavior.

2.     Defendants' anticompetitive conduct includes the following, as examples:

- Limiting radio airplay of artists who refuse to use Clear Channel's concert promotion services;

- Denying promotional air-time to artists who use competing promoters;

- Refusing to accept advertising by other concert promoters, charging excess fees for such advertising, or limiting such advertising to undesirable time slots;

- Excluding concerts promoted by competitors from radio updates of upcoming concerts; and

2

1         •   Inflating fees paid to artists, in some cases more than 100% of

2            gross sales, in order to exclude competitors from the market.

3     3.    This regional class action was filed to protect the direct purchasers of

4 tickets to live rock concerts from Clear Channel in the Chicago Region. The following

5 venues were, during the class period, owned, operated and/or exclusively programmed

6 by Clear Channel: Allstate Arena, Ford Center for the Performing Arts, Oriental

7 Theater, Rosemont Theater, Shubert Theater, The Cadillac Palace Theater, The

8 Tweeter Center (n.k.a. First Midwest Bank Amphitheatre), United Center, Alpine

9 Valley Music Theater and Marcus Amphitheater.

10     4.    In 2002, a class action titled *Heerwagen v. Clear Channel*

11 *Communications, Inc.,* Case No. 02-CV-4503 (S.D.N.Y.), was filed against certain of

12 the Defendants in the United States District Court for the Southern District of New

13 York on behalf of a nationwide class of concert ticket purchasers. Plaintiff and the

14 Class here would have been members of that putative nationwide class. However, in

15 August 2003, the *Heerwagen* Court found that the relevant market was regional, rather

16 than national, and denied a motion for certification. The District Court's decision was

17 affirmed by the Second Circuit on January 10, 2006. *Heerwagen v. Clear Channel*

18 *Communications*, 435 F.3d 219 (2d Cir. 2006). Accordingly, Plaintiff files this class

19 action on behalf of rock concert ticket purchasers in the Chicago Regional market.

20     5.    Clear Channel's anticompetitive practices have resulted in highly inflated

21 concert ticket prices that are unrelated to inflation. For example, from 1991 to 1996

22 (immediately before Clear Channel began acquiring many of its major competitors in

23 the promotion market), concert ticket prices rose on a nationwide basis by 21 percent,

24 while the Consumer Price Index shows that all prices grew by 15 percent. Yet during

25 the time when Clear Channel's consolidation of the industry and anticompetitive

26 practices were implemented, concert ticket prices ballooned by 61 percent nationwide

27 while the Consumer Price Index increased by just 13 percent. Similarly, a study

28 comparing the prices of concert tickets against the Consumer Price Index for movies,

theater and sports during the period of consolidation reveals that concert prices have increased across the country by 54 percent while the prices for movies, theater and sporting events increased just 24 percent.   As a result of Clear Channel's illegal conduct, Plaintiff and the Class paid and continue to pay artificially high prices for concert tickets.  In short, due to Defendants' actions, Plaintiff and the Class have been deprived of the benefits of free and open competition across the nation.

6.    Plaintiff seeks damages and injunctive relief on behalf of the Class.

## JURISDICTION AND VENUE

7.    The Court has jurisdiction over the claims relating to violations of Section 2 of the Sherman Act under 28 U.S.C. §§ 1331 and 1337 and 15 U.S.C. § 15.  The Court has supplemental jurisdiction over the state law claim pursuant to 28 U.S.C. § 1367(a).  The federal and state law claims arise from the same events and transactions, involve substantially identical issues of fact and law, and are so related to each other that they form part of the same case or controversy under Article III of the United States Constitution.

8.    Venue is proper in this judicial district under 15 U.S.C. § 22 and 28 U.S.C. § 1391.  Clear Channel transacts business and many of the acts and events giving rise to this action occurred within this district.

## PARTIES

9.    Plaintiff Malinda Riley is a resident of Chicago, Illinois.  Plaintiff purchased one or more tickets for rock concerts promoted and held by Defendants in the Chicago Region during the Class Period defined below.

10.    Defendant Clear Channel Communications, Inc. ("Clear Channel Communications") is a corporation organized and existing under the laws of the State of Texas, with its principal place of business located at 200 East Basse Road, San Antonio, Texas 78209.  Upon information and belief, Clear Channel Communications sometimes also does business as, among other things, "Clear Channel Worldwide" and "Clear Channel Concerts."

THIRD AMENDED CLASS ACTION COMPLAINT

11.     Defendant Clear Channel Entertainment, Inc. ("Clear Channel Entertainment"), upon information and belief, is a corporation organized and existing under the laws of the State of Delaware, in good standing, with its principal place of business located at 650 Madison Avenue, New York, New York 10022.   Upon information and belief, Clear Channel Entertainment is a wholly-owned subsidiary or affiliate of Clear Channel Communications that, until July 2001, did business as SFX Entertainment, Inc.

12.     Defendant Clear Channel Radio, Inc. ("Clear Channel Radio"), upon information and belief, is a corporation organized and existing under the laws of the State of Nevada, with its principal place of business located at 50 East Rivercenter Blvd., 12th Floor, Covington, Kentucky 41011.   Upon information and belief, Clear Channel Radio is a wholly-owned subsidiary or affiliate of Clear Channel Communications.

13.     Defendant Clear Channel Broadcasting, Inc. ("Clear Channel Broadcasting") is a corporation organized and existing under the laws of the State of Nevada with its principal place of business located at 200 East Basse Road, San Antonio, Texas 78209.

14.     Defendant Live Nation, Inc. ("Live Nation") is a Delaware corporation headquartered at 9348 Civic Center Drive, Beverly Hills, California 90210.   Prior to 2000, Live Nation was independently owned and known as SFX.   Clear Channel Communications, Inc. acquired SFX in 2000 and SFX changed its name to Clear Channel Entertainment in 2001.   In December 2005, Live Nation was spun-off from Clear Channel and became a publicly traded company.   Live Nation is one of the world's largest promoters and venue operators for live entertainment events.   Although Live Nation is now a separate, publicly owned company, it is dominated and controlled by the same individuals who control Clear Channel Communications: L. Lowry Mays, Mark P. Mays, and Randall T. Mays.

THIRD AMENDED CLASS ACTION COMPLAINT

## TRADE AND COMMERCE

15.     Clear Channel is involved in interstate trade and commerce, and the activities of Clear Channel substantially and adversely affect interstate commerce. In the conduct of its business, Clear Channel, directly or indirectly, has used and uses the means and instrumentalities of interstate commerce in furtherance of the acts and communications alleged herein, including but not limited to, the United States postal system, the nationwide system, through and by means of which a substantial amount of the nation's communications, information exchanges, and transportation take place.

16.     For example, Clear Channel uses all of these instrumentalities of interstate commerce to contact, book and bring performers to various venues throughout the United States, including in the Chicago Region. Concerts in various metro areas are regularly performed by entertainers from outside those areas, who themselves use the instrumentalities of interstate commerce to book and travel to the concerts, and upon information and belief, such concerts are attended by ticket-buyers from outside those areas, who use the instrumentalities of interstate commerce to purchase tickets and attend the concerts.

## PRODUCT MARKET / GEOGRAPHIC MARKET

17.     The relevant product market is the market for the sale of tickets to live rock concerts.

18.     The relevant geographic market is the Chicago Region.

## GENERAL ALLEGATIONS

**A.     Overview of the Concert Promotion Industry**

19.     Concert promoters are essentially the wholesalers for the live music industry. Promoters "buy" concerts from booking agents at wholesale prices negotiated separately between the agent and promoter. The promoter then "resells" the product as a live music event to the general public at retail prices in the form of a concert ticket. The booking agents are the authorized representatives for the musical

THIRD AMENDED CLASS ACTION COMPLAINT

groups, or artists.   Agents work directly with the artists and their managers to determine the best venue opportunities.

20.   The promoter is responsible for promoting the concert, which entails determining and executing the proper advertising and marketing plan.   Marketing strategies may include use of a variety of channels to promote the event, including print, TV, and street promotion (flyers); however, radio is by far the most effective tool for promoting concerts because of its close relationship to the product being advertised. Promoters also are responsible for, among other things: covering various expenses associated with a concert, including transportation, hotel costs and production costs; providing sound and lighting equipment, security, ushers, ticket takers and stage managers; and securing a proper venue for the concert. The venue can be one that the promoter either owns or rents.   These promotions services have a direct impact on ticket price.

21.   The promoter ultimately takes full financial responsibility for the concert. If ticket sales revenues are higher than the expenses for the concert, then the promoter will make a profit; if not, the promoter will take a loss. As the concert industry has matured, promoters have relied on different sources of income to offset risks associated with promoting concerts. These sources of income include sponsorship deals, food and beverage sales, and merchandise sales.

**B.**      **The Concert Promotion Business**

22.   The modern concert business began in the mid-1960s when a string of regional independent promoters began opening or renting out small theaters and dance ballrooms across the country. There were very few artists that could fill larger venues in those days. In the early 1970s, the audiences grew to the point where artists began filling arenas. At this point, some of these small "regional" promoters grew into large companies built around the oversized personalities of their founders.   Some of the more famous examples were Bill Graham Presents in Northern California, Fey Concerts in Colorado, Jam Productions in Chicago, and Don Law in Boston.

THIRD AMENDED CLASS ACTION COMPLAINT

23.     Around 1997, a major shift occurred when SFX, Inc., a company with no prior concert experience, raised billions of dollars and subsequently bought out nearly all of the major independent promoters in the business.  An even more dramatic shift occurred in August 2000, when Clear Channel Communications purchased SFX.  The result of this massive consolidation has been that Clear Channel has been able to book an entire tour nationwide, virtually eliminating the remaining individual promoters in any local geographic markets and allowing Clear Channel to set prices for tickets without competition in the Chicago Region.  Clear Channel is the epicenter of the live concert promoting world in the United States.  In its Annual Report on Form 10-K for 2001, Clear Channel stated: "Our recent entry into live entertainment operations allowed us to take advantage of the natural synergies between radio and live music events and to gain…leadership."

## C.     **The Clear Channel Empire**

24.     Clear Channel Communications is a publicly-traded, multimedia corporation which, on its own and through various subsidiaries and affiliates, including the other Defendants, owns, programs, and/or sells air time for nearly 1,200 radio stations in the U.S. and has equity interests in another 240 radio stations overseas; promotes and/or produces more than 26,000 live entertainment events that are attended by approximately 62 million people per year; owns or controls more than 135 live entertainment venues, (by far more than any other promoter), including clubs, theaters, and large amphitheaters; owns or controls approximately 900 websites, including sites that allow visitors to listen to music and the radio on-line; owns or operates 19 television stations; and operates more than 700,000 outdoor advertising displays, including billboards, street furniture and transit panels worldwide.  Clear Channel's net revenues in the year 2000 topped $5.3 billion, a 100 percent increase over the company's 1999 revenues.  No competitor exists on the same nationwide scale as Clear Channel.  As of October 2001, the next largest radio company, Infinity Broadcasting

THIRD AMENDED CLASS ACTION COMPLAINT

1  Corp., operated only 183 stations.  By design, Clear Channel dominates the market for
2  live concert tickets.

3       25.    Through its radio broadcasting arm, Clear Channel Radio, Clear Channel
4  reaches more than 110 million listeners nationwide every week.  According to Clear
5  Channel's 2000 Shareholder Report and its own website, www.clearchannel.com:

6              "Clear Channel *is* radio" [bold and italics in original]

7              "No one is bigger, better or more intense than Clear
8              Channel Radio"

9              Clear Channel Radio "reaches more people than the
10             population of many countries"

11             "One out of every ten radio stations across the United States
12             broadcasts under the Clear Channel's banner" [sic]

13             "Clear Channel broadcasts in every top ten market and in 47
14             of the top 50"

15             Clear Channel's stations "take to the airwaves across all 50
16             states, in almost every major market, reaching nearly every
17             demographic with dozens of distinct formats from
18             News/Talk to New Wave"

19             Clear Channel is "the first . . . and only" radio company to
20             own more than 900 radio stations

21             "Clear Channel's radio stations are powerful weapons,
22             especially when they unite to target a common goal"

23       26.    Randy Michaels, Chairman of Clear Channel's radio division, boasts that
24  Clear Channel has created "the first national footprint for radio."  Forty seven of Clear
25  Channel's radio stations are known as "Kiss-FM" reportedly part of the Company's
26  vision of creating a national radio franchise.

27       27.    Clear Channel's Premiere Radio Networks is the most widely distributed
28  and syndicated radio network in the nation, offering programming that has included

1  such highly recognizable names as Rush Limbaugh, Dr. Laura Schlessinger, Jim Rome
2  and Casey Kasem.

3       28.    Just as Clear Channel Communications' radio arm dominates the
4  airwaves, its live entertainment arm, Clear Channel Entertainment, dominates the
5  concert promotion business.  According to published reports, in 2001, Clear Channel
6  generated approximately 70% of concert ticket revenues in the U.S. and produced
7  more than 30 major music tours by such performers as U2, Madonna, Janet Jackson
8  and N'SYNC.  The list of nationwide concert tours Clear Channel has promoted reads
9  like a Who's Who in the popular music industry, and in addition to those listed above,
10  it also includes the national tours of Britney Spears, Backstreet Boys, Dave Matthews
11  Band, The Rolling Stones and Tina Turner.

12       29.    As recently as July 6, 2006, Live Nation has agreed to purchase one of its
13  biggest competitors in the concert promotion industry, House of Blues Entertainment,
14  Inc., for a reported $350 million.   This purchase will strengthen Defendants'
15  consolidation of the promotion business and thus monopolization of the relevant
16  market.

17  **D.**  **Clear Channel's Domination of the National Concert Market Results in Its**
18       **Ability To Inflate Prices in the Chicago Region**

19       30.    In August 2000, the same month that Clear Channel closed its $23.8
20  billion merger with AMFM, Clear Channel also merged with SFX Entertainment, Inc.,
21  ("SFX") in a deal valued between $2.9 - $4.6 billion.  Clear Channel continued to do
22  business as "SFX Entertainment" for almost a year following the merger but in July
23  2001 announced that it was dropping the SFX moniker and replacing it with the name
24  "Clear Channel Entertainment."

25       31.    As a result of the merger, Clear Channel immediately became the nation's
26  largest promoter and producer of live entertainment events across the country, selling
27  almost nine million tickets alone in the first half of 2001 while its next closest
28  competitor sold only about a million.

32.     Brian Becker, Chairman of Clear Channel Entertainment, attributes his company's domination of the concert promotion industry to its status as "a nationwide company with facilities in every major market and the ability to partner with [Clear Channel] radio."  According to Becker, "if you have forty markets, then you can put together national promotions."

33.     Critical decisions regarding those national promotions are made at the national level by Clear Channel.  In Clear Channel's Form 10-K, it admits that its live entertainment division is based in New York.  One commentator used the "lock, stock and sequins" cancellation of the "Supremes Reunion" tour to explain the impact which Clear Channel has had on the concert industry:

> In the past, if a tour had ticket sale problems, what would happen is that the promoters - typically local entrepreneurs - would scramble around trying to book at smaller venue so they could cut their losses.  You'd almost never see a complete cancellation, because the promoter would rather sell 40 percent of his tickets than have to come up with the full amount he'd promised the musicians out of his own pocket.  In any case, it would be a city-by-city decision.

> * * *

> Now, the concert business is owned almost exclusively by one giant corporation . . . [i]t is now virtually impossible to mount a national tour without making a deal with [Clear Channel].  More and more often the company simply "purchases" a tour, buying a band out for one big lump sum and telling 'em where they're going to play and when.  That's what [Clear Channel] did this summer with N'Sync, Ozzy Osbourne and Pearl Jam.

11

34.    Clear Channel not only acknowledges but also *boasts* about its national presence, often referring to its "national footprint."  For example, in a press release touting a new advertising sales product, Clear Channel claimed:

> "Clear Channel Advantage leverages the power of Clear Channel's unique national footprint . . .  the Clear Channel Advantage advertiser may now exploit any combination of radio, TV, outdoor and entertainment advertising or marketing opportunities across geographies as custom as a single market, a *regional trading area*, the entire country, or globally."

(emphasis supplied).

**E.      Clear Channel's Unlawful Conduct**

35.    Clear Channel has engaged in a vast array of anticompetitive, predatory and exclusionary practices in the course of acquiring, maintaining and extending its monopoly power in the relevant market.

36.    Clear Channel has eliminated competition in the relevant market by acquiring or merging with many of its principal competitors both in the radio broadcasting market and in the concert promotion market.  This includes, most notably, the AMFM and SFX mergers in August 2000, but also includes Clear Channel's more recent acquisitions of smaller promoters.

37.    Clear Channel has weakened or eliminated competition in the relevant market by hiring away from competitors experienced personnel, including representatives with well established followings in the concert promotion industry. Moreover, upon information and belief, when Clear Channel's mergers and acquisitions with other concert promoters have resulted in lay-offs, Clear Channel routinely has required personnel leaving the company to enter into non-competition agreements, thus ensuring a widespread preclusion of competition from some of the most experienced people in the business.

38.     The dynamics of FM radio broadcasting in the United States are such that many radio stations dedicate their daily programming to certain distinct musical formats, each of which attracts its own unique set of loyal listeners.  Clear Channel Communications Form 10-K, for the fiscal year ended December 31, 2000, acknowledges that "[a] station's format is important in determining the size and characteristics of its listening audience," and that "[a]dvertisers tailor their advertisements to appeal to selected population or demographic segments."

39.     Radio station formats, therefore, are critically important to promoters and the artists they promote.   According to John Scher, a director of Metropolitan Entertainment Group, a promotion company in New York which attempted to compete with Clear Channel: "It's an awesome task to compete against a company that controls most of the music radio in a market."

40.     Thus, other promoters' ability to promote their concerts on Clear Channel's stations - and the artists' ability to secure air play of their music on those stations -  can and does determine the financial success (or failure) of promoters, the artists and their concerts.  This is especially true with new artists.

41.     Clear Channel repeatedly has used it size and clout to coerce artists - including artists who had pre-existing business relationships with competitors - to use Clear Channel to promote their concerts or else risk losing airplay and other on-air promotional support on radio stations owned or otherwise controlled by Clear Channel.  Upon information and belief, because of the critical importance of having access to air play and other promotional time on Clear Channel's radio stations, which span the country and therefore can critically affect a national tour, many artists believe they have no choice but to use Clear Channel to promote their concerts.

42.     Clear Channel is leveraging its market power over certain dedicated formats of local FM radio - where it enjoys complete control over the content aired - to unlawfully acquire, maintain and extend its market power over the concert promotion business in the relevant market.  Jerry Michelson, a partner in Jam Productions, has

THIRD AMENDED CLASS ACTION COMPLAINT

publicly stated: "Clear Channel uses the leverage of their radio stations to intimidate groups to play [concerts] for them."  Such conduct has been and will continue to be devastating to Clear Channel's competitors, because access to air play and on-air promotional support is critical to the development and success of its artists and, accordingly, to the success of other promoters' concert promotion business.

43.   Clear Channel's nationwide practice of threatening to deny, and in fact denying, critical air play and other on-air promotional support to competitors' artists unless they agree to use Clear Channel to promote their concerts has caused competitors to lose many business relationships and prospective relationships.   In Southern California in 2001, the band "POD" cancelled an exclusive concert for a non-Clear Channel station because of the perceived threat that airplay on Clear Channel stations would be denied.

44.   Clear Channel's conduct has placed other promoters at a competitive disadvantage by adversely impacting their ability to attract and retain clients for their businesses.

45.   Upon information and belief, Clear Channel intends to continue and extend its anticompetitive, predatory and exclusionary conduct.   In the "Company Strategy" section of its Form 10-K, for the fiscal year ended December 31, 2000, Clear Channel Communications stated as follows: "We can now leverage our broadcasting assets to reach listeners who have an affinity for music to promote our live entertainment events and ultimately increase ticket revenue."   Similarly, Clear Channel's website states that the "opportunities for synergies" among Clear Channel's various business divisions "are explosive ... and are in the very early innings."

46.   Clear Channel has been bidding up the fees paid to artists to such levels that other promoters cannot profitably compete.   In some cases, Clear Channel has guaranteed artists more than 100 percent of gross sales to promote their concerts, leaving other promoters no choice but to either pass on such concerts or promote them at a guaranteed loss.  Upon information and belief, Clear Channel will be able (and has

THIRD AMENDED CLASS ACTION COMPLAINT

already begun) to recoup, through artificially inflated ticket prices to consumers and lower payments to artists, its losses from such tactics when other promoters are driven from the market. In an article published in The New York Times on August 12, 2002, *The Lost Boys: How A Pop Sensation Came Undone*, by Neil Strauss, it was reported that Clear Channel purchased the entire Backstreet Boys 2001 national tour for $100,000,000 and then set "extremely high ticket prices" to recoup the costs. In competing with a Denver based promoter for Bonnie Raitt concerts, Clear Channel bid more than double for the shows than the Denver based promoter and consequently charged ticket buyers far more than the $30.00 ticket price planned by the Denver promoter.

47.    Clear Channel has eschewed the historical industry practice of promoting concerts at the local level and instead has been leveraging its dominant position in radio and its control over venues to secure control over artists' entire national tours. Among other things, Clear Channel offers these artists large, up-front premiums, which other promoters cannot afford to match. Clear Channel's reach thus extends nationwide, and allows it to determine pricing of tickets on a regional basis without fear of competition or competitive pressures from other promoters or competing venues.

48.    With respect to competitors' efforts to place advertisements and otherwise promote its artists on local radio stations owned or operated by Clear Channel or its subsidiaries, Clear Channel has either limited advertising availability to undesirable time slots and placements or eliminated it completely; charged excessive advertising rates; misrepresented the availability of advertising time (e.g., by stating that Clear Channel is "out of inventory" when it actually ran its own advertisements instead); intentionally excluded artists promoted by others from their "concert calendars" (regular updates of upcoming concerts); and eliminated miscellaneous promotions (such as ticket giveaway contests) for artists not promoted by Clear Channel.

**F.      Anticompetitive Effects of Clear Channel's Unlawful Conduct**

49.    Clear Channel's monopolistic and predatory practices have had the following anticompetitive effects, among others, in the relevant market:

a.    Competition in the relevant market has been unreasonably restrained, suppressed, and, in some cases, destroyed;

b.    Potential competitors have been restrained from entering into the relevant market and have been prevented from competing effectively against Clear Channel;

c.    Clear Channel's monopoly has been entrenched and expanded, resulting in greater domination of the relevant market and the enhancement of barriers to entry;

d.    Clear Channel's unlawful leveraging of its economic strength in the FM radio business has resulted in the diversion to Clear Channel of artists who in a free and open market would otherwise turn to others for concert promotion services;

e.    Fans of music artists promoted by others have been denied the benefits of competition in a free and open market and have been forced to pay artificially high ticket prices;

f.    The airing of artists' music promoted by others has been reduced, thereby depriving consumers of entertainment they would otherwise have available to them;

g.    The on-air promotion of concerts has been reduced, thereby depriving consumers of information they otherwise would have available to them;

h.    Upon information and belief, Clear Channel has enjoyed, and will continue to enjoy, monopolistic profits to the detriment of competitors and purchasers of concert tickets from Clear Channel;

16

i.    Although the price of tickets within the Chicago Region may be different, Clear Channel's monopolistic behavior has raised ticket prices in the Chicago Region in a measurable amount and, therefore, Clear Channel's behavior has impacted and injured the Class in its entirety, regardless of the particular venue of an individual concert.

50.    The aforementioned anticompetitive effects of Clear Channel's conduct on competition in the relevant market outweigh any conceivable pro-competitive benefits.

## CLASS ACTION ALLEGATIONS

51.    Plaintiff brings this action pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of herself and the following Class:

All persons who purchased tickets to any live rock concert in the Chicago Region directly from any of the Defendants or their affiliates or predecessors or agents during the period from June 19, 1998 to the present.

The Class does not include, Defendants, their respective parents, subsidiaries and affiliates and any judge or magistrate presiding over this action and members of their families within the third degree of relationship.

52.    Plaintiff does not know the exact size of the Class since such information is exclusively in the control of Defendants.  However, due to the nature of the trade and commerce involved and the size of the venues owned, operated and/or exclusively programmed by Clear Channel in the Chicago Region, Plaintiff believes that there are thousands of Class members, and that they are sufficiently numerous and geographically dispersed throughout the United States so that joinder of all Class members is impracticable.

53.    Plaintiff's claims are typical of the claims of the members of the Class, because Plaintiff and all Class members were damaged by the same wrongful conduct of Defendants as alleged in this Complaint.

54.    Plaintiff will fairly and adequately protect the interests of the Class. The interests of Plaintiff coincide with, and are not antagonistic to, those of the Class.  In addition, Plaintiff is represented by counsel who are experienced and competent in the prosecution of complex class action and antitrust litigation.

55.    Questions of law and fact common to members of the Class predominate over any questions which may affect only individual members.  Common questions of law and fact include:

      a.    whether the relevant market consists of the market for the sale of tickets to live rock concerts in the Chicago Region;

      b.    whether Defendants have monopolized and attempted to monopolize the relevant market;

      c.    whether Defendants intentionally and unlawfully excluded competitors and potential competitors from the relevant market;

      d.    whether Defendants' unlawful conduct caused Plaintiff and the Class members to pay more for concert tickets than they otherwise would have paid;

      e.    whether Plaintiff and members of the Class are entitled to declaratory, equitable and/or injunctive relief; and

      f.    whether Plaintiff and the Class have been damaged and the amount of such damages.

56.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender.  The

THIRD AMENDED CLASS ACTION COMPLAINT

1   benefits of proceeding through the class mechanism, including providing injured

2   persons or entities with a method for obtaining redress for claims that might not be

3   practicable to pursue individually, substantially outweigh any difficulties that may arise

4   in management of this class action.

5        57.    Plaintiffs know of no difficulty to be encountered in the litigation of this

6   action that would preclude its maintenance as a class action.

7                 **FIRST CLAIM FOR RELIEF**

8      **(Violation of 15 U.S.C. § 2 Sherman Act Section 2 - Monopolization)**

9        58.    Plaintiff incorporates by reference the allegations contained in paragraphs

10   1 through 57 above.

11        59.    Clear Channel has monopoly power in the relevant market and has the

12   ability to control prices and exclude competition.

13        60.    There are high entry barriers associated with the business of promoting

14   concerts in the United States, including, among others, the industry expertise required

15   to promote such concerts; the ability to develop a reputation in the industry as being a

16   competent promoter; access to artists and the ability to develop relationships with

17   them; access to the radio airwaves; access to concert venues; the goodwill and name

18   recognition of Clear Channel achieved via advertising and other means; financial

19   wherewithal; and the position which Clear Channel now occupies as a monopoly

20   promoter in the U.S. and in the Chicago Region with respect to nationwide tours

21        61.    Through its mergers and acquisitions and other anticompetitive conduct

22   described above, Clear Channel has willfully acquired and maintained monopoly

23   power with the intent to gain an unfair competitive advantage and charge supra-

24   competitive prices for tickets in the relevant market.  Clear Channel continues to

25   dominate this market through the unlawful conduct described above, to the detriment

26   of Plaintiff and the Class.

27

28

1    62.    During the Class Period, by the conduct described herein, Defendants

2   engaged in exclusionary, anticompetitive conduct designed to prevent competition in

3   the relevant geographic and product market.

4    63.    The foregoing acts and conduct by Defendants have prevented or

5   suppressed competition, and continue to prevent or suppress competition, in violation

6   of Section 2 of the Sherman Act, 15 U.S.C. § 2.

7    64.    As a direct and proximate result of Clear Channel's monopolistic conduct,

8   competition in the relevant market has been unreasonably restrained and injured, and

9   consumers have been damaged through the supra-competitive ticket prices they have

10  been charged and will continue to be charged.  Plaintiff and the members of the Class

11  have suffered and will continue to suffer damages as a result of Clear Channel's

12  wrongdoing as alleged herein.

13                  **SECOND CLAIM FOR RELIEF**

14     **(Violation of 15 U.S.C. § 2 - Sherman Act Section 2 - Attempted**

15                        **Monopolization)**

16    65.    Plaintiff incorporates by reference the allegations contained in paragraphs

17  1 through 64 above.

18    66.    Clear Channel has engaged in the predatory and anticompetitive conduct

19  described above with the specific intent to monopolize the relevant market.

20    67.    Clear Channel possesses, and has demonstrated, a dangerous probability

21  of achieving monopoly power in the relevant market.  Clear Channel continues to

22  dominate this market through the unlawful conduct described above, to the detriment

23  of Plaintiff and the Class.

24    68.    As a direct and proximate result of Clear Channel's monopolistic conduct,

25  competition in the relevant market has been unreasonably restrained and injured, and

26  Plaintiff and the members of the Class have paid supra competitive prices for tickets.

27  As a result of Defendant's unlawful conduct, Plaintiff and members of the Class have

28  suffered and will continue to suffer damages.

THIRD AMENDED CLASS ACTION COMPLAINT

## THIRD CLAIM FOR RELIEF

### (Unjust Enrichment)

69.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 68 above.

70.    As a direct and proximate result of the unlawful conduct described above, Clear Channel has been and will continue to be unjustly enriched. Clear Channel's unlawful acts, including tying and the use of monopoly power, are designed to extract supra-competitive prices for concerts from ticket purchasers. Specifically, Clear Channel has been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and illegal monopoly profits on its sale of concert tickets.

71.    Clear Channel has benefited from its unlawful acts and it would be inequitable for Clear Channel to be permitted to retain any of the ill-gotten gains resulting from the overpayments for concert tickets made by Plaintiff and the Class.

72.    Plaintiff and members of the Class are entitled to the amount of Clear Channel's ill-gotten gains resulting from its unlawful, unjust and inequitable conduct. Plaintiff and members of the Class are entitled to the establishment of a constructive trust consisting of all overcharges from which Plaintiff and the Class members may make claims on a pro rata basis.

73.    Plaintiff and the Class have no adequate remedy at law.

WHEREFORE, Plaintiff prays that:

A.    The Court determines that this action may be maintained as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure with respect to Plaintiff's claims for injunctive relief, and Rule 23(b)(3) of the Federal Rules of Civil Procedure with respect to the claims for damages, and declaring Plaintiff as the representative of the Class and her counsel as counsel for the Class;

B.    The Court declares the conduct alleged herein to be unlawful in violation of the federal antitrust laws and the common law of unjust enrichment;

C.    Plaintiff and each member of the Class recover punitive and treble damages to the extent such are provided by the law;

D.    Plaintiff and each member of the Class recover the amounts by which the Defendants have been unjustly enriched in accordance with state law;

E.    Defendants be enjoined from continuing the illegal activities alleged herein;

F.    Plaintiff and the Class recover their costs of suit, including reasonable attorneys' fees and expenses as provided by law; and

G.    Plaintiff and the Class be granted such other, further, and different relief as the nature of the case may require or as may be determined to be just, equitable and proper by this Court.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury.

DATED:  March 27, 2007

MALINDA RILEY, individually and on behalf of all others similarly situated,

By: _Elaine T. Byszewski_
        Elaine T. Byszewski

Elaine T. Byszewski
Lee M. Gordon
HAGENS BERMAN SOBOL
SHAPIRO LLP
700 S. Flower Street
Suite 2940
Los Angeles, CA 90017

-and-

THIRD AMENDED CLASS ACTION COMPLAINT

Elizabeth A. Fegan
Timothy P. Mahoney
HAGENS BERMAN SOBOL
SHAPIRO LLP
60 N. Randolph
Suite 200
Chicago, IL 60601

**_Liaison Counsel for Plaintiffs_**


Lee Squitieri
Maria Ciccia
SQUITIERI & FEARON LLP
32 East 57th Street, 12th Floor
New York, NY 10022

**_Interim Co-Lead Counsel and Executive Committee Members_**


Lance Harke
Howard Bushman
HARKE & CLASBY
155 S. Miami Avenue
Suite 600
Miami, FL 33130

**_Executive Committee Members_**


Nicholas Chimicles
James Malone
Michael Gottsch
CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19401

THIRD AMENDED CLASS ACTION COMPLAINT

Hollis Salzman
Kellie Safar
LABATON SUCHAROW &
RUDOFF LLP
100 Park Avenue
New York, NY 10017


Jeffrey Kodroff
Rachel Kopp
SPECTOR, ROSEMAN &
KODROFF, P.C.
1818 Market Street
Suite 2500
Philadelphia, PA 19103


Kenneth A. Wexler
Jennifer Fountain Connolly
Mark J. Tamblyn
Mark R. Miller
WEXLER TORISEVA
WALLACE LLP
One N. LaSalle Street
Suite 2000
Chicago, IL 60602

THIRD AMENDED CLASS ACTION COMPLAINT

# PROOF OF SERVICE

I, the undersigned, declare and state:

That the decelarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of Los Angeles, over the age of 18 years, and not a party to or interested in the within action; that declarant's business address is 700 S. Flower St., Ste. 2940, Los Angeles, CA 90017-4101.

On March 27, 2007, I served the forgoing document described as

## THIRD AMENDED CLASS ACTION COMPLAINT

on all interested parties in this action as follows:

[x]   **BY OVERNIGHT DELIVERY**

By placing a true copy thereof enclosed in sealed envelopes addressed as follows:   **SEE ATTACHED SERVICE LIST**.   After sealing said envelope, declarant caused same to be delivered to the aforementioned by a qualified commercial overnight delivery service with delivery fees thereon fully prepaid

[x]   **BY EMAIL**

By causing the above listed documents to be served via E-MAIL from Kevin G. Acosta to the e-mail addresses as follows: **SEE ATTACHED SERVICE LIST**

I declare under the penalty of perjury, under the laws of the United States of America that the foregoing is true and correct.

Executed on March 27, 2007, at Los Angeles California.

Kevin G. Acosta

25

# SERVICE LIST

In re: Live Concert Antitrust Litigation
CASE NO.: 2:06-ML-01745 SVW-(RCx)
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

## PLAINTIFFS

## LIAISON COUNSEL FOR PLAINTIFFS

Lee M. Gordon
Elaine T. Byszewski
**HAGENS BERMAN SOBOL
    SHAPIRO LLP**
700 South Flower Street, Suite 2940
Los Angeles, CA 90017-4101
Telephone: (213) 330-7150
Facsimile: (213) 330-7152
Via Email:   elaine@hbsslaw.com
                 lee@hbsslaw.com

Steve W. Berman
**HAGENS BERMAN SOBOL
    SHAPIRO LLP**
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
Via Email:   steve@hbsslaw.com

## INTERIM CO-LEAD COUNSEL AND EXECUTIVE COMMITTEE MEMBERS

Elizabeth A. Fegan
Timothy P. Mahoney
**HAGENS BERMAN SOBOL
    SHAPIRO LLP**
60 West Randolph Street, Suite 200
Chicago, IL 60601
Telephone: (312) 762-9237
Facsimile: (312) 762-9286
Via Email:   beth@hbsslaw.com

Kenneth A. Wexler
Jennifer Fountain Connolly
Mark J. Tamblyn
Mark R. Miller
**WEXLER TORISEVA WALLACE
LLP**
One North LaSalle Street, Suite 2000
Chicago, IL 60602
Telephone: (312) 346-2222
Facsimile: (312) 346-0222
Via Email:   kaw@wtwlaw.us
                 jfc@wtwlaw.us

THIRD AMENDED CLASS ACTION COMPLAINT

Lee Squitieri
Stephen Fearson
**SQUITIERI & FEARON, LLP**
32 E. 57th Street, 12th Floor
New York, NY 10022
Telephone: (212) 421-6492
Facsimile: (212) 421-6553
Via Email:   lee@SFClasslaw.com
             stephen@SFClasslaw.com

## EXECUTIVE COMMITTEE MEMBERS

Hollis Salzman
Kellie Safar
**LABATON SUCHAROW & RUDOFF
LLP**
100 Park Avenue
New York, NY 10017
Via Email:   hsalzman@labaton.com

Jeffrey Kodroff
Rachel Kopp
**SPECTOR, ROSEMAN &
KODROFF, P.C.**
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Via Email:   ikodroff@srk-law.com

Lance Harke
**HARKE & CLASBY**
155 S. Miami Avenue
Suite 600
Miami, FL 33130
Via Email:   lharke@harkeclasby.com

Nicholas Chimicles
James Malone
Michael Goitsch
**CHIMICLES & TIKELLIS LLP**
361 W. Lancaster Avenue
Haverford, PA 19401
Email: jamesmalone@chimicles.com

## COUNSEL FOR DEFENDANTS

James F. Speyer
**HELLER EHRMAN LLP**
333 South Hope Street, 39th Floor
Los Angeles, CA 90071
Telephone: (213) 689-0200
Facsimile: (213) 614-1868
Via Email:
james.speyer@hellerehrman.com

Jonathan M. Jacobson
Anthony Geritano
**WILSON SONSINI GOODRICH
& ROSATI**
12 East 49th Street
New York, NY 10017
Telephone: (212) 999-5800
Facsimile: (212) 999-5899
Via Email:   jjacobson@wsgr.com
             ageritano@wsgr.com

THIRD AMENDED CLASS ACTION COMPLAINT