

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| IN RE: LIVE CONCERT ANTITRUST LITIGATION | ) ) ) | Case No: 06-ML-1745-SVW (RCx) |
| THIS DOCUMENT RELATES TO: | ) ) | ORDER GRANTING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION [79] AND DENYING DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS [74] |
| MARGARET THOMPSON v. CLEAR CHANNEL COMMUNICATIONS, INC., (CV 05-6704-SVW (Rcx)) | ) ) ) | |
| MALINDA RILEY v. CLEAR CHANNEL COMMUNICATIONS, (CV 06-2381-SVW (RCx)) | ) ) ) ) | |
| HAYES YOUNG v. CLEAR CHANNEL COMMUNICATIONS, INC., (CV 06-3701-SVW (RCx)) | ) ) ) ) | |
| ADAM ROSEN v. CLEAR CHANNEL COMMUNICATIONS, INC., (CV 06-3965-SVW (Rcx)) | ) ) ) | |
| LAUREN HAMMER v. CLEAR CHANNEL COMMUNICATIONS, INC., (CV 06-4987-SVW (RCx)) | ) ) ) | |

///

///

## I.  INTRODUCTION

This Multi-District Litigation ("MDL") consists of twenty-two class actions from across the country against Defendant Clear Channel Communications, Inc. and its subsidiaries.[1] The Plaintiffs, individuals who purchased tickets to live rock concerts, allege that Clear Channel and its subsidiaries engaged in unlawful and anticompetitive activities to acquire, maintain, and extend its monopoly power in various regional ticket markets for live rock concerts.  In each of the twenty-two class actions, the Plaintiffs filed substantively identical complaints which allege three causes of

---

[1] Margaret Thompson v. Clear Channel Communications, Inc., CV 05-6704-SVW (RCx) (Southern California Region); Malinda Riley v. Clear Channel Communications, CV 06-2381-SVW (RCx) (Chicago Region); Priscilla Diaz v. Clear Channel Communications, Inc., CV 06-2380-SVW (RCx) (South Florida Region); Mark Cooperberg v. Clear Channel Communications, Inc., CV 06-2382-SVW (RCx) (Philadelphia Region); Hayes Young v. Clear Channel Communications, Inc., CV 06-3701-SVW (RCx) (New York/New Jersey Region); Adam Rosen v. Clear Channel Communications, Inc., CV 06-3965-SVW (RCx) (New England Region); Nicole Latour v. Clear Channel Communications Inc., CV 06-4973-SVW (RCx) (Northern California Region); James Friedman v. Clear Channel Communications, Inc., CV 06-4974-SVW (RCx) (Michigan Region); Corey Rosen v. Clear Channel Communications, Inc., CV 06-4980-SVW (RCx) (Northern California Region); Jennifer Zbytowski v. Clear Channel Communications, Inc., CV 06-4985 (RCx) (Michigan Region); Lauren Hammer v. Clear Channel Communications, Inc., CV 06-4987-SVW (RCx) (Colorado Region); Coya Bailey v. Clear Channel Broadcasting, Inc., CV 06-4990-SVW (RCx) (Carolina Region); Daniel Hull v. Clear Channel Communications, Inc., CV 06-5000-SVW (RCx) (Atlanta Region); Terry Leitner v. Clear Channel Communications, Inc., CV 06-5008 (RCx) (Middle Ohio River Basin Region); Kevin MacLaughlan v. Clear Channel Communications, Inc., CV 06-5012 SVW (RCx) (New England Region); Daniel Woodring v. Clear Channel Communications, Inc., CV 06-5018-SVW (RCx) (Middle Ohio River Basin Region); Melissa Lewis v. Clear Channel Communications, Inc., CV 06-5024-SVW (RCx) (Philadelphia Region); Graham Sevier-Schultz v. Clear Channel Communications, Inc., CV 06-5058 (RCx) (Houston Region); Katherine Ludt v. Clear Channel Communications, Inc., CV 06-5091-SVW (RCx) (Wisconsin Region); Julie Walker v. Clear Channel Communications, Inc., CV 06-5653-SVW (RCx) (District of Columbia Region); Cheryl Hintzen v. Clear Channel Communications, Inc., CV 06-7522-SVW (RCx) (Arizona Region); Judy Kent v. Clear Channel Communications, Inc., CV 06-7523-SVW (RCx) (Seattle Region).

1  action: (1) monopolization in violation of 15 U.S.C. § 2; (2)

2  attempted monopolization in violation of 15 U.S.C. § 2; and (3) unjust

3  enrichment.  Plaintiffs seek damages and injunctive relief.

4      For purposes of efficiency, the Court ordered that discovery be

5  initially limited to the five regional markets of Boston, Chicago,

6  Denver, Los Angeles, and New Jersey/New York.  See (Order Narrowing

7  the Scope of Class Discovery, Nov. 1, 2006.)  The Court ordered the

8  Plaintiffs to file motions for class certification in these five

9  markets pursuant to an attached discovery schedule.  (Id.)

10     Plaintiffs filed motions for class certification in the five test

11 cities on March 7, 2007.  Defendant filed a motion for judgment on the

12 pleadings on Plaintiffs' second cause of action on March 6, 2007.  The

13 Court held a hearing on June 4, 2007 at which time both parties

14 presented expert testimony.  The Court ordered the parties to submit

15 supplemental briefing concerning class certification following the

16 hearing.  Both Plaintiffs and Defendants also supplemented the class

17 certification record with additional evidence following the hearing.

18

19 II.  FACTUAL ALLEGATIONS

20     The Plaintiffs allege that Defendant Clear Channel engaged in

21 unlawful and anticompetitive activities to acquire, maintain, and

22 extend its monopoly power in various regional markets for live rock

23 concerts.

24     A.  The Parties

25     Plaintiff Malinda Riley is a resident of Chicago, Illinois.

26 (Riley Compl. ¶ 9.)  Plaintiff Margaret Thompson is a resident of Los

27 Angeles, California.  (Thompson Compl. ¶ 9.)  Plaintif Lauren Hammer

28

is a resident of Boulder, Colorado. (Hammer Compl. ¶ 9.)    Plaintiff
Kevin MacLaughlan is a resident of Medford, Massachusetts.
(MacLaughlan Compl. ¶ 9.)  Plaintiff Hayes Young is a resident of New
Jersey.  (Young Compl. ¶ 9.)  All of the Plaintiffs purchased one or
more tickets to rock concerts promoted by Defendants in their
respective regions during the defined class period.  (Riley Compl. ¶
9; Thompson Compl. ¶ 9; Hammer Compl. ¶ 9; Young Compl. ¶ 9;
MacLaughlan Compl. ¶ 9.)

Defendant Clear Channel Communications, Inc. ("Clear Channel
Communications") was incorporated in Texas with its principal place of
business in Texas.  (Riley Compl. ¶ 10.)[2] Defendant Clear Channel
Radio, Inc. ("Clear Channel Radio") is a wholly-owned subsidiary of
Clear Channel Communications. (Riley Compl. ¶ 12.)  Clear Channel
Radio was incorporated in Nevada with its principal place of business
in Kentucky. (Riley Compl. ¶ 12.)  Defendant Clear Channel
Broadcasting, Inc. ("Clear Channel Broadcasting") was incorporated in
Nevada with its principal place of business in Texas.  (Riley Compl. ¶
13.)

SFX Entertainment, Inc. ("SFX") was one of the world's largest
promoters and venue operators for live entertainment events in the
late 1990s.  (Riley Compl. ¶ 14.)  Clear Channel Communications
acquired SFX in 2000 and changed SFX's name to Clear Channel
Entertainment, Inc. ("Clear Channel Entertainment") in July 2001.
(Riley Compl. ¶¶ 11, 14.)  Clear Channel Entertainment is a wholly-

---

[2]  Because the complaints in the cases are substantively identical
except for the named plaintiffs and the geographic region, the Court
refers to the complaint in Malinda Riley v. Clear Channel
Communications, et. al., CV 06-2381-SVW (RCx) (Chicago Region) for
purposes of convenience.

1   owned subsidiary of Clear Channel Communications and was incorporated

2   in Delaware with its principal place of business in New York. (Riley

3   Compl. ¶¶ 11,14.)  In December 2005, Clear Channel Communications

4   spun-off Clear Channel Entertainment as a publicly traded company

5   named Live Nation, Inc. ("Live Nation"). Live Nation was incorporated

6   in Delaware with its headquarters in California. (Riley Compl. ¶ 14.)

7   When all of the Defendants are referenced collectively, the Court will

8   refer to them as "Clear Channel."

9       B.  The Concert Promotion Industry

10      Musical artists contract with booking agents to serve as the

11  artists' authorized representatives concerning the booking of live

12  concerts.  (Riley Compl. ¶ 19.)  Booking agents "sell" concerts to

13  concert promoters.  (Id.)  The concert promoter subsequently "resells"

14  the concert to the public in the form of a concert ticket.  (Id.)

15      The concert promoter is financially responsible for the concert.

16  For example, the concert promoter is responsible for advertising and

17  marketing the concert (e.g. promoting the concert on the radio).  (Id.

18  ¶ 20.)  Also, the concert promoter is responsible for concert expenses

19  such as transportation, hotel costs, sound and lighting equipment,

20  security, ushers, ticket takers, and stage managers.  (Id.)

21  Additionally, the concert promoter is responsible for securing the

22  venue for the concert.  (Id.)  Whether the promoter earns a profit

23  depends on the revenue generated from ticket sales and other sources

24  of income such as sponsorship deals, food and beverage sales, and

25  merchandise sales.  (Id. ¶ 21.)

26      C.  Overview of Clear Channel Communications

27      Clear Channel Communications is a publicly-traded, multimedia

28  corporation. Clear Channel is the largest owner of radio stations in

the United States.  (Riley Compl. ¶ 24.)  The 1200 radio stations
owned or programmed by Defendant dwarfs its next largest radio
competitor, Infinity Broadcasting Corp., which operates only 183
stations.  (Id.)  Clear Channel's radio stations reach more than 110
million listeners nationwide each week.  (Riley Compl. ¶ 25.)

As noted above, Clear Channel entered the live entertainment
business in August 2000 when it acquired SFX Entertainment, Inc.[3]
(Riley Compl. ¶ 23.)  SFX was one of the largest national concert
promoters following SFX's acquisition of several independent concert
promoters in 1997.  (Id. ¶ 23.)  With the acquisition of SFX, Clear
Channel generates approximately 70% of concert ticket revenue in the
United States.  (Id. ¶ 28.)  Clear Channel produces more than 26,000
live entertainment events per year, and owns or controls more than 135
live entertainment venues.  (Id. ¶ 24.)  Clear Channel produced major
music tours including U2, Madonna, Janet Jackson, N'SYNC, Britney
Spears, Backstreet Boys, Dave Matthews Band, The Rolling Stones, and
Tina Turner.  (Id. ¶ 28.)

Clear Channel also operates more than 700,000 outdoor
advertising displays, such as billboards, and owns or operates more
than 19 television stations.  (Riley Compl. ¶ 24.)

D.  Alleged Anticompetitive Conduct

Plaintiffs allege that "Clear Channel has engaged in a vast array
of anticompetitive, predatory and exclusionary practices in the course
of acquiring, maintaining and extending its monopoly power in the
relevant market."  (Riley Compl. ¶ 35.)  First, Plaintiffs claim that
Clear Channel substantially eliminated competition in the radio and

---

[3]  As noted above, Clear Channel changed SFX's name to Clear Channel
Entertainment.

concert promotion markets.  For example, Clear Channel increased its

market power through the acquisition or merger of primary competitors

such as the AM/FM and SFX mergers.  (Id. ¶ 36.)

Second, Plaintiffs allege that Clear Channel has leveraged its

market power in the radio market to increase its market power in the

concert promotion market.  Specifically, Plaintiffs claim that "Clear

Cannel repeatedly has used it [sic] size and clout to coerce artists -

including artists who had pre-existing business relationships with

competitors - to use Clear Channel to promote their concerts or else

risk losing airplay and other on-air promotional support on radio

stations owned or otherwise controlled by Clear Channel."[4]  (Id. ¶

41.)  Airplay of music and concert promotion on radio stations can

determine the financial success of a concert. (Id. ¶ 40.)

Similarly, Plaintiffs claim that Clear Channel Radio has limited

advertising availability, charged excessive advertising rates, and

misrepresented the availability of advertising to competing promoters

and artists not promoted by Clear Channel.[5]  (Id. ¶ 48.)

Finally, Plaintiffs allege that Clear Channel bids up the fees

for artists to levels at which competing promoters cannot compete.

For example, Plaintiffs claim that Clear Channel will guarantee

artists more than 100 percent of gross sales in exchange for the right

to promote the artist's concert. (Id. ¶ 46.)  As a result, competing

---

[4] Similar allegations were made in Nobody in Particular Presents, Inc. v. Clear Channel Communications, Inc., 311 F. Supp. 2d 1048, 1061-1065 (D. Colo. 2004).

[5] Similar allegations were made in Heerwagen v. Clear Channel Communications, 435 F.3d 219, 224 (2d Cir. 2006).

1 │ producers must either pass on such artists or promote the artists at a

2 │ guaranteed loss.[6]  (Id.)

3 │    E.  Alleged Effects of Clear Channel's Conduct

4 │     Plaintiffs claim that Clear Channel's conduct had various

5 │ anticompetitive effects on the concert promotion industry.  For

6 │ example, Plaintiffs allege that Clear Channel's conduct has restrained

7 │ potential competitors from entering and competing in the market.

8 │ (Riley Compl. ¶ 49.)   Plaintiffs claim that they suffered damage by

9 │ being charged supra-competitive ticket prices by Clear Channel.

10 │ (Riley Compl. ¶¶ 64, 68.)

11 │

12 │ **III.  PROCEDURAL HISTORY**

13 │    A.  New York Litigation

14 │     In 2002, Plaintiff Melinda Heerwagen filed a civil antitrust

15 │ action against Defendant Clear Channel in the Southern District of New

16 │ York.  Heerwagen v. Clear Channel Entm't, Inc., 2003 WL 24467832, at

17 │ *1 (S.D.N.Y. Aug. 13, 2003).  Heerwagen alleged that Clear Channel

18 │ engaged in unlawful and anticompetitive activities to acquire,

19 │ maintain, and extend its monopoly power in the national ticket market

20 │ for live rock concerts.  The district court ruled that the relevant

21 │ market was local, rather than national, and therefore denied the

22 │ petition for class certification.  The court explained that proof

23 │ specific to individual putative class members in different geographic

24 │ markets would predominate over common questions of law and fact.  Id.

25 │

26 │ [6] Although not mentioned in the complaints, in Plaintiffs' motion for
   │ class certification the Plaintiffs allege that Clear Channel used its
27 │ control of concert venues to monopolize the market. (Pl.'s Mem. at 9-
   │ 10.)  For example, Plaintiffs claim that Clear Channel refuses to rent
28 │ its venues to other promoters.  (Id.)

1  The Second Circuit affirmed the district court's denial of class

2  certification based on the plaintiff's failure to show that the live

3  rock concert ticket market was national. <u>Heerwagen v. Clear Channel</u>

4  <u>Communications</u>, 435 F.3d 219, 227 (2d Cir. 2006). Because the Second

5  Circuit held that the plaintiff failed to demonstrate live rock

6  concerts constitute a single geographic market national in scope, the

7  Second Circuit did "not address the issue of whether the rock concert

8  ticket market is a single product market." <u>Id.</u>

9  B.  MDL Litigation

10  On September 12, 2005, Plaintiff Margaret Thompson filed a

11  complaint against Defendant Clear Channel in this Court. <u>Margaret</u>

12  <u>Thompson v. Clear Channel Communications, Inc., et al.</u>, CV 05-6704-SVW

13  (RCx) (Southern California Region). Similar to <u>Heerwagen</u>, Plaintiff

14  Thompson alleged that Clear Channel and its subsidiaries engaged in

15  unlawful and anticompetitive activities to acquire, maintain, and

16  extend its monopoly power in various regional ticket markets for live

17  rock concerts.  The only difference between Thompson's complaint and

18  <u>Heerwagen</u> is that Thompson defined the putative class as encompassing

19  the Southern California region whereas the putative class in <u>Heerwagen</u>

20  was national.

21  Pursuant to 28 U.S.C. § 1407, the Judicial Panel on Multidistrict

22  Litigation transferred related actions pending outside the Central

23  District of California to this Court on April 19, 2006. (Transfer

24  Order, Apr. 19, 2006.)  A total of twenty-one cases were eventually

25  transferred to this Court. <u>See</u> <u>infra</u> n.1.  In each of the twenty-two

26  class actions, the Plaintiffs filed substantively identical

27  complaints.

28

9

1    For purposes of efficiency, the Court ordered that discovery be

2  initially limited to the five regional markets of Boston, Chicago,

3  Denver, Los Angeles, and New Jersey/New York.  <u>See</u> (Order Narrowing

4  the Scope of Class Discovery, Nov. 1, 2006.)  Plaintiffs filed motions

5  for class certification in the five test cities on March 7, 2007.

6  Defendant filed a motion for judgment on the pleadings on Plaintiffs'

7  second cause of action on March 6, 2007.

8

9  **IV. CHOICE OF LAW**

10    A difficult initial question is determining which circuit's law

11  applies when resolving questions of federal law in this multi-district

12  litigation.[7]  The Manual for Complex Litigation (4th ed. 2004)

13  provides the following instruction about choice of law:

14        Complexities may arise where the rulings turn on questions of

15        substantive law.  In diversity cases, the law of the transferor

16        district follows the case to the transferee district.  Where the

17        claim or defense arises under federal law, however, the

18        transferee judge should consider whether to apply the law of the

19        transferee circuit or that of the transferor court's circuit,

20        keeping in mind that statutes of limitations may present unique

21        problems.

22  § 20.132.

23    Prior to 1987, numerous courts applied the law of the transferor

24  jurisdiction in MDL proceedings involving federal law.  <u>See</u> <u>In re The</u>

25  <u>Dow Company "Sarabond" Prods. Liab. Litig.</u>, 666 F. Supp. 1466, 1468

26  n.3 (D. Colo. 1987) (listing cases applying law of the transferor

27  _____

[7]  Complicating the Court's analysis is the fact that none of the

28  parties briefed this issue in any of the motions.

1  jurisdiction).  In 1987, the D.C. Circuit ruled that the law of the

2  transferee applies when construing federal law in an opinion authored

3  by then Judge Ruth Bader Ginsburg.  In re Korean Air Lines Disaster,

4  829 F.2d 1171 (D.C. Cir. 1987).  Specifically, the D.C. Circuit held:

5         The federal courts spread across the country owe respect to each

6         other's efforts and should strive to avoid conflicts, but each

7         has an obligation to engage independently in reasoned analysis.

8         Binding precedent for all is set only by the Supreme Court, and

9         for the district courts within a circuit, only by the court of

10        appeals for that circuit. . . . the law of a transferor forum on

11        a federal question - here, the law of the Second Circuit - merits

12        close consideration, but does not have stare decisis effect in a

13        transferee forum situated in another circuit.

14  Id. at 1176.  The D.C. Circuit based its determination on four

15  grounds.  First, the Court determined that prior federal courts had

16  based their decision on an inapplicable Supreme Court opinion

17  involving state choice-of-law issues rather than federal choice-of-law

18  issues.  Id. at 1173-1175.  Second, the Court found that "[a]pplying

19  divergent interpretations of the governing federal law to plaintiffs,

20  depending solely upon where they initially filed suit, would surely

21  reduce the efficiencies achievable through consolidated preparatory

22  proceedings."  Id. at 1175.  Third, the Court determined that it would

23  be "inherently self-contradictory" and "logically inconsistent to

24  require one judge to apply simultaneously different and conflicting

25  interpretations of what is supposed to be a unitary federal law."  Id.

26  at 1175-76.  Finally, the Court explained that "'[i]f . . . more than

27  one interpretation of federal law exists, the Supreme Court of the

28  United States can finally determine the issue and restore uniformity

11

in the federal system.'" Id. at 1176 (quoting In re Korean Air Line Disaster of Sept. 1, 1983, 664 F. Supp. 1488, 1489 (D.D.C. 1983))

Following the D.C. Circuit's decision, circuit and district courts, including the Ninth Circuit, have uniformly applied the law of the transferee circuit in MDL proceedings involving federal law. See, e.g., Newton v. Thomason, 22 F.3d 1455, 1460 (9th Cir. 1994); Temporomandibular Joint (TMJ) Implant Recipients v. E.I. Du Pont de Nemours & Co., 97 F.3d 1050, 1055 (8th Cir.1996); Murphy v. F.D.I.C., 208 F.3d 959, 964-65 (11th Cir. 2000); Bradley v. United States, 161 F.3d 777, 782 n.4 (4th Cir.1998); Menowitz v. Brown, 991 F.2d 36, 40-41 (2d Cir.1993); Eckstein v. Balcor Film Investors, 8 F.3d 1121, 1126 (7th Cir.1993). See also In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig., 2005 WL 106936 at *4 n.37 (S.D.N.Y. Jan. 18, 2005) (listing examples of district court opinions holding that questions of federal law are governed by the law of the transferee circuit). For example, in Newton the Ninth Circuit held that "when reviewing federal claims, a transferee court in this circuit is bound only by our circuit's precedent." 22 F.3d at 1460. The Court follows the approach mandated by Newton and Korean Air Line Disaster.[8]

---

[8] The Court recognizes that the district court in In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig., 241 F.R.D. 185, 193 (S.D.N.Y. 2007) concluded that it was required to apply the law of the transferor circuit in resolving a motion for class certification, even though the same district court had previously held that the court was only bound by the law of the transferee court in a motion to dismiss in the same case. In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liability Litig., 2005 WL 106936 (S.D.N.Y. Jan. 18, 2005). However, this Court is not bound by MTBE and the reasoning of MTBE is unpersuasive for several reasons.

The MTBE court reasoned that the Supreme Court's decision in Lexecon v. Milberg Weiss Bershad Hynes & Lerach, 523 U.S. 26 (1998) undermined the Second Circuit's decision in Menowitz v. Brown, which held that the law of the transferee circuit applied in a MDL. MTBE, 241 F.R.D. at 191-92. In Lexecon, the Supreme Court held that

transferee courts were prohibited from retaining § 1407 cases for trial through a self-transfer under § 1404. 523 U.S. at 40. The Court held that § 1407 required the transferee court to remand all cases to the transferor courts at the conclusion of pretrial proceedings. Id. The MTBE court found that Lexecon undercut the reasoning of Menowitz.

The MTBE court is correct that one rationale offered in support of applying the law of the transferee circuit was that the vast majority of cases were resolved prior to trial or otherwise self-transferred under § 1404 to the transferee court for joint trial. See, e.g., In re Korean Airlines, 829 F.2d at 1176-86 (D.H. Ginsburg, J., concurring). This rationale is undermined by Lexecon. However, as explained above, decisions such as In re Korean Airlines have offered numerous other rationales for applying the law of the transferee circuit such as the reduction in efficiency of forcing a court to apply divergent interpretations of governing federal law and the logical inconsistency of requiring one judge to apply simultaneously different and conflicting interpretations of what is supposed to be a unitary federal law. 829 F.2d at 1173-76. The Ninth Circuit relied on In re Korean Airlines, rather than the rationale undermined by Lexecon. Newton, 22 F.3d at 1460 ("[I]n resolving an identical question under 28 U.S.C. § 1407, the D.C. Circuit correctly pointed out that '[b]inding precedent for all [courts] is set only by the Supreme Court, and for the district courts within a circuit, only by the court of appeals for that circuit [in the absence of Supreme Court authority].') (quoting In re Korean Air Lines Disaster, 829 F.2d at 1176 ). Therefore, the Court concludes that Newton's holding continues to control because the reasoning of In re Korean Airlines is not undermined by Lexecon.

Second, the MBTE court reasoned that "[i]t would be neither just nor efficient to apply the law of this Circuit in considering class certification, and then force the transferor court to try a class action that it might never have certified." 241 F.R.D. at 193. However, the D.C. Circuit rejected this argument in In re Korean Airlines and explained that forcing the transferor court to apply the law of the transferee court promotes efficiency:

> Should the several cases consolidated for pretrial preparation in the instant proceeding eventually return to transferor courts outside this circuit, would our district court's Warsaw Convention/Montreal Agreement ruling, which we have affirmed, have binding force? We believe it should, as "law of the case," for if it did not, transfers under 28 U.S.C. § 1407 could be counterproductive, i.e., capable of generating rather than reducing the duplication and protraction Congress sought to check. . . . On this issue in the case at hand, however, our circuit is not positioned to speak the last word.

829 F.2d at 1176.

Finally, the district court's decision is contrary to the determination of every other federal court to consider the issue subsequent to Lexecon. See, e.g., In re Gen. Am. Life Ins. Co. Sales

1  Therefore, the Court will give the precedent of transferor circuits

2  "close consideration," but the Court is only bound by Ninth Circuit

3  and Supreme Court precedent.

4

5  **V.  PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

6        Plaintiffs filed a motion for class certification in each of the

7  five test cases: Chicago, Los Angeles, Denver, Boston, and New

8  York/New Jersey.  Plaintiff's proposed class in the Chicago case is

9  "All persons who purchased tickets to any live rock concert in the

10  Chicago Region directly from any of the Defendants or their affiliates

11  or predecessors or agents during the period from June 19, 1998 to the

12  present."  (Pl.'s Mem. at 1.)  The definitions for the other test

13  cases are identical except for the geographic region.[9]

14  ///

15  ///

16

17  Practices Litig., 391 F.3d 907, 911 (8th Cir.2004) ("When a transferee
   court receives a case from the MDL Panel, the transferee court applies
18  the law of the circuit in which it is located to issues of federal
   law."); In re Cardizem CD Antitrust Litig., 332 F.3d 896, 912 n.17
19  (6th Cir. 2003);  Murphy, 208 F.3d at 964-66; In re Gen. Motors Corp.
   "Piston Slap" Products Liab. Litig., 2006 WL 1049259, at *2 n.6
20  (W.D.Okla. Apr. 19, 2006); In re Nat'l Century Fin. Enters., Inc.,
   Inv. Litig., 323 F. Supp. 2d 861, 876-77 (S.D. Ohio 2004); Moore v.
21  Sulzer Orthopedics, Inc., 337 F. Supp. 2d 1002, 1009-11 (N.D. Ohio
   2004); In Re Enron Corp. Sec., Derivative, & ERISA Litig., 2004 WL
22  1237497, at *7-14 (S.D. Tex. May 20, 2004); In re Farmers Ins. Exch.
   Claims Representatives' Overtime Pay Litig., 300 F. Supp. 2d 1020,
23  1031 n.9 (D.Or. 2003); In re Ikon Office Solutions, Inc. Sec. Litig.,
   86 F. Supp. 2d 481, 484 (E.D.Pa. 2000); Hartline v. Sheet Metal
24  Workers' Nat'l. Pension Fund, 201 F. Supp. 2d 1, 2-4 (D.D.C. 1999); In
   re Baseball Bat Antitrust Litig., 75 F. Supp. 2d 1189, 1200
25  (D.Kan.1999); In re Indep. Serv. Orgs. Antitrust Litig., 1998 WL
   919125, at *2-3 (D. Kan. Dec. 31, 1998).
26  [9] The Los Angeles case defines the region as "Southern California,"
27  the Boston case defines the region as "New England," the Denver case
   defines the region as "Colorado," and the New York/New Jersey case
28  defines the region as "New York/New Jersey."  (Pl's Mem. at 1-2.)

A.  General Standard for Class Certification

Rule 23(a) provides that a class member may sue as a representative party on behalf of all class members if: (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.  Fed. R. Civ. P. 23(a).   If the prerequisites of Rule 23(a) are satisfied, Plaintiff must also satisfy Rule 23(b)(1), (b)(2), or (b)(3).  Plaintiff seeks to certify the class pursuant to Federal Rule of Civil Procedure 23(b)(3).  Rule 23(b)(3) provides that "An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition . . . the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

"The party seeking certification bears the burden of showing that each of the four requirements of Rule 23(a) and at least one requirement of Rule 23(b) have been met."  Dukes v. Wal-Mart, Inc., 474 F.3d 1214, 1224 (9th Cir. 2007).

B.  Assessment of the Evidence in a MotionCertiClass

A significant issue in resolving Plaintiffs' motion is determining whether the Court may make factual findings in determining whether the requirements of Rule 23 are satisfied.  Plaintiffs contend that the Court may not engage in a "battle of the experts" and must certify the class so long as Plaintiffs' expert has "employed a well-

accepted methodology to reach his opinions . . . and his testimony has a reliable basis in knowledge and experience of the relevant discipline." (Pls.' Post-Hearing Brief at 3-4.) (quoting <u>Dukes</u>, 474 F.3d at 1227). In contrast, Defendants contend that "analysis of the merits is permissible to determine if Rule 23 Requirements are met." (Defs.' Post-Hearing Brief at 2.)

As discussed below, Rule 23 is silent on this issue, the Supreme Court has never directly addressed this issue, and the Circuits appear to be split on this issue.

### 1. Text and Amendments to Rule 23

Rule 23 does not provide what standard of proof a Plaintiff must satisfy in order to obtain class certification. Nor does Rule 23 explain whether a district court may make factual findings in determining whether the requirements of Rule 23 have been satisfied. However, the 2003 amendments to Rule 23 arguably support the inference that a district court is not permitted to engage in a more extensive inquiry in determining whether the requirements of Rule 23 have been satisfied.

First, the amendments to Rule 23 eliminated the prior Rule 23(c)(1)(C) provision that allowed the conditional granting of class certification. Second, Rule 23(c)(1)(A) previously stated that a class certification decision be made "as soon as practicable." The amendments changed Rule 23(c)(1)(A) to state that a decision should be made "at an early practicable time." Finally, the Advisory Committee notes provide that a "court that is not satisfied that the requirements of Rule 23 have been met should refuse certification until they have been met." Fed. R. Civ. P. 23(c)(1)(C) Adv. Comm. Notes 2003. The Committee further explains that

1　　　　[a]lthough an evaluation of the probable outcome on the merits is

2　　　　not properly part of the certification decision, discovery in aid

3　　　　of the certification decision often includes information required

4　　　　to identify the nature of the issues that actually will be

5　　　　presented at trial.  In this sense it is appropriate to conduct

6　　　　controlled discovery into the "merits," limited to those aspects

7　　　　relevant to making a certification decision on an informed basis.

8　Id.

9　　　Based on these amendments and comments, the Second Circuit has

10　noted that a district court may be permitted "a more extensive inquiry

11　into whether Rule 23 requirements are met than was previously

12　appropriate."   In re Initial Public Offering Sec. Litig., 471 F.3d 23,

13　39 (2d Cir. 2006).  However, for reasons discussed below, the Ninth

14　Circuit has apparently rejected the holding of In re IPO Securities

15　Litigation. See Dukes, 474 F.3d at 1227.  Therefore, it is unclear

16　whether the Second Circuit's view of the effect of the 2003 amendments

17　carries any weight in the Ninth Circuit.

18　　　2.  Supreme Court Treatment of Rule 23

19　　　The first major Supreme Court case to address this issue was

20　Eisen v. Carlisle and Jacquelin, 417 U.S. 156 (1974).  In Eisen, the

21　district court determined that the Rule 23 class certification

22　requirements were satisfied.  Id. at 161.   In determining which party

23　should bear the cost of providing notice to the class, the district

24　court reasoned that it was unfair to impose the cost of notice on the

25　defendants unless the plaintiffs showed a probability of success on

26　the merits.  Id. at 167-68.

27　　　The Supreme Court reversed, holding that the plaintiffs were

28　required to bear the cost of notice to the class because it found

1  "nothing in either the language or history of Rule 23 that gives a

2  court any authority to conduct a preliminary inquiry into the merits

3  of a suit in order to determine whether it may be maintained as a

4  class action." Id. at 177.  Additionally, the Court reasoned that a

5  preliminary inquiry into the merits was improper because it would

6  provide the plaintiffs with a determination on the merits "without any

7  assurance that a class action may be maintained," and might "color the

8  subsequent proceedings," and "place an unfair burden on the

9  defendant." Id. at 177-78.

10     As an analysis of Eisen shows, however, the issue concerned a

11  "preliminary inquiry into the merits" for purposes of the

12  apportionment of the cost of notice rather than a determination of the

13  Rule 23 requirements.  However, the statement "has led some courts to

14  think that in determining whether any Rule 23 requirement is met, a

15  judge may not consider any aspect of the merits, and has led other

16  courts to think that a judge may not do so at least with respect to a

17  prerequisite of Rule 23 that overlaps with an aspect of the merits of

18  the case." In re IPO Sec. Litig., 471 F.3d at 33.  See, e.g., Alba v.

19  Papa John's USA, Inc., 2007 WL 953849, at *5 (C.D. Cal. Feb. 7, 2007)

20  ("In deciding a motion to certify a class, the court may not evaluate

21  whether the plaintiff is likely to prevail on the merits of the stated

22  claims.") (citing Eisen, 417 U.S. at 177-78.)

23     The Supreme Court further addressed Rule 23 requirements in Gen.

24  Tel. Co. of the Southwest v. Falcon, 457 U.S. 147 (1982).  The Supreme

25  Court explained that "[A] Title VII class action, like any other class

26  action, may only be certified if the trial court is satisfied, after a

27  rigorous analysis, that the prerequisites of Rule 23(a) have been

28  satisfied." Id. at 161.  The Supreme Court also stated that "actual,

18

1   not presumed, conformance with Rule 23(a) remains . . .

2   indispensable." Id. at 160. Finally, the Supreme Court observed that

3   "the class determination generally involves considerations that are

4   enmeshed in the factual and legal issues comprising the plaintiff's

5   cause of action." Id. (quoting Coopers & Lybrand v. Livesay, 437 U.S.

6   463, 469 (1978)). The Court concluded that "sometimes it may be

7   necessary for the court to probe behind the pleadings before coming to

8   rest on the certification question." Id. Therefore, several

9   propositions can be gleaned from Gen. Tel. Co.: (1) class

10  certification required a "rigorous analysis," (2) a court may not

11  simply presume conformance with the Rule 23 requirements, and (3) a

12  court may sometimes need to look beyond the pleadings in determining

13  the certification issue. However, the import of the Supreme Court's

14  statement that a class determination involves considerations "enmeshed

15  in the factual and legal issues" is unclear and has been interpreted

16  in disparate ways by the lower courts. See In re IPO Sec. Litig., 471

17  F.3d at 33.

18      3.  Treatment by the Ninth Circuit prior to 2007

19      In Blackie v. Barrack, the Ninth Circuit established its standard

20  concerning a district court's evaluation of the Rule 23 factors:

21      The court is bound to take the substantive allegations of the

22      complaint as true, thus necessarily making the class order

23      speculative in the sense that the plaintiff may be altogether

24      unable to prove his allegations. While the court may not put the

25      plaintiff to preliminary proof of his claim, it does require

26      sufficient information to form a reasonable judgment. Lacking

27      that, the court may request the parties to supplement the

28

1    pleadings with sufficient material to allow an informed judgment

2    on each of the Rule's requirements.

3  524 F.2d 891, 901 n.17 (9th Cir. 1975).  The Ninth Circuit also cited

4  Eisen even though Blackie involved a determination of the Rule 23

5  requirements rather than the apportionment of the cost of providing

6  notice to class members:

7        The Court made clear in Eisen [] that that determination does not

8        permit or require a preliminary inquiry into the merits, 417 U.S.

9        at 177-178; thus the district judge is necessarily bound to some

10       degree of speculation by the uncertain state of the record on

11       which he must rule. An extensive evidentiary showing of the sort

12       requested by defendants is not required. So long as he has

13       sufficient material before him to determine the nature of the

14       allegations, and rule on compliance with the Rule's requirements,

15       and he bases his ruling on that material, his approach cannot be

16       faulted because plaintiffs' proof may fail at trial.

17  Id. at 901.

18       Blackie provides little guidance on whether a district court may

19  resolve factual disputes in determining whether the Rule 23

20  requirements are satisfied.[10]  Some of Blackie's language suggests

---

21  [10]  If evidence is not in dispute, the Court is permitted to rely on
    evidence submitted by the defendant even if such evidence also relates
22  to the merits of the case.  In Hanon v. Dataproducts Corp., the Ninth
    Circuit denied certification because it determined that the class
23  plaintiff failed to satisfy the typicality requirement of Rule 23(a).
    976 F.2d 497, 509 (9th Cir. 1992).  The Ninth Circuit reasoned that
24  the class plaintiff was not typical because his "unique background and
    factual situation require him to prepare to meet defenses that are not
25  typical of the defenses which may be raised against other members of
    the proposed class."  Id. at 508.
26       The Ninth Circuit emphasized that the unique defenses to which
27  the class plaintiff was susceptible were "not a basis for denial of
    class certification."  Id. at 509 (citing Blackie, 524 F.2d at 901 n.
28  17; In re Pizza Time Theatre Sec. Litig., 112 F.R.D. 15, 22 (N.D. Cal.

that a district court may not resolve factual disputes.  For example,

Blackie mandates that a district court take the factual allegations as

true.  Id. at 901 n.17.  Such an inference seems to bar a district

court from resolving factual disputes against the plaintiff so long as

the plaintiff has alleged sufficient facts to create a dispute.[11]

Additionally, Blackie precludes a district court from putting a

plaintiff "to preliminary proof of his claim." Id.  Finally, Blackie

cites Eisen for the proposition that a court may not make a

preliminary inquiry into the merits.  Id. at 901.  This extension of

Eisen beyond the notice context suggests that the Ninth Circuit

intended to preclude a weighing of evidence at the class certification

stage.

However, other language in Blackie suggests the opposite

conclusion.  Blackie states that a motion for class certification

requires "sufficient information to form a reasonable judgment." Id.

at 901 n.17.  A judge is permitted to request supplemental material so

that an "informed judgment" may be made. Id. While an "extensive

evidentiary showing" is not required, the district court may "rule on

-----

1986)).  However, the Court also explained that "we are 'at liberty to
consider evidence which goes to the requirements of Rule 23 even
though the evidence may also relate to the underlying merits of the
case.'"  Id. (quoting In re Unioil Sec. Litig., 107 F.R.D. 615, 618
(C.D. Cal. 1985)).

[11] The Ninth Circuit's reference to "substantive allegations" could be
read as referring to the allegations relating to the substantive
claims rather than allegations concerning the Rule 23 requirements.
The Court recognizes that courts in this Circuit have almost uniformly
interpreted "substantive allegations" as referring to allegations
concerning the Rule 23 requirements.  See, e.g., In re Portal
Software, Inc. Sec. Litig., 2007 WL 1991529, at *2 (N.D. Cal. June 30,
2007); Hunt v. Check Recovery Sys., Inc., 241 F.R.D. 505, 509 (N.D.
Cal. 2007); In re Tableware Antitrust Litig., 241 F.R.D. 644, 648
(N.D. Cal. 2007); Edwards v. City of Long Beach, 467 F. Supp. 2d 986,
991 (C.D. Cal. 2006); Romero v. Producers Dairy Foods, Inc., 235
F.R.D. 474, 485 (E.D. Cal. 2006).

compliance" and base its ruling on the supplemental material. <u>Id.</u> at 901. The use of the phrases "ruling based on that material," "informed judgment," and "reasonable judgment" suggest that a district court may make a factual determination when the pleadings have been supplemented with additional material. Additionally, a request for supplemental material would be meaningless if the court were precluded from making factual determinations concerning these submissions. Therefore, the Court concludes that <u>Blackie</u> is ambiguous as to whether a court may resolve factual disputes in determining whether the Rule 23 requirements are satisfied.

The Court recognizes the hundreds of courts that have cited <u>Blackie</u>'s language concerning motions for class certification. Most courts simply quote a substantial portion of the two paragraphs but do not attempt to resolve the issue discussed above. <u>See, e.g.</u>, <u>L.H. v. Schwarzenegger</u>, 2007 WL 662463, at *13 (E.D. Cal. Feb. 28, 2007); <u>Westways World Travel, Inc. v. AMR Corp.</u>, 218 F.R.D. 223, 231 (C.D. Cal. 2003); <u>Levine v. SkyMall, Inc.</u>, 2002 WL 31056919, at *2-3 (D.Ariz. May 24, 2002); <u>Joyce v. City and County of San Francisco</u>, 1994 WL 443464, at *3 (N.D. Cal. Aug. 4, 1994); <u>In re Unioil Sec. Litig.</u>, 107 F.R.D. 615, 618 (C.D. Cal. 1985); <u>Schwartz v. Harp</u>, 108 F.R.D. 279, 280 (C.D. Cal. 1985). Other courts have reworded <u>Blackie</u>, but refrained from deciding whether a court may resolve factual disputes. <u>See, e.g.</u>, <u>In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.</u>, 691 F.2d 1335, 1342 (9th Cir. 1982) ("Although in determining whether to certify the class, the district court is bound to take the substantive allegations of the complaint as true, the court is also required to consider the nature and range of proof necessary to establish those allegations."); <u>Nat'l Fed'n of the</u>

1  <u>Blind v. Target Corp.</u>, 2007 WL 1223755, at *3 (N.D. Cal. Apr. 25,

2  2007) ("However, in adjudicating a motion for class certification, the

3  court accepts the allegations in the complaint as true so long as

4  those allegations are sufficiently specific to permit an informed

5  assessment as to whether the requirements of Rule 23 have been

6  satisfied."); <u>Kirkpatrick v. Ironwood Communications, Inc.</u>, 2006 WL

7  2381797, at *3 (W.D. Wash. Aug. 16, 2006) ("The court may assume the

8  truth of Plaintiffs' substantive allegations, but should consider

9  extrinsic evidence regarding whether the action is appropriate to

10  treat as a class."); <u>Rogers v. NationsCredit Fin. Servs. Corp.</u>, 233

11  B.R. 98, 102-103 (N.D.Cal. 1999) ("Notwithstanding the general

12  prohibition against examining the merits, some canvassing of the facts

13  is permissible."); <u>Schwartz v. Upper Deck Co.</u> 183 F.R.D. 672, 681

14  (S.D. Cal. 1999) ("Reasonable judgments cannot be made out of thin

15  air; sufficient information to make such a judgment is a required

16  preliminary step.").

17      One of the few decisions to address whether a court may resolve

18  factual disputes is <u>Osmer v. Aerospace Corp.</u>, 1982 WL 488, at *1 (C.D.

19  Cal. Oct. 20, 1982).  In <u>Osmer</u>, the plaintiff alleged that the

20  defendant applied certain discriminatory policies on a class-wide

21  basis.  1982 WL 488, at *2.  The plaintiff submitted affidavits and

22  statistical studies based on a regression analysis of data "on

23  employee advancement and salary."  <u>Id.</u> at *2 n.2.  Defendant submitted

24  declarations "asserting that plaintiff's expert opinion is

25  statistically unsound, that management level personnel made their

26  decisions in a non-discriminatory manner, and affidavits of various

27  female employees who claim they were not held back by any policy of

28  defendant."  <u>Id.</u> at *4.  The Court held that "[t]aking the

representations alleged by plaintiff in the complaint, and the statistical proof offered, along with the affidavits, the plaintiff has presented common questions capable of resolution in the context of a class suit." Id. The Court observed that it was not ruling "on whether the contrary affidavits of defendant are sufficient to prevail on the merits . . . [but instead] that, under the test mandated by Blackie, 524 F.2d at 901, the plaintiff has shown that questions of fact which would be common to the whole class are presented by the pleadings and material submitted." Id.

### 4. Dukes v. Wal-Mart

The Ninth Circuit recently issued an opinion which may have resolved the uncertainty discussed above. In Dukes v. Wal-Mart, Inc., female Wal-Mart employees alleging sex discrimination brought a Title VII class action against Wal-Mart. 474 F.3d 1214 (9th Cir. 2007). The district court certified the class for certain of plaintiffs' claims and the Ninth Circuit affirmed. Id.

One of the principal issues raised by Wal-Mart on appeal was whether the plaintiffs had satisfied Rule 23(a)(2)'s commonality requirement by presenting evidence that Wal-Mart engaged in discriminatory practices that affected all plaintiffs in a common manner. Id. at 1225. To establish commonality, plaintiffs submitted factual evidence, expert opinions, expert statistical evidence, and anecdotal evidence. Id. For example, plaintiffs' expert sociologist explained that "Wal-Mart has and promotes a strong corporate culture – a culture that may include gender stereotyping." Id. at 1226. Plaintiffs' expert concluded "(1) that Wal-Mart's centralized coordination, reinforced by a strong organizational culture, sustains uniformity in personnel policy and practice; (2) that there are

24

significant deficiencies in Wal-Mart's equal employment policies and practices; and (3) that Wal-Mart's personnel policies and practices make pay and promotion decisions vulnerable to gender bias." Id.

Wal-Mart argued that the expert's third conclusion was vague, imprecise, and failed to satisfy Daubert. However, the district court rejected Wal-Mart's argument, explaining that Wal-Mart's challenges "'are of the type that go to the weight, rather than the admissibility, of the evidence.'" Id. at 1227 (quoting Dukes v. Wal-Mart, Inc., 222 F.R.D. 189, 191-92 (N.D. Cal. 2004)). The Ninth Circuit agreed, explaining that "[t]he district court was on very solid ground here as it has long been recognized that arguments evaluating the weight of evidence or the merits of a case are improper at the class certification stage." Id. (citing Eisen, 417 U.S. at 177 ("We find nothing in either the language or history of Rule 23 that gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action."); Selzer v. Bd. of Educ. of City of New York, 112 F.R.D. 176, 178 (S.D.N.Y.1986) ("A motion for class certification is not the occasion for a mini-hearing on the merits.")). The Ninth Circuit also stated that "courts need not apply the full Daubert 'gate-keeper' standard at the class certification stage." 474 F.3d at 1227. "Rather, 'a lower Daubert standard should be employed at this [class certification] stage of the proceedings.'" Id. (quoting Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc., 209 F.R.D. 159, 162 (C.D. Cal. 2002)).

Similarly, Plaintiffs' expert statistician presented statistical evidence of class-wide discrimination based on data collected at a regional level. 474 F.3d at 1228. Wal-Mart claimed that "the

1  district court erred by not finding Wal-Mart's statistical evidence
2  more probative than Plaintiffs' evidence because, according to Wal-
3  Mart, its analysis was conducted store-by-store" rather than at a
4  regional level.  Id. at 1229.  The Ninth Circuit rejected Wal-Mart's
5  argument that class certification should not have been granted because
6  Wal-Mart's statistical evidence was more probative:

7       [O]ur job on this appeal is to resolve whether the "evidence is
8       sufficient to demonstrate common questions of fact warranting
9       certification of the proposed class, not whether the evidence
10      ultimately will be persuasive" to the trier of fact.  In re Visa
11      Check/MasterMoney Antitrust Litig., 280 F.3d 124, 135 (2d Cir.
12      2001).  Thus, it was appropriate for the court to avoid resolving
13      "the battle of the experts" at this stage of the proceedings.  See
14      Caridad v. Metro-North Commuter R.R., 191 F.3d 283, 292-93 (2d
15      Cir. 1999) (noting that a district court may not weigh
16      conflicting expert evidence or engage in "statistical dueling" of
17      experts).

18 474 F.3d at 1229.

19      Thus, Dukes appears to have established three propositions.
20 First, the Dukes majority explains that challenges to expert opinions
21 constitute merits determinations that go to the weight of the evidence
22 rather than admissibility.  Id. at 1227.  Thus, a district court is
23 not permitted to discount the testimony of a plaintiff expert merely
24 because the defendant has challenged some aspect of the expert's
25 opinion.  Id.

26      Second, Dukes extended the holding of Eisen to determinations
27 involving Rule 23 requirements.  Id.  As discussed above, numerous

28

courts have extended Eisen beyond its original holding, including the Ninth Circuit in Blackie.

Finally, the Dukes majority held that a court may not weigh conflicting evidence in determining whether the Rule 23 requirements are satisfied. Id. at 1229. Where both plaintiffs and defendants have proffered expert testimony, the court must avoid resolving a "battle of the experts" in a motion for class certification. Id. Therefore, at a minimum, Dukes establishes that a court may not resolve factual conflicts concerning expert opinions in a motion for class certification. Read more broadly, Dukes could be interpreted as holding that a district court may not resolve any factual disputes in determining whether the Rule 23 requirements are satisfied.

Such a reading of Dukes is essentially required in light of Dukes' reliance on the Second Circuit cases of Caridad v. Metro-North Commuter R.R., 191 F.3d 283 (2d Cir. 1999) and In re Visa Check/MasterMoney Antitrust Litig., 280 F.3d 124 (2d Cir. 2001).

a.  Caridad

In Caridad, present and former employees of the defendant brought a Title VII race discrimination action. 191 F.3d at 286. The plaintiffs sought to certify a class consisting of current and former African-American employees of Metro-North. Id. To establish commonality, plaintiffs submitted numerous statistical analyses which were analyzed by the plaintiffs' expert. Id. at 288. Based on an analysis of company-wide statistics, the plaintiffs' expert concluded that the Metro-North's company-wide policies for discipline and promotion were exercised in a discriminatory manner. Id.

Metro-North's expert, Dr. Evans, criticized the conclusions of plaintiff's expert. Id. Specifically, Dr. Evans argued that the

1  plaintiffs' expert's analysis was flawed because it was conducted on a

2  company-wide basis rather than a position-by-position basis.  _Id._  For

3  example, Dr. Evans noted that out of the thirty-seven different

4  departments at the employer, no disciplinary action was taken in

5  twenty-five of the departments.  _Id._  Additionally, Dr. Evans

6  explained that there was significant variation in discipline from job

7  to job within those departments where disciplinary action was taken.

8  _Id._  Dr. Evans pointed out similar flaws regarding plaintiffs'

9  expert's analysis of promotions.  _Id._ at 289.  Therefore, Dr. Evans

10 concluded that "'an organization-wide pattern and practice of

11 discrimination is . . . implausible'" and the plaintiffs were "'at

12 best, typical of only a fraction of the [defendant's] workforce.'"

13 _Id._ at 288.

14     Relying on the analysis of Dr. Evans, the district court denied

15 class certification.  _Id._ at 289-90.  The Second Circuit reversed and

16 criticized the district court's reliance on Dr. Evans:

17     The District Court relied on the report of Metro-North's

18     statistical expert, Dr. Evans, to conclude that the Class

19     Plaintiffs' statistics were inadequate because they failed to

20     take into account the fact that various Metro-North positions

21     have materially different rates of discipline and promotion.

22     Though Metro-North's critique of the Class Plaintiffs' evidence

23     may prove fatal at the merits stage, the Class Plaintiffs need

24     not demonstrate at this stage that they will prevail on the

25     merits. Accordingly, this sort of "statistical dueling" is not

26     relevant to the certification determination. _See, e.g.,_ _Krueger_

27     _v. New York Telephone Company_, 163 F.R.D. 433, 440-41 (S.D.N.Y.

28     1995). We conclude that the Class Plaintiffs' statistical

28

evidence supports a finding of commonality on the issue of discipline with respect to those African-American employees who were disciplined while working in one of the 48 positions in which African-Americans are more likely to be disciplined than Whites. In addition, the statistical evidence supports a finding of commonality on the promotion claim. The Class Plaintiffs submitted evidence that tends to establish that being Black has a statistically significant effect on an employee's likelihood of being promoted; indeed, being Black reduces an employee's likelihood of promotion by approximately 33 percent. In conducting her analyses, the Class Plaintiffs' expert controlled for various factors that one would expect to be relevant to the likelihood of disciplinary action and promotion. These statistical disparities are not insignificant. Cf. Watson v. Fort Worth Bank and Trust, 487 U.S. 977, 994-95 (1988). More detailed statistics might be required to sustain the Plaintiffs' burden of persuasion, see Wards Cove Packing Company v. Atonio, 490 U.S. 642, 650-55, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989), but this report, in conjunction with the anecdotal evidence, satisfies the Class Plaintiffs' burden of demonstrating commonality for purposes of class certification.

Id. at 292-93.

The Ninth Circuit explicitly relied on Caridad in concluding that a court may not resolve a "battle of the experts" at the class certification stage. Dukes, 474 F.3d at 1229. Therefore, Dukes establishes that the court may not weigh evidence from Defendants' expert against evidence from Plaintiffs' expert in determining whether the Rule 23 requirements are satisfied.

1    b. <u>Visa Check</u>

2   In <u>In re Visa Check/MasterMoney Antitrust Litig.</u>, various

3 retailers, merchants, and retail associations brought an antitrust

4 action against defendants Visa and MasterCard.  280 F.3d at 129.  The

5 plaintiffs alleged that the defendants had created a tying arrangement

6 in violation of the Sherman Act by requiring stores accepting their

7 credit cards to also accept their debit cards.  <u>Id.</u> at 129-30.

8 Plaintiffs sought to certify a class consisting of "'all persons and

9 business entities who have accepted Visa and/or MasterCard credit

10 cards and therefore are required to accept Visa Check and/or

11 MasterMoney debit cards under the challenged tying arrangements.'"

12 <u>Id.</u> at 131.

13   Plaintiffs' expert, Dr. Carlton, asserted that a large number of

14 retailers would have refused to accept Visa Check and MasterMoney in

15 the absence of the alleged tying arrangement.  <u>Id.</u> at 133.  Carlton

16 reasoned that the defendants would have lowered interchange fees in

17 response.  <u>Id.</u>  Thus, Carlton concluded that consumers paid higher

18 interchange fees than they would have absent the tying arrangement.

19 <u>Id.</u>

20   Defendants' expert asserted that "Carlton's model of how the

21 debit card market would operate absent the alleged tie did not

22 adequately take into account [several] consequences that would have

23 accompanied the cessation of the tie."  <u>Id.</u> at 134.  Relying on

24 Carlton's report, the district court granted plaintiffs' motion for

25 class certification.  <u>Id.</u> at 132.

26   On appeal, defendant argued that "the district court erroneously

27 relied on Carlton's report in granting plaintiffs' class certification

28 motion because, according to defendants, the district court improperly

limited its scrutiny of the report and Carlton's expert opinion
'failed to provide a credible basis for class certification.'" Id. at
134.  The Second Circuit rejected defendants' criticism of plaintiffs'
expert and held that so long as the expert's methodology was not
"fatally flawed," such methodology "was sufficiently reliable for
class certification purposes." Id. at 135. The Second Circuit's
conclusion was based on its reasoning that a court may not examine the
merits at the class certification stage:

> Defendants contend that the district court erroneously relied on
> Carlton's report in granting plaintiffs' class certification
> motion because, according to defendants, the district court
> improperly limited its scrutiny of the report and Carlton's
> expert opinion "failed to provide a credible basis for class
> certification." Although a trial court must conduct a "rigorous
> analysis" to ensure that the prerequisites of Rule 23 have been
> satisfied before certifying a class, "a motion for class
> certification is not an occasion for examination of the merits of
> the case." Caridad, 191 F.3d at 291 (internal quotation marks
> omitted). A district court must ensure that the basis of the
> expert opinion is not so flawed that it would be inadmissible as
> a matter of law. See Cruz v. Coach Stores, Inc., No. 96 Civ.
> 8099, 1998 WL 812045, at *4 n. 3 (S.D.N.Y. Nov.18, 1998)
> (disregarding expert report submitted in support of motion for
> class certification because the report was "fatally flawed"),
> aff'd in part, vacated in part on other grounds, 202 F.3d 560,
> 573 (2d Cir.2000) ("[Plaintiff] has not shown that the court
> abused its discretion in finding the report methodologically
> flawed."); accord In re Sumitomo Copper Litig., 182 F.R.D. 85, 91

1    (S.D.N.Y.1998) (granting class certification upon finding that

2    "plaintiffs' econometric methodologies have a reasonable

3    probability of establishing" plaintiffs' claims by common proof);

4    In re Disposable Contact Lens Antitrust Litig., 170 F.R.D. 524,

5    531-32 (S.D.Fla.1996) (granting class certification upon finding

6    that "Plaintiffs have demonstrated at least a 'colorable method'

7    of proving [common injury] at trial"); In re Potash Antitrust

8    Litig., 159 F.R.D. 682, 687 (D.Minn.1995) (stating that "in

9    assessing whether to certify a class, the Court's inquiry is

10   limited to whether or not the proposed methods are so

11   insubstantial as to amount to no method at all"). However, a

12   district court may not weigh conflicting expert evidence or

13   engage in "statistical dueling" of experts. Caridad, 191 F.3d at

14   292-93. The question for the district court at the class

15   certification stage is whether plaintiffs' expert evidence is

16   sufficient to demonstrate common questions of fact warranting

17   certification of the proposed class, not whether the evidence

18   will ultimately be persuasive. Id. at 292-93.

19

20   To the extent that defendants' contention is that the court did

21   not sufficiently examine whether Carlton's methodology was

22   fatally flawed, and thus inadmissible even for class

23   certification purposes, we reject this argument as meritless. The

24   district court, in an almost fifty page opinion, thoroughly

25   considered each of defendants' criticisms of Carlton's theory and

26   Carlton's response to each of those criticisms and concluded in

27   each case that Carlton's response sufficiently addressed the

28   criticism. The district court correctly noted that its function

1    at the class certification stage was not to determine whether

2    plaintiffs had stated a cause of action or whether they would

3    prevail on the merits, but rather whether they had shown, based

4    on methodology that was not fatally flawed, that the requirements

5    of Rule 23 were met. In re Visa Check/MasterMoney Antitrust

6    Litig., 192 F.R.D. at 76, 79. As for defendants' claim that

7    plaintiffs' expert evidence failed to provide a reliable basis

8    for class certification, the district court's finding that

9    Carlton's methodology was not fatally flawed, and therefore, was

10    sufficiently reliable for class certification purposes, does not

11    constitute an abuse of its discretion.

12 Id. at 134-35.

13    The Ninth Circuit explicitly relied on In re Visa

14 Check/MasterMoney Antitrust Litig. in concluding that a court should

15 determine whether "'evidence is sufficient to demonstrate common

16 questions of fact warranting certification of the proposed class, not

17 whether the evidence ultimately will be persuasive' to the trier of

18 fact." Dukes, 474 F.3d at 1229 (quoting In re Visa Check/MasterMoney

19 Antitrust Litig., 280 F.3d at 135). Even if Dukes does not implicitly

20 adopt the "fatal flaw" standard, its reliance on In re Visa

21 Check/MasterMoney Antitrust Litig. establishes that the court cannot

22 deny a motion for class certification simply because experts disagree

23 over the proper methodology.

24    c.  In re Initial Public Offerings Sec. Litig.

25    The Ninth Circuit's reliance on Caridad and In re Visa

26 Check/MasterMoney Antitrust Litig. is particularly significant because

27 these cases were overruled by the Second Circuit prior to Dukes. In

28 In re IPO Sec. Litig., plaintiffs brought class action securities

fraud lawsuits against some of the nation's largest underwriters in connection with a series of initial public offerings.  471 F.3d 24, 27 (2d Cir. 2006).  The district court granted plaintiffs' motions for class certification in six "focus cases."  Id.

The Second Circuit determined that the "appeal primarily concerns the issue . . . as to what standards govern a district judge in adjudicating a motion for class certification."  Id. at 26.  First, the Second Circuit examined the Supreme Court cases discussed above as well as Second Circuit precedent.  Id. at 32-37.  Next, the Second Circuit overruled Caridad and In re Visa Check/MasterMoney Antitrust Litig. with respect to their standards for class certification:

> [W]e can no longer continue to advise district courts that "some showing," Caridad, 191 F.3d at 292, of meeting Rule 23 requirements will suffice . . . or that an expert's report will sustain a plaintiff's burden so long as it is not "fatally flawed," see Visa Check, 280 F.3d at 135 . . . .

471 F.3d at 40.[12]

The Second Circuit clarified that a district court must make factual findings to the extent such findings are necessary to determine if a requirement is met:

---

[12] The Court overruled Caridad and In re Visa Check/MasterMoney Antitrust Litig. more explicitly later in the opinion:
> [O]ur conclusions necessarily preclude the use of a "some showing" standard, and to whatever extent Caridad might have implied such a standard for a Rule 23 requirement, that implication is disavowed. Second, we also disavow the suggestion in Visa Check that an expert's testimony may establish a component of a Rule 23 requirement simply by being not fatally flawed.

471 F.3d at 42.  Additionally, Judge Newman points out that as the author of both In re Initial Public Offering Sec. Litig. and Caridad, he "welcome[s] the opportunity to acknowledge the shortcomings of [Caridad's] language and to participate with the panel in the pending case in providing needed clarification." 471 F.3d at 35 n.6.

It would seem to be beyond dispute that a district court may not grant class certification without making a determination that all of the Rule 23 requirements are met. We resist saying that what are required are "findings" because that word usually implies that a district judge is resolving a disputed issue of fact. Although there are often factual disputes in connection with Rule 23 requirements, and such disputes must be resolved with findings, the ultimate issue as to each requirement is really a mixed question of fact and law. A legal standard, e.g., numerosity, commonality, or predominance, is being applied to a set of facts, some of which might be in dispute. The Rule 23 requirements are threshold issues, similar in some respects to preliminary issues such as personal or subject matter jurisdiction. We normally do not say that a district court makes a "finding" of subject matter jurisdiction; rather, the district court makes a "ruling" or a "determination" as to whether such jurisdiction exists. The judge rules either that jurisdiction exists or that it does not. Of course, in making such a ruling, the judge often resolves underlying factual disputes, and, as to these disputes, the judge must be persuaded that the fact at issue has been established. The same approach is appropriate for Rule 23 requirements. For example, in considering whether the numerosity requirement is met, a judge might need to resolve a factual dispute as to how many members are in a proposed class. Any dispute about the size of the proposed class must be resolved, and a finding of the size of the class, e.g., 50, 100, or more than 200, must be made. At that point, the judge would apply the legal standard governing numerosity and make a ruling

35

1  as to whether that standard, applied to the facts as found,

2  establishes numerosity.

3  Id. at 40.

4  Finally, the Second Circuit held that a court must make

5  requirement determinations even if such determinations overlap with

6  merits issues:

7  The more troublesome issue arises when the Rule 23 requirement

8  overlaps with an issue on the merits. With Eisen properly

9  understood to preclude consideration of the merits only when a

10  merits issue is unrelated to a Rule 23 requirement, there is no

11  reason to lessen a district court's obligation to make a

12  determination that every Rule 23 requirement is met before

13  certifying a class just because of some or even full overlap of

14  that requirement with a merits issue. We thus align ourselves

15  with Szabo, Gariety, and all of the other decisions discussed

16  above that have required definitive assessment of Rule 23

17  requirements, notwithstanding their overlap with merits issues.

18  As Gariety usefully pointed out, the determination as to a Rule

19  23 requirement is made only for purposes of class certification

20  and is not binding on the trier of facts, even if that trier is

21  the class certification judge. 368 F.3d at 366.

22  471 F.3d at 41.[13]

23  Therefore, the Second Circuit concluded "(1) that a district

24  judge may not certify a class without making a ruling that each Rule

25

26  [13] The Second Circuit provided that "[t]o avoid the risk that a Rule 23 hearing will extend into a protracted mini-trial of substantial

27  portions of the underlying litigation, a district judge must be accorded considerable discretion to limit both discovery and the

28  extent of the hearing on Rule 23 requirements." 471 F.3d at 41.

1  23 requirement is met and that a lesser standard such as 'some

2  showing' for satisfying each requirement will not suffice, (2) that

3  all of the evidence must be assessed as with any other threshold

4  issue, (3) that the fact that a Rule 23 requirement might overlap with

5  an issue on the merits does not avoid the court's obligation to make a

6  ruling as to whether the requirement is met, although such a

7  circumstance might appropriately limit the scope of the court's

8  inquiry at the class certification stage." Id. at 27.

9       The Second Circuit observed that its conclusions were consistent

10  with the conclusions of the case law in most of the Circuits.  For

11  example, in Szabo v. Bridgeport Machs., Inc., 249 F.3d 672, 676 (7th

12  Cir. 2001), Judge Easterbrook explained that "a judge should make

13  whatever factual and legal inquiries are necessary under Rule 23."

14  Judge Easterbrook also stated that "the judge would receive evidence

15  (if only by affidavit) and resolve the disputes before deciding

16  whether to certify the class."  Id.  The Third, Fourth, and Fifth

17  Circuits have all followed Szabo.  Gariety v. Grant Thornton, LLP, 368

18  F.3d 356, 366 (4th Cir. 2004) (relying on Szabo); Newton v. Merrill

19  Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 166 (3d Cir. 2001)

20  (relying on Szabo); Unger v. Amedisys, Inc., 401 F.3d 316, 322-23 (5th

21  Cir. 2005) (relying on Gariety).  Similarly, the Eighth Circuit has

22  held that "in ruling on class certification, a court may be required

23  to resolve disputes concerning the factual setting of the case . . .

24  [including] the resolution of expert disputes concerning the import of

25  evidence," Blades v. Monsanto Co., 400 F.3d 562, 575 (8th Cir. 2005),

26  and the Eleventh Circuit has stated that

27       [w]hile it is true that a trial court may not properly reach the

28       merits of a claim when determining whether class certification is

37

1    warranted, this principle should not be talismanically invoked to

2    artificially limit a trial court's examination of the factors

3    necessary to a reasoned determination of whether a plaintiff has

4    met her burden of establishing each of the Rule 23 class action

5    requirements.

6  Love v. Turlington, 733 F.2d 1562, 1564 (11th Cir. 1984) (citation

7  omitted).[14]

8        If this Court were free to craft its own standard, it would

9  follow the standard established by In re IPO Sec. Litig.. The Court

10  finds the reasoning of IPO persuasive and consistent with the views of

11  nearly every other Circuit.  However, as discussed in Part IV, for

12  purposes of the MDL this Court is only bound by Ninth Circuit

13  precedent.  A plain reading of Dukes, coupled with Dukes' reliance on

14  standards articulated by the overruled Caridad and In re Visa

15  Check/MasterMoney Antitrust Litig. decisions rather than In re IPO

16  Sec. Litig. (or a decision from any other Circuit), clearly

17  demonstrates that the Ninth Circuit intended to prohibit district

18  courts from weighing conflicting evidence when determining whether the

19  Rule 23 requirements are satisfied.[15]

20  ─────────────
   [14] Although the First Circuit does not appear to have definitely
21  addressed this issue, it appears to have adopted an approach
   consistent with the majority view. In re IPO Sec. Litig., 471 F.3d at
22  39.  In a securities fraud class action, the First Circuit stated
   that "[t]he question of how much evidence of efficiency is necessary
23  for a court to accept the fraud-on-the-market presumption of reliance
   at the class-certification stage is . . . one of degree." In re
24  PolyMedica Corp. Sec. Litig., 432 F.3d 1, 17 (1st Cir. 2005).
   [15] In his dissent, Judge Kleinfeld relied on In Re IPO Sec. Litig. in
25  setting forth his standard for class certification: "as the Second
   Circuit recently held in In re IPO, a district judge considering class
26  certification must make a 'definitive assessment of Rule 23
   requirements, notwithstanding their overlap with merits issues' and
27  'must receive enough evidence, by affidavits, documents or testimony,
   to be satisfied that each Rule 23 requirement has been met.'" 474 F.3d

### 5.   Post-Dukes Caselaw

Although the opinion in Dukes was issued only six months ago, at least one district court has interpreted Dukes similarly to this court.  In L.H. v. Schwarzenegger, 2007 WL 662463, at *1 (E.D. Cal. Feb. 28, 2007), plaintiff juvenile parolees in California alleged that California has a policy and practice of denying class members with disabilities their statutory rights under the Americans with Disabilities Act.  The defendants argued that the class plaintiffs were not in fact disabled, and therefore neither of the plaintiffs satisfied the typicality requirement.  Id. at *12.  In support of their position, the defendants submitted educational records of the plaintiffs.  Id.

First, the district court noted that "although the allegations in the complaint must be taken as true for the purposes of class certification . . . the court is 'at liberty' to consider evidence that relates to the merits if such evidence also goes to the requirements of Rule 23."  Id. at 10.  However, the district court went on to reject the defendants' argument that the plaintiffs were not typical because the plaintiffs were not in fact disabled.  Id. at 12.  The court explained that "arguments evaluating the weight of evidence or the merits of a case are improper at the class certification stage" and "plaintiffs need only provide sufficient information for the court to form a reasonable judgment about whether plaintiffs' claims are typical."  Id. at *12-13 (quoting Dukes, 474 F.3d at 1227).  The court concluded that "[i]n examining the allegations set forth in the complaint, as well as the evidence

at 1245 (Kleinfeld, J., dissenting) (quoting In re IPO Sec. Litig., 471 F.3d at 51-52.)

submitted by both plaintiffs and defendants, the court finds that there is sufficient information to conclude that plaintiffs' claims are typical of the class."   <u>Id.</u>

Therefore, under one reading of <u>Dukes</u>, the scope of the Court's analysis is so limited that certification is virtually inevitable. Review of a motion for class certification would be similar to review of a Rule 12(b)(6) motion because class certification would be granted so long as the Plaintiffs submitted expert testimony in support of each of the Rule 23 requirements.   Much of the analysis detailed in the remainder of the opinion would be irrelevant under such a standard.

While <u>Dukes</u> may impose such a restricted review, <u>Dukes</u> possibly permits a limited inquiry that still allows the Court - without too much probing - to examine Plaintiffs' Rule 23 showing.[16]   Therefore, the Court proceeds with a more detailed analysis to determine whether Plaintiffs have satisfied Rule 23.[17]

<u>C.   Application of Rule 23(a) Factors</u>

Rule 23(a) provides that a class member may sue as a representative party on behalf of all class members if: (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.   Fed. R. Civ. P.

---

[16]   For example, <u>Dukes</u> cited <u>Visa Check</u> with approval, and <u>Visa Check</u> held that an expert's methodology was sufficient for class certification purposes so long as it was not "fatally flawed." 280 F.3d at 135.

[17]   Even under this more searching review, <u>Dukes</u> clearly precludes the Court from conducting a <u>Daubert</u> analysis or weighing expert testimony.

1  23(a).  The plaintiff has the burden of establishing that all four

2  factors are satisfied.  <u>In re N. Dist. of Cal., Dalkon Shield IUD</u>

3  <u>Prods. Liability Litig.</u>, 693 F.2d 847, 854 (9th Cir. 1982) (citing

4  <u>Doninger v. Pac. Northwest Bell, Inc</u>., 564 F.2d 1304, 1308-09 (9th

5  Cir. 1977)).

6      <u>1.  The Class is So Numerous that Joinder of All Class Members Is</u>

7  <u>Impracticable</u>

8      The first requirement of Rule 23(a) is that the class be so

9  numerous that joinder of all members individually would be

10  impracticable.  Fed. R. Civ. P. 23(a)(1).  The Supreme Court has

11  cautioned that "[t]he numerosity requirement requires examination of

12  the specific facts of each case and imposes no absolute limitations."

13  <u>General Tel. Co. of the Northwest, Inc. v. Equal Employment</u>

14  <u>Opportunity Comm'n</u>, 446 U.S. 318, 330 (1980).  Moreover, "the absolute

15  number of class members is not the sole determining factor in whether

16  joinder will be impracticable."  <u>Buttino v. Fed. Bureau of</u>

17  <u>Investigation</u>, 1992 WL 12013803, at *1 (N.D. Cal. Sept. 25, 1992).

18  <u>Hum v. Dericks</u>, 162 F.R.D. 628, 634 (9th Cir. 1995) ("There is no

19  magic number for determining when too many parties make joinder

20  impracticable.").

21      The Supreme Court has held that a class of fifteen is too small

22  to satisfy the numerosity requirement.  <u>General Tel. Co. v. EEOC</u>, 446

23  U.S. 318, 330 (1980).  However, some courts have found the numerosity

24  requirement satisfied when the class comprises as few as 40 members.

25  <u>See</u>, <u>e.g.</u>, <u>Ansari v. New York Univ.</u>, 179 F.R.D. 112, 114 (S.D.N.Y.

26  1998); <u>Consolidated Rail Corp. v. Town of Hyde Park</u>, 47 F.3d 473, 483

27  (2d Cir. 1995).  The Ninth Circuit has noted that classes with fewer

28  than 70 members have been certified in numerous cases.  <u>Jordan v.</u>

1   <u>County of Los Angeles</u>, 669 F.2d 1311, 1320 n.10 (9th Cir. 1982),

2   <u>vacated on other grounds</u>, 459 U.S. 810 (1982) (noting that classes

3   with fewer than 70 members have been certified in numerous cases).

4       In each of the five class actions, the Plaintiff alleges that

5   there are thousands of class members in the relevant region that are

6   geographically dispersed.  (Riley Compl. ¶ 52); (Thompson Compl. ¶

7   52); (Hammer Compl. ¶ 52); (MacLaughlan Compl. ¶ 52); (Young Compl. ¶

8   52).  Defendants do not contest Plaintiffs' allegation that there are

9   thousands of purchasers of rock concert tickets.  Instead, Defendants

10  argue that the class is not ascertainable because "rock" cannot be

11  defined.  Regardless of how the market is defined, the class will

12  consist of thousands of individuals.  For example, even if the each

13  concert were defined as a single market, the class would still consist

14  of the thousands of class members who attended that concert.

15  Therefore, the numerosity requirement is satisfied.

16      2.  Are There Questions of Law or Fact Common to the Class?

17      Rule 23(a)(2) requires that there be "questions of law or fact

18  common to the class."  Fed. R. Civ. P. 23(a)(2).  "The commonality

19  preconditions of Rule 23(a)(2) are less rigorous than the companion

20  requirements of Rule 23(b)(3)."  <u>Hanlon v. Chrysler Corp.</u>, 150 F.3d

21  1011, 1019 (9th Cir. 1998).  The Ninth Circuit has explained that "All

22  questions of fact and law need not be common to satisfy the rule . . .

23  shared legal issues with divergent factual predicates is sufficient,

24  as is a common core of salient facts coupled with disparate legal

25  remedies within the class."  <u>Id.</u>  "The commonality test is qualitative

26  rather than quantitative--one significant issue common to the class

27  may be sufficient to warrant certification."  <u>Dukes v. Wal-Mart, Inc.</u>,

28

474 F.3d 1214, 1225 (9th Cir. 2007).   Common questions of law or fact alleged by Plaintiffs include:

> 1.   Whether the relevant market consists of the market for the sale of tickets to live rock concerts in the [relevant] region;
>
> 2.   Whether Defendants have monopolized and attempted to monopolize the relevant market;
>
> 3.   Whether Defendants intentionally and unlawfully excluded competitors and potential competitors from the relevant market;
>
> 4.   Whether Defendants' unlawful conduct caused Plaintiff and the Class members to pay more for concert tickets than they otherwise would have paid;
>
> 5.   Whether Plaintiff and members of the Class are entitled to declaratory, equitable and/or injunctive relief; and
>
> 6.   Whether Plaintiff and the Class have been damaged and the amount of such damages.

(Riley Compl. ¶ 55.)

Although Defendants argue that Plaintiffs cannot satisfy the requirements of Rule 23(a)(2), Defendants conflate this analysis with their Rule 23(b)(3) analysis.   (Def.'s Opp. at 11.)   Regardless, the Court finds that Plaintiffs have demonstrated substantial shared legal issues and the existence of a common core of salient facts. See Part V.D (examining common issues such as market definition, monopoly power, anticompetitive conduct, and casual antitrust injury). Therefore, Plaintiffs have satisfied the commonality requirement of Rule 23(a)(2).

///

///

43

### 3.  Are the Claims or Defenses of the Representative Parties Typical of the Claims or Defenses of the Class?

The "claims or defenses of the class representative must be typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).  The Ninth Circuit has explained that Rule 23(a) is satisfied "if [Plaintiffs'] situations share a 'common issue of law or fact,' and are 'sufficiently parallel to insure a vigorous and full presentation of all claims for relief.'" CRLA v. Legal Services Co., 917 F.2d 1171, 1175 (9th Cir. 1990) (citing Blackie, 524 F.2d at 904). Plaintiffs' injuries may be typical even if the amount of injury is different from other class members, Rosario v. Livaditis, 963 F.2d 1013, 1018 (7th Cir. 1992) or if other class members suffered their injury at a different time.  Mullen v. Treasure Chest Casino, LLC, 186 F.3d 620, 625 (5th Cir. 1999).  Plaintiffs' claim may not be typical where their claim is subject to a unique defense that could not be asserted against other members of the class.  Ross v. Bank South, N.A., 837 F.2d 980, 990 (11th Cir. 1988).

The class representatives' claims are not only typical, but virtually identical with the rest of the class members.  The representatives' and class members' claims all arise from the same course of conduct – Clear Channel's alleged monopolization and anticompetitive practices in the rock concert market- and all of the Plaintiffs seek identical relief.

However, Defendants contend that the ticket price for each concert is the result of a unique negotiation between the artist and the promoter.  (Id.)  As a result, Defendants assert that "the named Plaintiffs' proof that they were overcharged for the concerts they attended would not prove that absent class members were overcharged

44

1 for the different concerts they attended." (Id.) Therefore,

2 Defendants conclude that "the named Plaintiffs' claims are not typical

3 of the proposed class." (Id.)

4     In essence, Defendants contend that some class members may have

5 been injured and some class members may not have been injured. As a

6 result, Defendants seem to contend that some potential class members

7 are unlikely to recover because of a unique defense. However, the

8 fact that some prospective plaintiffs may ultimately fail to prove

9 damages once the merits are considered is not relevant to typicality.

10 If Defendants are correct that each concert must be individually

11 examined in order to determine how the ticket price was negotiated,

12 this is potential defense common to all of the claims. Thus, while

13 Defendants' argument may relate to whether individual issues will

14 predominate, see Section V.D, typicality is unaffected. Therefore,

15 the Court holds that the representatives' claims are typical of the

16 claims of the rest of the class members.

17     4.  Will the Representative Parties Fairly and Adequately Protect

18         the Interests of the Class?

19     Under Rule 23(a)(4), the named representative must "fairly and

20 adequately protect the interests of the class." Fed. R. Civ. P.

21 23(a)(4).  "This factor requires: (1) that the proposed

22 representative Plaintiffs do not have conflicts of interest with the

23 proposed class, and (2) that Plaintiffs are represented by qualified

24 and competent counsel." Dukes, 474 F.3d at 1233. See also Staton v.

25 Boeing Co., 327 F.3d 938, 957 (9th Cir. 2003) (same); In re Mego Fin.

26 Corp. Litig., 213 F.3d 454, 462 (9th Cir. 2000) (same); Hanlon, 150

27 F.3d at 1020.  Occasionally the Ninth Circuit divides these two

28 questions down into four components: 1) qualifications of counsel for

1  the representatives; 2) absence of antagonism; 3) sharing of interests

2  between representatives and absentees; and 4) unlikelihood that the

3  suit is collusive. See Molski v. Gleich, 318 F.3d 937, 955 (9th Cir.

4  2003); Local Joint Executive Bd. of Culinary/Bartender Trust Fund v.

5  Las Vegas Sands, Inc., 244 F.3d 1152, 1162 (9th Cir. 2001); Walters v.

6  Reno, 145 F.3d 1032, 1046 (9th Cir. 1998). None of these cases impose

7  a knowledge requirement on the part of the class representatives, and

8  the Court cannot locate any other Ninth Circuit decision imposing such

9  a requirement.

10      However, relying on Fifth Circuit cases, Defendants argue that

11  Rule 23(a)(4) requires that the class representatives possess

12  heightened knowledge about the case. (Def.'s Opp. at 20-21) (citing

13  Berger v. Compaq Computer Corp., 257 F.3d 475, 482-83 (5th Cir. 2001);

14  Horton v. Goose Creek Indep. Sch. Dist., 690 F.2d 470, 484 (5th Cir.

15  1982)). Specifically, Defendants contend that Rule 23(a)(4) imposes a

16  three part inquiry: (1) whether the class representatives "know more

17  than that they were involved in a bad business deal," (2) whether the

18  class representatives' knowledge of the case is "limited to derivative

19  knowledge acquired solely from counsel," and (3) whether the class

20  representatives are willing and able to "take an active role in and

21  control and to protect the interests of absentees." (Def.'s Opp. at

22  20-21) (quoting Berger, 257 F.3d at 482-83).

23      Even if the Court were to consider these Fifth Circuit cases,

24  Berger is clearly inapplicable to this case. In Berger, the

25  plaintiffs alleged violations of §§ 10(b) and 20(a) of the Securities

26  and Exchange Act of 1934. 257 F.3d at 477. The Fifth Circuit held

27  that the PSLRA raised the "adequacy" threshold for class

28  representatives by imposing a knowledge requirement on the

representatives.  <u>Berger</u>, 257 F.3d at 483.  The Fifth Circuit explained:

> Any lingering uncertainty, with respect to the adequacy standard
> in securities fraud class actions, has been conclusively resolved
> by the PSLRA's requirement that securities class actions be
> managed by active, able class representatives who are informed
> and can demonstrate they are directing the litigation.  In this
> way, the PSLRA raises the standard adequacy threshold.

<u>Id</u>. at 483 (emphasis added).  The Fifth Circuit concluded that "in complex class action securities cases governed by the PSLRA, the adequacy standard must reflect the governing principles of the Act and, particularly, Congress's emphatic command that competent plaintiffs, rather than lawyers, direct such cases." <u>Id</u>. at 484. Therefore, it appears that <u>Berger</u>'s heightened requirement for knowledge only applies to securities fraud class actions.

With respect to <u>Horton</u>, the Fifth Circuit did not require more than a basic knowledge of the case because the court deemed the proposed class representative as adequate because he was familiar with the complaint and the concept of a class action lawsuit.  <u>Horton</u>, 690 F.2d at 484.  While the Court is not bound to follow <u>Horton</u>, some district courts within the Ninth Circuit have stated that the knowledge of the class representatives is a factor to be considered based on citations to authority outside of the Ninth Circuit.  <u>See, e.g.</u>, <u>In re Communications Sys., Inc.</u>, 2003 WL 21383824, at *4 (N.D. Cal. Feb. 24, 2003) (relying on district court opinions from the Seventh and Eleventh Circuits); <u>In re Emulex Corp. Sec. Litig.</u>, 210 F.R.D. 717, 721 (C.D. Cal 2002) (relying, as Defendants do here, on the <u>Berger</u> case from the Fifth Circuit); <u>In re THQ, Inc. Sec. Litig.</u>,

2002 WL 1832145, at *6 (C.D. Cal. Mar, 22, 2002) (citing a district court opinion from the Second Circuit); In re Pilgrim Sec. Litig., 1996 WL 742448, at *6-7 (C.D. Cal. Jan. 23, 1996) (citing a district court opinion from the Third Circuit); Loma Linda Univ.Med. Ctr. Inc. v. Farmers Group Inc., 1995 WL 363441 at *6 (E.D. Cal. May 15, 1995) (relying on an opinion from the Third Circuit); In re Quarterdeck Office Sec. Office Sys. Litig., 1993 WL 623310, at *5-6 (C.D. Cal. Sept. 30, 1993) (relying on a district court opinion from the Eighth Circuit); In re MDC Holdings Sec. Litig., 754 F. Supp. 785, 803 (S.D. Cal. 1990) (relying on district court opinions from the Third and Eighth Circuits).

i. Representatives' Individual Interests

To find adequacy of representation, the representatives' individual interests must be the same or similar to the interests of other class members rather than antagonistic to the interests of class members. Gen. Tel. Co. of Southwest v. Falcon, 457 U.S. 147, 157 (1982); Jordan, 669 F.2d at 1323. For example, the Supreme Court has held that the conflict in interests between current and future claimants in the Amchem asbestos litigation prevented the class representatives from providing adequate representation. Amchem Products, Inc. v. Windsor, 117 S.Ct. 2231, 2251(1997). Also, Plaintiffs must allege and show that "they personally have been injured." Lierboe v. State Farm Mut. Auto Ins. Co., 350 F.3d 1018, 1022 (9th Cir. 2003). Finally, Plaintiffs' claims must not be subject to unique defenses not relevant to other class members. Hanon v. Dataproducts Corp., 976 F.2d 497, 508 (9th Cir. 1992). However, "regarding potential conflicts, 'courts have generally declined to consider conflicts, particularly as they regard damages, sufficient to

48

1   defeat class action status at the outset unless the conflict is

2   apparent, imminent, and on an issue at the very heart of the suit.'"

3   Winkler v. DTE, Inc., 205 F.R.D. 235, 242 (D. Ariz. 2001) (quoting

4   Blackie, 524 F.2d at 909.)

5       For example, in Hanlon the Ninth Circuit explained that

6   "[e]xamination of potential conflicts of interest has long been an

7   important prerequisite to class certification" and cases should be

8   given heightened scrutiny where "class members may have claims of

9   different strength." 150 F.3d at 1020.  In finding that the

10  representation was adequate, the Ninth Circuit stated:

11      Potential plaintiffs are not divided into conflicting discrete

12      categories, such as those with present health problems and those

13      who may develop symptoms in the future. Rather, each potential

14      plaintiff has the same problem: an allegedly defective rear

15      latchgate which requires repair or commensurate compensation. The

16      differences in severity of personal injury present in *Amchem* are

17      avoided here by excluding personal injury and wrongful death

18      claims. Similarly, there is no structural conflict of interest

19      based on variations in state law, for the named representatives

20      include individuals from each state, and the differences in state

21      remedies are not sufficiently substantial so as to warrant the

22      creation of subclasses. Representatives of other potential

23      subclasses are included among the named representatives,

24      including owners of every minivan model. However, even if the

25      named representatives did not include a broad cross-section of

26      claimants, the prospects for irreparable conflict of interest are

27      minimal in this case because of the relatively small differences

28      in damages and potential remedies.

1   Hanlon, 150 F.3d at 1021.

2      Plaintiffs argue that there are no actual or potential conflicts

3   of interest between the proposed class members and the representative

4   Plaintiffs because each class member was allegedly harmed by the same

5   conduct in the form of artificially inflated ticket prices.  (Pl.'s

6   Mot. at 16-17.)  Defendant does not argue that there are potential or

7   actual conflicts of interests between class members.  (Def.s' Opp. at

8   20-21.)

9      ii.  Qualifications and Experience of the Representative's

10     Attorney

11     In evaluating whether class plaintiffs are represented by

12   qualified and competent counsel, courts examine counsels' litigation

13   experience in this type of action.  For example, in Molski, the Ninth

14   Circuit held that the district court did not abuse its discretion in

15   finding Rule 23(a)(4) satisfied based on its finding that "class

16   counsel had significant experience litigating ADA cases."  318 F.3d at

17   955.  See also Dunnigan v. Metropolitan Life Ins. Co., 214 F.R.D. 125

18   (S.D.N.Y. 2003).  Other factors include the proposed counsel's

19   motivation, competence, support personnel, and other professional

20   commitments.  See, e.g., Gomez v. Illinois State Bd. of Education, 117

21   F.R.D. 394, 400-02 (N.D. Ill. 1987); Georgia State Conference of

22   Branches of NAACP v. Georgia, 99 F.R.D. 16, 33-34 (S.D. Ga. 1983).

23   Plaintiffs' counsel possess experience in antitrust litigation. See

24   (Miller Decl. Ex. 2,3,4.)

25     Another factor in assessing proposed counsel's competence appears

26   to be counsel's prior experience in class action litigation.  See,

27   e.g., Coco v. Incorporated Village of Belle Terre, 233 F.R.D. 109

28   (E.D.N.Y. 2005) (finding counsel competent to act as counsel for 800

1 | member class where firm had experience in class action litigation at

2 | state level involving large classes); In re National Gas Commodities

3 | Litig., 231 F.R.D. 171 (S.D.N.Y. 2005) (counsel adequate where they

4 | had previously represented classes); Jeffreys v. Communications

5 | Workers of America, AFL-CIO, 212 F.R.D. 320 (E.D. Va. 2003).

6 | Plaintiffs' counsel have significant experience in class action

7 | litigation. See (Miller Decl. Ex. 2,3,4.)

8 | Finally, courts can evaluate the performance of counsel in prior

9 | stages of the instant case. See, e.g., Hatch v Reliance Ins. Co., 758

10 | F.2d 409 (9th Cir. 1985); Mechigian v Art Capital Corp., 612 F. Supp

11 | 1421 (S.D.N.Y. 1985); Zeffiro v First Pennsylvania Banking & Trust

12 | Co., 96 F.R.D. 567 (E.D. Pa. 1983); Twyman v Rockville Housing

13 | Authority, 99 FRD 314; Armstrong v Chicago Park Dist., 117 F.R.D 623

14 | (N.D. Ill. 1987). The Court finds that Plaintiffs' counsel has

15 | performed competently to date. Therefore, the Court concludes that

16 | Plaintiffs are represented by qualified and competent counsel, and

17 | determines that the requirements of Rule 23(a)(4) are satisfied.

18 | iii. Knowledge of Class Representatives

19 | As discussed above, the Ninth Circuit has never imposed such a

20 | knowledge requirement. However, because some district courts within

21 | the Ninth Circuit have imposed such a requirement, the Court will

22 | consider this factor.

23 | Defendants argue that the proposed class representatives do not

24 | "fairly and adequately protect the interests of the class" due to the

25 | representatives' "abdication to counsel." (Id. at 20.) Specifically,

26 | the Defendants assert that proposed representatives lack knowledge

27 | about the basis for the lawsuits, the representatives' knowledge about

28 | the suits is solely derivative knowledge acquired from counsel, and

1    the representatives had no input in drafting the complaint and took no

2    steps to confirm that the allegations in the complaint were true.

3    (Id. at 21.)

4        The district courts which have imposed this requirement have

5    recognized that the threshold for sufficient knowledge is not high.

6    All that is necessary is a "rudimentary understanding of the present

7    action and . . . a demonstrated willingness to assist counsel in the

8    prosecution of the litigation." Thomas & Thomas, 209 F.R.D. at 165;

9    see also In re THQ, Inc. Sec. Litig., 2002 WL 1832146, at *6

10   ("[U]nfamiliarity with the suit does not itself require denial of

11   class certification."). The degree of knowledge required is lowered

12   if the case involves complicated legal issues. See In re

13   Communications Sys., Inc., 2003 WL 21383824, at *4 ; In re THQ, Inc.

14   Sec. Litig., 2002 WL 1832146, at *6; In re Emulex Corp. Sec. Litig.,

15   210 F.R.D. at 721; In re Pilgrim Sec. Litig., 1996 WL 742448, at *6-7;

16   Kassover v. Coeur D'Alene Mines Corp., 1992 WL 509995, at *3 (D. Idaho

17   Sept. 2, 1992); In re MDC Holdings Sec. Litig., 743 F. Supp. at 803.

18   As one court explained, imposing a heightened knowledge requirement

19   "would render the class action device an impotent tool." Kassover,

20   1992 WL 509995, at *3. This threshold may be reduced even more if

21   there are many class representatives. See In re Pilgrim Sec. Litig.,

22   1996 WL 742448, at *7 ("Although Defendants have asserted that several

23   of the class representatives may not have sufficient knowledge of the

24   case, the large number of class representatives will assure that the

25   attorneys associated with the case will be adequately supervised.").

26       Consequently, the plaintiff's knowledge must be severely lacking

27   in order to find the representatives inadequate. In re THQ, Inc. Sec.

28   Litig., 2002 WL 1832145, at *6; see also Yamner v. Boich, 1994 WL

1    514035 at *6-7 (N.D. Cal. Sept. 15, 1994) (holding that Plaintiff was

2    an adequate class representative because he had "a basic understanding

3    of the allegations," despite the fact that he was unaware of the

4    case's legal history and had probably not read the complaint). In the

5    one district court case within the Ninth Circuit in which the

6    representatives were determined to be inadequate, the court found that

7    the plaintiffs did not seem to care about the case, did not know that

8    several defendants had been dropped, and were unsure as to who was

9    representing them in the case. In re Quarterdeck Office Sec. Office

10   Sys., Inc. Sec. Litig., 1993 WL 623310, at *5-6 (C.D. Cal. Sept. 30,

11   1993). Other examples from outside the Ninth Circuit include a woman

12   who did not know who she was suing or what a "defendant" was, In re

13   CBS Cos., Inc. Collection Letter Litig., 181 F.R.D. 380, 383-84 (N.D.

14   Ill. 1998), and a man who had never seen the complaint and could not

15   recall ever seeing any of the representations made in the complaint,

16   Hillis v. Equifax Consumer Servs, Inc., 237 F.R.D 491, 502 (N.D. Ga.

17   2006).

18        Having reviewed the deposition transcripts of the class

19   representatives, the Court finds that the representatives demonstrated

20   an understanding of the basic theory for the case. See, e.g., (Rosen

21   Dep. at 18-21, 53-57, 112-114); (MacLaughlan Dep. at 50-59); (Thompson

22   Dep. at 19-20); (Riley Dep. at 4, 14-21); (Young Dep. at 28-33; 113);

23   (Hammer Dep. at 21, 106-111, 159-160). The representatives also

24   evidenced an understanding of their duties as class representatives

25   and a willingness to participate in the litigation. See, e.g., (Rosen

26   Dep. at 17-26, 51-53, 142-143); (MacLaughlan Dep. at 50); (Young Dep.

27   at 24, 37-38). Because the representatives demonstrated sufficient

28   knowledge of the litigation and a willingness to assist counsel, the

1 Court holds that the representatives meet the knowledge requirement

2 that some district courts in this Circuit have imposed.  See 209

3 F.R.D. at 165.  Because the Plaintiffs have made a sufficient showing

4 that representatives do not have conflicts of interest with the

5 proposed class, that Plaintiffs are represented by qualified and

6 competent counsel, and that the representatives have adequate

7 knowledge about the litigation, the Court finds that the requirements

8 of Rule 23(a)(4) are satisfied.

9     In sum, the Court concludes that Plaintiffs have satisfied all

10 four Rule 23(a) requirements.  Therefore, the Court proceeds to

11 analyze whether Plaintiffs have satisfied Rule 23(b).

12     D.  Rule 23(b) Factors

13     Plaintiffs must also satisfy Rule 23(b)(1), (b)(2), or (b)(3).

14 Plaintiff seeks to certify the class pursuant to Federal Rule of Civil

15 Procedure 23(b)(3).  (Pl.'s Mem. at 17.)  Rule 23(b)(3) requires that

16 "the court find[] that the questions of law or fact common to the

17 members of the class predominate over any questions affecting only

18 individual members, and that a class action is superior to other

19 available methods for the fair and efficient adjudication of the

20 controversy" (emphasis added). Factors to be considered in this

21 determination include:

22   · "the interest of members of the class in individually controlling

23     the prosecution or defense of separate actions;"

24   · "the extent and nature of any litigation concerning the

25     controversy already commenced by or against members of the class;"

26   · "the desirability or undesirability of concentrating the

27     litigation of the claims in the particular forum;" and

28

1    · "the difficulties likely to be encountered in the management of a

2    class action."

3    Id.

4         The predominance inquiry of Rule 23(b)(3) differs from the

5    commonality inquiry of Rule 23(a)(2) in that "[t]he Rule 23(b)(3)

6    analysis 'presumes that the existence of common issues of fact or law

7    have been established pursuant to Rule 23(a)(2),' and instead 'focuses

8    on the relationship between the common and individual issues.'"    In re

9    NCAA I-A Walk-On Football Players Litig., 2006 WL 1207915, at *9

10   (W.D.Wash. May 3, 2006) (quoting Hanlon, 150 F.3d at 1022).

11   Throughout this analysis, the Court's focus must be "whether the

12   'evidence is sufficient to demonstrate common questions of fact

13   warranting certification of the proposed class, not whether the

14   evidence ultimately will be persuasive' to the trier of fact."    Dukes,

15   474 F.3d at 1229 (quoting In re Visa Check/MasterMoney Antitrust

16   Litig., 280 F.3d at 135).

17        1.  Questions of Law or Fact Common to Members of the Class

18            Predominate Over Any Questions Affecting Only Individual Members

19        "In order to state a claim for monopolization under Section 2 of

20   the Sherman Act, a plaintiff must prove: (1) Possession of monopoly

21   power in the relevant market; (2) willful acquisition or maintenance

22   of that power; and (3) causal antitrust injury." Pacific Exp., Inc. v.

23   United Airlines, Inc., 959 F.2d 814, 817 (9th Cir. 1992) (citing Movie

24   1 & 2 v. United Artists Communications, Inc., 909 F.2d 1245, 1254 (9th

25   Cir. 1990), cert. denied, 501 U.S. 1230, 111 S.Ct. 2852, 115 L.Ed.2d

26   1020 (1991)); Forsyth v. Humana, Inc., 114 F.3d 1467, 1475 (9th Cir.

27   1995) (same).  See also, United States v. Grinnell Corp., 384 U.S.

28   563, 570-571 (1966)   ("The offense of monopoly under § 2 of the

Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."); Heerwagen, 435 F.3d at 226-27 (same).[18]

Plaintiffs argue that common issues predominate because common or generalized proof will predominate at trial with respect to the essential elements of the antitrust claims. (Pl.'s Mot. at 17-18.) For example, Plaintiffs contend that each member of the class would introduce exactly the same evidence to demonstrate the scope of the relevant market, possession of monopoly power in the market, and the alleged illegality of Defendants' actions under the Sherman Act. (Id. at 18.) Furthermore, Plaintiffs argue that the scope of the relevant product market is a common issue to the members of each regional class, the scope of the relevant geographic market is a common issue to the members of each regional class, and the demonstration of antitrust impact will be proven based on common evidence and methods. (Id. at 19-23.) Defendants argue that common issues do not predominate because there is no common product market, no common anticompetitive conduct, and no common injury. (Def.s' Opp. at 11-18.)

  i. Market Definition

---

[18] With respect to Plaintiffs' claim for attempted monopolization, the following elements must be proved: " (1) specific intent to control prices or destroy competition; (2) predatory or anticompetitive conduct to accomplish the monopolization; (3) dangerous probability of success; and (4) causal antitrust injury." Pacific Exp., Inc. v. United Airlines, Inc. 959 F.2d 814, 817 (9th Cir. 1992) (citing Movie 1 & 2 v. United Artists Communications' Inc., 909 F.2d 1245, 1254 (9th Cir. 1990), cert. denied, 501 U.S. 1230 (1991)).

1  The first step in evaluating market power is defining the

2  relevant market.  Plaintiffs' expert asserts that the relevant product

3  market is all rock concerts in a given geographic region.  Defendants'

4  experts claim that that rock concerts are highly differentiated

5  products competing in more than a single product market.  (Def.s' Opp.

6  at 15.)  Defendants argue that the "class cannot be certified if the

7  putative class members did not purchase in the same product market

8  because it would be impossible to assess whether the defendant's

9  conduct affected them all on a common basis."  (Id.)

10  "The relevant market is the field in which meaningful

11  competition is said to exist."  Image Technical Services, Inc. v.

12  Eastman Kodak Co., 125 F.3d 1195, 1202-1203 (9th Cir. 1997).

13  "Generally, the relevant market is defined in terms of product and

14  geography."  Id.  Defendants do not contest that the relevant

15  geographic market is a common issue to the members of each regional

16  class.

17  "For antitrust purposes, a 'market is composed of products that

18  have reasonable interchangeability for the purposes for which they are

19  produced - price, use and qualities considered.'"  Paladin Associates,

20  Inc. v. Montana Power Co., 328 F.3d 1145, 1163 (9th Cir. 2003)

21  (quoting Int'l Boxing Club of N.Y., Inc. v. United States, 358 U.S.

22  242, 250 (1959)); see also Oltz v. St. Peter's Cmty. Hosp., 861 F.2d

23  1440, 1446 (9th Cir. 1988) ("The product market includes the pool of

24  goods or services that enjoy reasonable interchangeability of use and

25  cross-elasticity of demand."); Areeda & Hovenkamp, Antitrust Law ¶ 560

26  ("A product grouping constitutes a market if a hypothetical defendant

27  controlling its output could maximize profits by charging

28  significantly more than the competitive price for a significant

period.”); Id. ¶ 530a (“[A] market is the arena within which

significant substitution in consumption or production occurs.”).

Calculating the cross-elasticity of demand is often the first

step in defining a market. See, e.g., Lucas Automotive Engineering,

Inc. v. Bridgestone, 275 F.3d 762, 767 (9th Cir. 2001); SuperTurf,

Inc. v. Monsanto Co., 660 F.3d 1275, 1278 (8th Cir. 1981); United

States Department of Justice and the Federal Trace Commission,

Horizontal Merger Guidelines § 1.11 (1997) [hereinafter “Merger

Guidelines”].[19] Cross-elasticity of demand measures the

substitutability of two products by determining whether consumers will

shift from one product to another in response to changes in the

relative costs of the two products. Bridgestone, 275 F.3d at 767;

SuperTurf, 660 F.3d at 1278. Cross-elasticity of demand is calculated

based on changes in the quantity demanded in response to changes in

price:

> The responsiveness of demand to changes in the price of another
>
> product is called the cross elasticity of demand. It is denoted
>
> ηxy and defined as follows:
>
> ηxy = (% change in quantity demanded of X) / (% change in price
>
> of Y)

---

[19]  The Merger Guidelines provide the following test to determine which
products should be included in the market:
> [T]he Agency will begin with each product (narrowly defined)
> produced or sold by each merging firm and ask what would happen
> if a hypothetical monopolist of that product imposed at least a
> "small but significant and nontransitory" increase in price, but
> the terms of sale of all other products remained constant. If, in
> response to the price increase, the reduction in sales of the
> product would be large enough that a hypothetical monopolist
> would not find it profitable to impose such an increase in price,
> then the Agency will add to the product group the product that is
> the next-best substitute for the merging firm's product.
Merger Guidelines § 1.11.

1        The change in the price of good Y causes the demand curve for

2        good X to shift. If X and Y are substitutes, then an increase in

3        the price of Y leads to an increase in the demand for X. If X

4        and Y are complements, then an increase in the price of Y leads

5        to a reduction in demand for X. In either case, we hold the

6        price of X constant. We therefore measure the change in the

7        quantity demanded of X (at its unchanged price) by measuring the

8        shift of the demand curve for X.

9 Lipsey, Richard G. et al., <u>Microeconomics</u>, 99 (12th ed. 1998); <u>see</u>

10 <u>also</u> Mansfield, Edwin, <u>Microeconomics: Theory/Applications</u>, 128 (6th

11 ed. 1988) ("The cross elasticity of demand is defined as $\eta xy$ =

12 $(\Delta Qx/Qx)$ / $(\Delta Py/Py)$ where $\Delta Py$ is the change in the price of good Y, Py

13 is the original price of good Y, $\Delta Qx$ is the resulting change in in the

14 quantity demanded of good X, and Qx is the original quantity demanded

15 of good X.") "A high cross elasticity of demand indicates that

16 products are close substitutes, and should probably be treated as part

17 of the same market. A low or zero cross elasticity of demand is

18 evidence that products do not compete in the same relevant market."

19 <u>Forsyth v. Humana, Inc.</u>, 114 F.3d 1467, 1483 (9th Cir. 1997) (Wallace,

20 C.J., concurring-in-part and dissenting-in-part).

21        Areeda and Hovenkamp explain that substitutability can also be

22 determined by analyzing cross-elasticity of supply:

23        Two products, A and B, are in the same relevant market if

24        substitutability at the competitive price is very high as

25        measured from <u>either</u> the demand side or the supply side. To have

26        separate markets, one must find that a significant price increase

27        beyond the competitive level in the A price would <u>neither</u> induce

28        customers of A to buy B instead, nor induce B producers to make

1    A.   Thus, although not close substitutes for each other on the

2    demand side, two products produced interchangeably from the same

3    production facilities are in the same market.

4    Areeda & Hovenkamp, Antitrust Law ¶ 561 (emphasis in original).

5    Numerous courts consider cross-elasticity of supply in defining the

6    relevant market, not simply cross-elasticity of demand.  See, e.g.,

7    Rebel Oil Co. v. Atlantic Richfield Co., 51 F.3d 1421, 1436 (9th Cir.

8    1995); AS/ST v. Associated Press, 181 F.3d 216, 227 (2d Cir. 1999);

9    Calnetics Corp. v. Volkswagen of Am., 532 F.2d 674, 691 (9th Cir.

10   1976); Calnetics Corp. v. Volkswagen of Am., Inc., 532 F.2d 674, 691

11   (9th Cir. 1976); Rothary Storage Van Co. v. Atlas Van Lines, Inc., 792

12   F.2d 210, 218 (D.C. Cir. 1986); Blue Cross & Blue Shield v. Marshfield

13   Clinic, 65 F.3d 1406, 1410-11 (7th Cir. 1995); United States v. Anchor

14   Mfg., 7 F.3d 986, 995 (11th Cir. 1993); National Bancard Corp.

15   (NaBanco) v. VISA U.S.A., Inc., 596 F. Supp. 1231, 1257 (C.D. Fla.

16   1984); Nobody in Particular Presents, Inc. v. Clear Channel

17   Communications, Inc., 311 F. Supp. 2d 1048, 1081 (D. Colo. 2004);

18   Bauer, Joseph P. & Page, William H., Kinter Federal Anitrust Law, §

19   10.4 (2002 ed.).

20       However, while cross-elasticities of demand and supply provide

21   the most reliable measures of market definition, "it is ordinarily

22   quite difficult to measure cross-elasticities of supply and demand

23   accurately." U.S. Anchor Mfg., Inc. v. Rule Indus., Inc., 7 F.3d 986,

24   995 (11th Cir. 1993).  Therefore, courts consider a wide range of

25   evidentiary sources in evaluating substitutability and estimating

26   cross-elasticity of demand.  In Brown Shoe Co. v. United States, the

27   Supreme Court held that courts could determine the boundaries of an

28   antitrust market "by examining such practical indicia as industry or

public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." 370 U.S. 294, 325 (1962). Although Brown Shoe involved the definition of submarkets, the Ninth Circuit has held that the Brown Shoe factors "are relevant even in determining the primary market to be analyzed for antitrust purposes." Olin Corp. v. F.T.C., 986 F.2d 1295, 1299 (9th Cir. 1993) (citing United States v. Continental Can Co., 378 U.S. 441, 449-55 (1964)). See also H.J., Inc. v. Internat'l Tel. & Tel. Corp., 867 F.2d 1531, 1540 (8th Cir.1989) (citing Areeda & Hovenkamp, Antitrust Law ¶ 518.1 at 311-15 (1987 Supp.)); Nobody in Particular Presents, 311 F. Supp. 2d at 1082-83 (compilation of cases which have held that a plaintiff may define a relevant market without a cross-elasticity of demand analysis so long as sufficient evidence of other indicia of market definition is introduced).

###### a.  Plaintiffs' Expert

Plaintiffs rely on the expert report of Professor Owen Phillips in support of their claim that the relevant product market is "live rock concerts" in a given geographic region.[20]  Phillips contends that the relevant product market in this case is "live rock music concerts." (Id. ¶ 29.)  Although Phillips does not attempt to calculate the cross-elasticities of demand or supply for particular rock concerts, Phillips claims that rock concerts constitute a single product market for several reasons.  First, Phillips asserts that rock

---

[20] Phillips is a professor of economics at the University of Wyoming who received his Ph.D. in economics at Standford University in 1980 and previously worked at the Antitrust Division of the United States Department of Justice.  (Phillips Prelim. Report. ¶ 1.)

1  music is an identifiable genre.  (_Id._)  Phillips notes that Webster's

2  Ninth New Collegiate Dictionary defines rock music as "popular music

3  played on electronically amplified instruments and characterized by a

4  persistent heavily accented beat, [with] much repetition of simple

5  phrases."  (_Id._)  Phillips highlights that rock music is identified as

6  a distinct genre by industry radio guides such as <u>Arbitron</u> and

7  <u>Duncans</u>, and by industry sources such as <u>Billboard</u> and <u>Radio &</u>

8  <u>Records</u>. (_Id._ ¶¶ 31,33.)  Phillips also states that "bands, artists,

9  record labels, and fans have no difficulty distinguishing between rock

10  music and other types of music, such as jazz, classical, and country

11  and western."  (_Id._ ¶ 34.)

12       Second, Phillips argues that "[s]ubstitutability (or

13  interchangeability) across rock artists is common sense."  (_Id._ at 9.)

14  In support of this argument, Phillips emphasizes that the musical

15  tastes of the class representatives demonstrates that substitutability

16  exists between rock concerts.  (Phillips Rebuttal report at 9-10.)

17  For example, Phillips points out that Plaintiff Riley has attended

18  concerts by U2, Bob Dylan, Madonna, and Pearl Jam.  (Riley Depo. at

19  8,9,22.).  <u>See also</u> (Hayes Depo. at 30-57) (attended concerts by Bruce

20  Springsteen, Roger Waters, Crosby Stills Nash & Young, Indigo Girls,

21  Prince, Eric Clapton, Elton John, Billy Joel, Bob Sieger, Melissa

22  Ethrdige, and the Who); (Young Depo. at 18-27) (attended concerts by

23  Bruce Springsteen, Elvis Costello, and the Rolling Stones).

24       Third, Phillips concedes that cross-elasticities of demand vary

25  across concerts for individual buyers.  However, Phillips contends

26  that this fact does not prevent rock concerts from being defined as a

27  market because the Court must examine the market collectively:

28

1      In any market the collection of buyers or the class is made up of

2      individuals with different tastes.  The definition of the market

3      still rests on the fundamental concept that it is a good

4      collection of goods that consumers find to be good substitutes.

5      It is a collection of goods, which if sold by one vendor, would

6      generate higher revenues with a small price increase.  As with

7      any market there will be individuals who have strong opinions

8      about quality.  Just as some automobile buyers have strong

9      preferences between a Ford and Chevy, buyers in the relevant rock

10      concert will have strong opinions about the difference in quality

11      between U2 and Metallica.  These individual tastes do not destroy

12      the definition of a market, nor do they destroy the definition of

13      a class of buyers harmed by high ticket prices.

14  (Id. ¶ 38.)

15      Finally, Phillips notes that he was the plaintiff's expert in

16  Nobody in Particular Presents, Inc. v. Clear Channel Communications,

17  Inc., 311 F. Supp. 2d 1048 (D. Colo. 2004).  In that case a rock

18  concert promoter in Denver named Nobody in Particular Presents, Inc.

19  ("NIPP") sued Clear Channel in 2001.  Similar to the allegations in

20  the MDL, the concert promoter alleged that Clear Channel violated the

21  Sherman Act "by conditioning air-play of an artist's songs and

22  promotional support for the artist's concerts on the artist's use of

23  SFX/Clear Channel Entertainment or Clear Channel Concerts/Clear

24  Channel Radio Festivals for the artist's concert-promotions needs in

25  the Denver market."  Id. at 1091.  With respect to both the

26  monopolization and attempted monopolization claims, NIPP argued that

27  the relevant product market "is the market for tickets to rock music

28

1    concerts, where the seller is the music concert promoter and the buyer

2    is the concert-going public."[21] _Id._ at 1077.

3         Defendant Clear Channel filed a motion for summary judgment on

4    all claims.    The first step in the Colorado district court's analysis

5    of the Sherman Act claims was to "examine the reasonable

6    interchangeability of the rock concerts and non-rock concerts to the

7    concert-going public in order to determine whether NIPP sets forth

8    sufficient evidence to define the scope of the relevant market for the

9    monopolization and attempted monopolization claims." _Id._ at 1078.

10   The court noted that "[t]here is only one relevant market definition

11   for NIPP's monopolization and attempted monopolization claims, despite

12   the fact that numerous inputs are implicated." _Id._ n.5.

13        The court's market definition analysis involved consideration of

14   cross-elasticity of demand, cross-elasticity of supply, and

15   examination of practical indicia. _Id._ at 1080-85.  While the court

16   observed that NIPP's expert witness, Dr. Phillips, failed to perform

17   an economic analysis of cross-elasticity of demand, the court found

18   that Phillips had analyzed other practical indicia of the relevant

19   market. _Id._ at 1083.  Phillips' analysis of other indicia included:

20   (1) assimilation of "data supporting the assertion that the industry

21   and the public view rock concerts as a separate and distinct market

22   from non-rock concerts," (2) the presentation of "evidence that rock

23   concerts have uses and qualities distinctive from non-rock concerts,"

24   and (3) the presentation of "evidence of distinct price and of pricing

25   

26   [21] Defendant Clear Channel argued that the relevant markets should be
     defined as "all music, not just rock."  311 F. Supp. 2d at 1080.    In
27   contrast, Defendant Clear Channel now argues that the relevant market
     proposed by Plaintiffs in this case - all rock concerts - is too
28   broad.

1  patterns for rock concerts." Id. at 1083-84. The district court

2  concluded that "NIPP has set forth evidence of the practical indicia

3  necessary to define the relevant market as tickets for rock concerts."

4  [22] Id. at 1084.

5      b.  Defendants' Experts

6      Defendants argue that Phillips' market definition analysis is

7  flawed in several respects. Defendants submitted an expert report

8  prepared by Professor Richard J. Gilbert.[23] Gilbert asserts that the

9  "relevant product markets appropriate to the analysis of the

10  allegations in these cases are significantly narrower than the 'all

11  rock concerts' product market alleged by plaintiffs and their expert."

12  (Gilbert Report ¶ 10.) Gilberts posits that "there are many relevant

13  product markets, each one much narrower than the market defined by

14  plaintiffs." (Gilbert Report ¶ 33.)

15      Gilbert explains that "[a] relevant product market contains

16  products that consumers consider to be close substitutes for each

17  other." (Gilbert Report ¶ 20.) Thus, Gilbert's analysis is based

18  solely on consumers alleged views of the substitutability of rock

19  concerts. For example, Gilbert argues that "[b]ecause the potential

20  purchasers of rock concert tickets do not consider all or most rock

21  concerts to be close substitutes, it is inappropriate to group them

22  within a single relevant product market." (Gilbert Report ¶ 21.)

23

24  [22] The Court proceeded to grant-in-part and deny-in-part Clear
    Channel's motion for summary judgment. Id. at 1121. The case settled

25  prior to trial. (Def.'s Opp. at 6.)

    [23] Gilbert is currently a Professor of Economics at the University of

26  California at Berkley. (Gilbert Report ¶ 1.) Among other positions,
    Gilbert was the Deputy Assistant Attorney General for Economics in the

27  Antitrust Division of the U.S. Department of Justice from 1993 to 1995
    and the Chair of the Department of Economics at Berkley from 2002 to

28  2005. (Id. ¶¶ 1,4.)

Similarly, Gilbert states that "when individual tastes differ enough for two products, then they are not in the same relevant product market." (Gilbert Report ¶ 22.)

1. **Cross-elasticity conclusions based on testimony of class representatives**

Gilbert relies on statements made by the respective class representatives during their depositions in support of his contention that individuals do not consider rock concerts to be substitutes. For example, Adam Rosen, the representative for the proposed Boston Region, stated that he "wouldn't just go to a concert for the sake of going because it was less expensive than another." (Rosen Depo. at 68:25-69:15.) Gilbert concludes that Rosen's comment "is equivalent to Mr. Rosen saying that for him there is no cross-price elasticity between concerts by different artists and thus he does not consider a concert by any one artist to be a close substitute for a concert by other artists." (Gilbert Report ¶ 23.) Similarly, Gilbert points out that Manish Bhatia, the named representative for the proposed Chicago Region class, does not consider Creed or Rush to be acceptable substitutes for Pearl Jam. (Bhatia Depo. at 71:3-74:2.) Gilbert explains that the fact that "Bhatia would not see Rush even at a much cheaper price than Pearl Jam is equivalent to there being no cross-price elasticity between the concerts of Pearl Jam and Rush from his perspective." (Gilbert Report ¶ 24.) See also (Gilbert Report ¶¶ 25-26) (interpreting statement by other class representatives as indicating that there is no cross-price elasticity between various rock concerts.) Defendants also submit declaration from various Live Nation executives and artists managers in support of Defendants' argument that cross-elasticity of demand between bands is low. See

(Campana Decl. ¶ 2) ("If a fan does not like a particular artist or band, she will not switch her preference to that artist merely because of that artist's concert ticket price."); (Guernot Decl. ¶ 7) ("the fans of each one of my clients would very likely list only a small number of artists whom they would consider seeing in concert instead of my client."); (Innamorato Decl. ¶ 13) ("In my experience, a higher or lower ticket price for one artist will not influence a person to change his or her mind and go see another artist on the same night."); (Lavoisne Decl. ¶ 6) ("[I]f Barenaked Ladies tickets are $20 cheaper than Coldplay tickets, that will not cause Barenaked Ladies fans to go see Coldplay instead.")

Gilbert's conclusion that rock concerts are not close substitutes based on his analysis of statements by class representatives is questionable for several reasons.  First, as stated by Professors Areeda and Hovenkamp, the "least reliable" evidence in predicting the effects of a hypothetical price increase is "'subjective' testimony by customers that they would or would not defect in response to a given price increase." Areeda & Hovenkamp, <u>Antitrust Law</u> ¶ 538b. <u>See also</u> <u>F.T.C. v. Tent Health Care Corp.</u>, 186 F.3d 1045, 1054 (8th Cir. 1999). "Though not irrelevant, such statements are often unreliable, especially when the question is oversimplified." Areeda, <u>supra</u>, ¶ 538b.

Setting aside the unpersuasive nature of the evidence on which Gilbert bases his opinion, Gilbert's analysis is more fundamentally flawed because he bases his conclusions about cross-elasticity of demand on the consumption decisions of individual purchasers.  For example, Gilbert concludes that representative Rosen's comment that he "wouldn't just go to a concert for the sake of going because it was

1    less expensive than another . . . is equivalent to Mr. Rosen saying

2    that for him there is no cross-price elasticity between concerts by

3    different artists and thus he does not consider a concert by any one

4    artist to be a close substitute for a concert by other artists."

5    (Gilbert Report ¶ 23.)  However, when calculating the cross-elasticity

6    of demand, economists examine the aggregate demand of consumers as

7    represented by a demand curve rather than the purchasing decisions of

8    an individual consumer. See, e.g., Mansfield, Edwin, Microeconomics:

9    Theory/Applications, 128 (6th ed. 1988) ("Holding constant the

10   commodity's own price (as well as the level of money incomes) and

11   allowing the price of another commodity to vary, there may be

12   important effects on the quantity demanded in the market for the

13   commodity in question.") (emphasis added).  See also Lipsey, Richard

14   G. et al., Microeconomics, 88-100 (12th ed. 1998).  Thus, whether or

15   not various rock concerts are close substitutes for representative

16   Rosen does not demonstrate whether the aggregate quantity demanded in

17   the market for one concert will be affected by a price increase for

18   another concert.[24]

19   _____

[24]  Phillips also explains that the fact that products have low price-

20   elasticities does not necessarily mean that two products have a low
     cross-elasticity of demand.  Phillips provides the following example

21   to illustrate this distinction.  (Phillips Rebuttal Report at 6-7.)
     First, Phillips assumes that there are two types of rock bands, type A

22   and type B.  (Id. at 6.)    Second, Phillips assumes that type A bands
     sell 1000 tickets per year in a geographic region and type B bands

23   sell 500 tickets per year in the same geographic region.  (Id. at 6-
     7.)  Next, Phillips assumes that A's ticket prices are raised by 5%

24   and this causes 40 ticket buyers from type A's bands to decide to
     attend a type B concert instead.  (Id. at 7.)  Phillips notes that

25   this results in a cross-price elasticity of 1.6.  (Id.)  Phillips
     explains that this is a "reasonably high" cross-price elasticity which

26   indicates that the two band types should be in the same market.  (Id.)
     Phillips emphasizes that the cross-price elasticity is reasonably high

27   even though the price elasticity of group A is sufficiently low that

28   group A can raise its price without a significant loss in sales.

2.  <u>Cross-elasticity conclusions based on a comparison of prices</u>

Gilbert also concludes that the cross-price elasticity between concerts is "zero or very low" based on analysis of the average price of a concert ticket for twenty-one various artists in 2001.  (Gilbert Report ¶¶ 29-30, Figure 1.)  Gilbert observes that the average prices range from $12.67 for the group "Seven Nations" to $189.04 for Cream.  (Gilbert Report ¶ 29.)  Gilbert concludes that "[t]he broad range of average prices shown in Figure 1 reflects the great variation across artists in the 'willingness to pay' of consumers for tickets to those artists' concerts . . . [and] suggests that cross-price elasticity between concerts with very different prices is often zero or very low." (Gilbert Report ¶ 30.)  Gilbert supports this conclusion with the following reasoning:

> For example, if there were any cross-price elasticity between the concerts of Cream (average 2005 price = $189.04) and the concerts of Modest Mouse (average 2005 price = $23.49), so many concertgoers would have decided to see Modest Mouse at its much lower price instead that the concert halls for Cream would have been nearly empty.  Instead, Cream sold over 56,000 tickets to its three sold-out shows at the Madison Square garden Arena.

(Gilbert Report ¶ 31.)

Gilbert's conclusion that the substantial difference in prices demonstrates that cross-elasticity of demand is low is economically flawed.  As discussed above, cross-price elasticity of demand is "[t]he responsiveness of demand [for one product] to changes in the price of another product."  Cross-elasticity of demand is calculated as follows: $\eta_{xy}$ = (% change in quantity demanded of X) / (%

(<u>Id.</u>)

1  change in price of Y). Thus, the difference in price between the two

2  products is irrelevant – the only relevant price is the change in

3  price of product Y. Consequently, the fact that Cream sold over

4  56,000 tickets at three concerts even though its ticket price was

5  $189.04 and the price of Modest Mouse tickets was $23.49 reveals

6  nothing about the cross-elasticity of demand between the two

7  concerts.[25]

8      Similarly flawed arguments have been condemned by the Ninth

9  Circuit. For example, in Twin City Sportservice, Inc. v. Charles O.

10 Finley & Co., Inc., the Ninth Circuit stated that "the scope of the

11 relevant market is not governed by the presence of a price

12 differential between competing products." 512 F.2d 1264, 1274 (9th

13 Cir. 1975). The Ninth Circuit noted that in United States v. E.I. du

14 Pont de Nemours & Co., the Supreme Court included cellophane in the

15 flexible wrapping market even though the cost of cellophane was two to

16 three times more than the other products in the market. Id. (citing

17 351 U.S. 377, 401 (1956)).

18     3. Failure to consider cross-elasticity of supply

19     Gilbert admits that "[f]rom the perspective of a promoter,

20 concerts by two very different rock artists such as John Mayer and

21 _____

22 [25]  To calculate the cross-elasticity of demand, it would be necessary to estimate the percentage change in the quantity demanded of Modest

23 Mouse tickets in response to a percentage change in the price of Cream tickets. Alternatively, cross-elasticity of demand could be

24 calculated by estimating the percentage change in the quantity demanded of Cream tickets in response to a percentage change in the

25 price of Modest Mouse tickets. "However, it should not be expected that the two elasticities will have the same numerical value . . .

26 [because even if two goods are substitutes] the consumption of good X may be more sensitive to changes in the price of good Y than the

27 consumption of good Y is to changes in the price of good X." Mansfield, Edwin, Microeconomics: Theory/Applications, 130-31 (6th ed.

28 1988).

Nine Inch Nails might indeed be close substitutes, because both might be able to satisfy the promoter's need to have a concert which the promoter can sell tickets, fill a venue, and make a profit." (Gilbert Report ¶ 19 n.11.)  Thus, Gilbert concedes that the cross-elasticity of supply may be quite high.  However, Gilbert contends that the Court need not analyze the market from the perspective of a promoter because the MDL cases were brought by consumers rather than promoters. (Gilbert Report ¶ 19 n.11.)

The Ninth Circuit has stated that "defining a market on the basis of demand considerations alone is erroneous" because "[a] reasonable market definition must also be based on 'supply elasticity.'" Rebel Oil, 51 F.3d at 1436 (citing Virtual Maintenance, Inc. v. Prime Computer Inc., 11 F.3d 660, 664 (6th Cir. 1993) and Areeda & Hovenkamp, Antitrust Law ¶ 533f.).  Defendants have failed to point the Court to any case or treatise stating that the nature of the plaintiff dictates how the court should analyze market definition.

### 4.  Differentiation does not preclude market definition

Gilbert argues that rock concerts for each artist might constitute a separate market because each rock concert is a differentiated product.  However, Defendants' contention that rock concerts are differentiated products does not necessarily compel the conclusion that rock concerts, when aggregated, cannot be defined as a single market.  Areeda and Hovenkamp define product differentiation:

Product differentiation ordinarily describes narrower differences that at least some buyers value.  Identical grocers a few blocks apart may differ in the minds of buyers closer to one of the other.  Consumers may favor one brand over another of physically identical or similar aspirin.  Many machines performing the same

1    function – such as copiers, computers or automobiles – differ not

2    only in brand name but also in performance, physical appearance,

3    size, capacity, cost, price, reliability, ease of use, service,

4    customer support, and other features.  Nevertheless, they

5    generally compete with one another sufficiently that the price of

6    one brand is greatly constrained by the price of others.  In one

7    sense, any item is differentiated when any buyer distinguishes

8    among the offerings of different sellers.  But this extreme

9    definition has little utility.  The differences may be trivial:

10   that all buyers would pay a penny more for a particular computer

11   hardly matters to anyone.  Differences may be substantial and yet

12   "wash out" when buyer preferences for a certain feature of any

13   item are offset by disutilities of other features of that item.

14   Even net preferences by some buyers of one seller's version of a

15   product may be balanced by opposite preferences by other buyers.

16   In that event, sellers regard themselves as competing on more or

17   less equal terms for market shares. . . . For antitrust purposes,

18   we apply the differentiated label to products that are

19   distinguishable in the minds of buyers but not so different as to

20   belong in separate markets.

21   Areeda & Hovenkamp, Antitrust Law ¶ 563a.  Areeda and Hovenkamp

22   conclude that "[t]he answer is almost uniformly negative" whether "the

23   degree of power inherent in each differentiated product [is]

24   sufficient to make each brand a separate market."  Areeda & Hovenkamp,

25   Antitrust Law ¶ 533e.

26   For example, courts have defined the presumptive market to

27   include various rival products which could be differentiated by brand.

28   See, e.g., Theatre Party Assoc., Inc. v. Shubert Org., Inc., 695 F.

72

Supp 150, 154-55 (S.D.N.Y. 1988) (rejecting argument that the Broadway show Phantom of the Opera constituted its own product market because "other forms of entertainment, namely other Broadway shows, the opera, ballet or even sporting events" would provide "adequate substitute products"); Belfiore v. The New York Times Co., 826 F.2d 177, 180 (2d Cir. 1987) (rejecting claim that the New York Times newspaper constituted its own market because substitutes included all "general circulation daily newspapers"); Package Shop, Inc. v. Anheuser-Busch, Inc., 675 F. Supp 894, 943-45 (D.N.J. 1987) (finding rival beers to presumptively be in same product market); Coast Cities Truck Sales, Inc. v. Navistar Intern. Tranps. Co., 912 F. Supp. 747, 766-67 (D.N.J. 1995) (finding all medium and heavy duty trucks to constitute a single market); Domed Stadium Hotel, Inc. v. Holiday Inns, Inc., 732 F.2d 480, 487-88 (5th Cir. 1984) (finding hotel rooms in general, rather than Holiday Inn hotel rooms, to constitute the relevant market); Nifty Foods Corp. v. Great Atlantic & Pac. Tea Co., Inc., 614 F.2d 832 (2d cir. 1980) (defining product market to include private label and brand name frozen waffles); Liggett & Myers, Inc. v. FTC, 567 F.2d 1273 (4th Cir. 1977) (defining market to include premium and lower quality canned dog food); United States v. Jos. Schlitz Brewing Co., 253 F. Supp 129 (N.D. Cal. 1966), aff'd per curiam 385 U.S. 37 (finding private label and premium beer to share the same market); Shaw v. Rolex Watch, U.S.A., Inc., 673 F. Supp. 674, 679 (S.D.N.Y. 1987) ("This Court does not need protracted discovery to state with confidence that Rolex watches are reasonably interchangeable with other high quality timepieces."); Deep South Pepsi-Cola Bottling Co., Inc. v. Pepsico, Inc., 1989 WL 48400, at *8 (S.D.N.Y. May 2, 1989) ("There can be no serious dispute that Pepsi-Cola products are in

73

competition with many other soft drinks."); <u>Global Discount Travel</u>

<u>Services, LLC v. Trans World Airlines, Inc</u>., 960 F.Supp. 701, 705

(S.D.N.Y. 1997) (explaining that the argument that a differentiated

product constitutes a single market "is analogous to a contention that

a consumer is 'locked into' Pepsi because she prefers the taste, or

NBC because she prefers 'Friends,' 'Seinfeld,' and 'E.R.' A consumer

might choose to purchase a certain product because the manufacturer

has spent time and energy differentiating his or her creation from the

panoply of products in the market, but at base, Pepsi is one of many

sodas, and NBC is just another television network.").  Therefore, the

claim that each rock concert is a differentiated product does not

necessarily compel the conclusion that each concert constitutes a

single product market.

### 5.  Evidence of Similar Price Trajectories

Finally, one of Defendants' own exhibits supports the inference

that rock concerts belong in a single market.  Figure 3 of Gilbert's

expert report is a graph depicting the average concert ticket price

for selected artists between 1981 and 2006.  (Gilbert Report Figure

3.)  The graph contains data for a wide range of disparate artists

from various genres such as Madonna, the Rolling Stones, and Garth

Brooks.  (<u>Id.</u>)  The graph illustrates how the average ticket prices

for these various artists have followed roughly the same upward

trajectory over the past twenty years.  (<u>Id.</u>)  "When the prices of

two products (or of the same product in two regions) change in the

same direction and by similar amounts over a substantial period of

1   time, they are presumptively in the same market." [26]   Areeda &

2   Hovenkamp, Antitrust Law ¶ 534c.

3        c.  Market Definition Involves Similar Questions of Law and Fact

4        Defendants argue that the Court should find that individual

5   issues predominate because rock concerts do not constitute a single

6   market.  However, as the Court's analysis demonstrates, there is

7   considerable disagreement between the experts about whether rock

8   concerts constitute a single market.  For example, based on

9   essentially the same set of data, the experts form different

10  conclusions about the cross-price elasticities of demand.  The experts

11  also draw different inferences about the substitutability of rock

12  concerts based on the testimony of class plaintiffs.  Finally, the

13  analyses of both experts may be flawed in various respects, such as

14  failing to consider cross-elasticity of supply, and calculating cross-

15  elasticity of demand merely by comparing the prices for two different

16  products.

17       Despite vigorous argument from both parties, the Court cannot

18  resolve this dispute over market definition in a motion for class

19  certification.  Defining the "[r]elevant market is a factual issue

20  which is decided by the jury."  Syufy Enterprises v. American

21  Multicinema, Inc., 793 F.2d 990, 994 (9th Cir. 1986) (citing Los

22  Angeles Memorial Coliseum Comm'n v. N.F.L., 726 F.2d 1381, 1392 (9th

23  Cir. 1984)); see also Morgan, Strand, Wheeler & Biggs v. Radiology,

24  Ltd., 924 F.2d 1484, 1489 (9th Cir.1991) ("Ordinarily, the relevant

25  market is a question of fact for the jury"); Agron, Inc. v. Lin, 2004

26

27  [26]  However, such evidence is far from conclusive because the price
    increases might simply be due to changes in common costs.  Areeda &
28  Hovenkamp, Antitrust Law ¶534c.

1  WL 555377, at *8 (C.D. Cal. 2004) (same); <u>Rebel Oil Co., Inc. v.</u>

2  <u>Atlantic Richfield Co</u>., 133 F.R.D. 41, 44 (D. Nev.1990) ("The Ninth

3  Circuit has established that both market definition and market power

4  are essentially questions of fact appropriate for jury

5  consideration"); <u>Nobody in Particular Presents</u>, 311 F. Supp. 2d at

6  1083 ("The scope of the market is usually a question of fact for the

7  jury.") (citing <u>Telecor Comm., Inc. v. Southwestern Bell Tel. Co.</u>, 305

8  F.3d 1124, 1131 (10th Cir. 2002)).  As discussed in Part V.B, a

9  district court could resolve this issue to the extent necessary to

10  evaluate the Rule 23 requirements in some circuits.  However, this

11  court is precluded from resolving such issues pursuant to <u>Dukes</u>.

12      Moreover, as discussed at length in Part V.B, the Court must

13  "avoid resolving 'the battle of the experts' at this stage of the

14  proceedings." <u>Dukes</u>, 474 F.3d at 1229.  Thus, the Court cannot weigh

15  the various expert testimonies and define the relevant product market

16  as a matter of law.  Based upon this limited inquiry permitted by

17  <u>Dukes</u>, the Court cannot determine that each rock concert constitutes

18  an individual market at this stage in the proceedings.  Therefore, the

19  Court cannot conclude that individual issues will predominate due to

20  the lack of a single product market.

21      Instead, for purposes of resolving the motion for class

22  certification, the nature of the Court's inquiry centers on

23  determining the extent to which a definition of the relevant product

24  market will involve common questions of law and fact.  As the above

25  analysis illustrates, the process of defining the product market will

26  be predominated by common questions.  The analysis involves the same

27  data, the same experts, the same industry analyses, and the same

28  application of the same economic tests.  It would be incredibly

1 inefficient to duplicate this analysis in thousands of individual

2 cases.

3    Defendants' argument that individual questions will predominate

4 is misleading because Defendants' argument presumes that the Court

5 will define each concert as an individual market.  However, the Court

6 is not concerned with the <u>outcome</u> of the analysis – how the market is

7 defined is to be determined by the jury.[27]  Instead, the Court's focus

8 is the process of defining the relevant market, and this process will

9 clearly be predominated by common questions of law and fact.

10 Therefore, the Court finds that common issues of law and fact

11 predominate with respect to market definition.[28]

12

13

14 _____

15 [27] Alternatively, the Court could define the market in a motion for summary judgment if there are no material disputes of facts and one party is entitled to a particular definition as a matter of law.

16 [28] The Court also holds that individual issues would not predominate

17 even if delineating the boundaries of a "rock" market involved deciding whether various fringe artists should be properly categorized

18 as rock.  In <u>Nobody in Particular Presents</u> case, Clear Channel similarly argued that a jury would have difficulty distinguishing

19 between rock and non-rock concerts, especially with regard to certain fringe artists such as Jewel and Sheryl Crow.  311 F. Supp. 2d at

20 1090.  The district court rejected this argument:

      Just as "customers know a department store when they see it,"
21    customers know a rock concert when they hear it, as will the
      jury. [<u>Bon-Ton Stores, Inc. v. May Dept. Stores Co.</u>, 881 F. Supp.
22    860, 870 (W.D.N.Y. 1994)] That the outer edge of a market's
      boundaries are a disputed does not mean the market is legally
23    flawed for purposes of a motion for summary judgment. Market
      boundaries of necessity may be imprecise. Antitrust Law
24    Developments (Fifth) at 525. Therefore, the question of
      boundaries is most properly answered by the jury.
25 311 F. Supp. 2d at 1090.

26    The Court finds this reasoning persuasive.  Moreover, to the extent an individual analysis would be required to determine whether

27 fringe artists fell within the market definition, common questions of law and fact establishing the definition in general would predominate

28 over questions concerning such fringe artists.

ii.  Possession of Monopoly Power in the Relevant Market

For the same reasons that the market definition analysis is predominated by common questions of law and fact, the Court holds that the possession of monopoly power analysis is predominated by common questions of law and fact.[29]

iii.  The Alleged Anti-competitive Conduct

At the outset, it is necessary to emphasize that whether Defendants engaged in the alleged anti-competitive conduct is a distinct issue from whether such conduct caused Plaintiffs' alleged injuries.  The Plaintiffs allege that the Defendants engaged in a wide range of anti-competitive conduct to acquire and maintain Clear Channel's monopoly in the rock concert promotion market, including merging with primary competitors, leveraging Clear Channel's market power in the radio market, and bidding up artist fees beyond competitive levels.  Defendants argue that there is no common anti-competitive conduct.  (Def.'s Opp. at 18-19.)  For example, Defendants claim that the Court would need to examine the alleged radio monopoly leveraging claims on an artist-by-artist basis.

However, the Court finds that proving the alleged anti-competitive conduct will predominantly involve common evidence. Plaintiffs allege that Clear Channel engaged in a calculated course of conduct to leverage its market power in the radio market into the concert promotion market.  While the implication of this strategy necessarily involves numerous discrete acts, common evidence can be used to show that Clear Channel engaged in this overall course of conduct.  For example, Defendants submitted numerous declarations from

---

[29] Defendants do not argue that this factor would involve substantial individual questions of law or fact.

78

1 Clear Channel radio station program directors.  All of the program

2 directors state that the selection of which songs receive radio

3 airplay is determined by consumer preferences generated by internal

4 research as to what the station's listeners like to hear.  See

5 (Buchman Decl. ¶ 3) (program director for Clear Channel radio station

6 in New York); (Ivey Decl. ¶ 7) (operations manager who oversees all

7 program directors for Clear Channel's Los Angeles radio stations);

8 (Markesich Decl. ¶ 6) (program director for two Clear Channel radio

9 stations in Boston); (Davis Decl. ¶ 7) (vice president of programming

10 who oversees all of the program directors for Clear Channel's Chicago

11 radio stations).  Similarly, the program directors state that their

12 stations only accept concert promotions proposals for concerts that

13 will appeal to the station's listeners.  See (Buchman Decl. ¶ 5);

14 (Ivey Decl. ¶ 5); (Markesich Decl. ¶ 4); (Davis Decl. ¶ 6.)

15 Similarly, Plaintiffs submit various documents purporting to show that

16 Clear Channel's radio stations withheld airplay for artists whose

17 concerts were not being promoted by Clear Channel.  See (Pl.'s Hearing

18 Exs. A,B,D,F-H.)  While the Court cannot consider these submissions

19 for the purposes of resolving the merits of Plaintiffs' claims, the

20 submissions show that common evidence, such as the testimony of

21 program directors, would be used to prove or disprove whether the

22 alleged anticompetitive conduct occurred.

23　　　　Defendants' contention that the Court would need to examine the

24 alleged radio monopoly leveraging claims on an artist-by-artist basis

25 is incorrect.  In order to satisfy this element, all the Plaintiffs

26 must show is that Clear Channel engaged in some form of prohibited

27 conduct.  Whether the conduct caused a specific artists' ticket prices

28 to increase is a distinct inquiry analyzed under the rubric of casual

1  antitrust injury.  Therefore, the Court finds that common issues

2  predominate with respect to this element of the monopolization claim.

3         iv. Casual Antitrust Injury

4         Private parties are permitted to bring suits to enforce the

5  Sherman Act pursuant to Sections 4 and 16 of the Clayton Act.  15

6  U.S.C. §§ 15, 26.  Section 4 of the Clayton Act provides in pertinent

7  part:

8         Except as provided in subsection (b) of this section, any person

9         who shall be injured in his business or property by reason of

10        anything forbidden in the antitrust laws may sue therefore in any

11        district court of the United States in the district in which the

12        defendant resides or is found or has an agent, without respect to

13        the amount in controversy, and shall recover threefold the

14        damages by him sustained, and the cost of suit, including a

15        reasonable attorney's fee.

16  15 U.S.C. § 15.

17        "By providing that only those persons 'who shall be injured in

18  [their] business or property by reason of anything forbidden in the

19  antitrust laws' may sue . . . the antitrust plaintiff must establish

20  that it suffered injury, also known as impact or fact of damage, and

21  that the injury was materially and directly caused by an antitrust

22  violation."  8 von Kalinowski et al., supra, § 160.02[2][c].  "There

23  are two distinct aspects to what in antitrust literature has come to

24  be known as a requirement of fact of damage."  Bogosian v. Gulf Oil

25  Corp., 561 F.2d 434, 454 (3d Cir. 1977); see also Brunswick Corp. v.

26  Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977) (same); MetroNet

27  Services Corp. v. U.S. West Communications, 329 F.3d 986, 1008 (9th

28  Cir. 2003), vacated on other grounds by Qwest Corp. v. MetroNet

Services Corp., 540 U.S. 1147 (2004) (same).  The first aspect "is founded upon the recognition that some limitation must be placed upon liability stemming from violations which may have a widespread and unforeseeable ripple effect throughout the economy . . . [and therefore] courts have uniformly limited the private action to those plaintiffs whose injury is not too indirect, remote or incidental a consequence of a violation."  Bogosian, 561 F.2d at 454; see also Brunswick, 429 U.S. at 489 (holding that to prove antitrust injury, plaintiffs must first prove "injury of the type the antitrust laws were intended to prevent.")  This aspect of the injury analysis is analyzed under the rubric of standing.  Bogosian, 561 F.2d at 454. Defendants have not challenged the standing aspect of injury with respect to the monopolization claim.[30]

The second aspect of impact or fact of damage "is purely factual and does not involve questions of policy in its routine application."[31]  Bogosian, 561 F.2d at 454; see also Brunswick, 429 U.S. at 489 (holding that to prove antitrust injury, plaintiffs must also prove that the injury "flows from that which makes defendants' acts unlawful.")  Fact of damage involves two intertwined questions: (1) whether "the plaintiff suffered some loss in his business or property," and (2) whether "there is a casual relationship between the violation and the loss."  Bogosian, 561 F.2d at 454; see also MetroNet, 329 F.3d at 1008 (same).  To demonstrate causation, "[i]t is enough that the illegality is shown to be a material cause of the

---

[30] Defendants challenge Plaintiffs' standing for the attempted monopolization claim.  See (Def.'s Mot. to Dismiss.)  Defendants' motion is addressed in Part VI.
[31] Hereinafter, the Court refers to this second aspect when it uses the term "impact" or "fact of damage."

injury; a plaintiff need not exhaust all possible alternative sources of injury in fulfilling his burden of proving compensable injury." Zenith, 395 U.S. at 114 n.9.

Finally, the amount of damages sustained by Plaintiffs is a separate and distinct issue from fact of damage or impact.  See Catlin v. Washington Energy Co., 791 F.2d 1343, 1350 (9th Cir. 1986) ("[T]he requirement that plaintiff prove 'both the fact of damage and the amount of damage . . . are two separate proofs.'") (quoting Knutson v. Daily Review, Inc., 468 F. Supp. 226, 229 (N.D. Cal. 1979), aff'd, 664 F.2d 1120 (9th Cir. 1981); Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 114 n. 9 (1969) ("[The plaintiff's] burden of proving the fact of damage under [Section] 4 of the Clayton Act is satisfied by its proof of some damage flowing from the unlawful conspiracy; inquiry beyond this minimum point goes only to the amount and not the fact of damage.") (emphasis in original); MetroNet, 329 F.3d at 1008-09 (same); Lumco Indus., Inc. v. Jeld-Wen, Inc., 171 F.R.D. 168, 172 (E.D. Pa. 1997) ("First, Plaintiffs must prove that Defendants violated the antitrust laws. Second, Plaintiffs must prove the fact of damage, or the impact, of Defendants' unlawful activity. Third, Plaintiffs must prove the amount of damages sustained by said activity."); 8 von Kalinowski et al., supra, § 171.03[1].  Fact of damage and amount of damages are subject to different burdens of proof. See Flintkote Co. v. Lysfjord, 246 F.2d 368, 392 (9th Cir. 1957); 8 von Kalinowski et al., supra, § 171.03[1].

Defendants argue that proving both impact and the amount of damages involves substantial individual factual questions based on the factual allegations in this case.  With respect to impact, Defendants contend that some class members suffered no harm, and furthermore that

1  there is no casual relationship between the alleged harm and

2  Defendant's alleged anti-competitive conduct.  Even if impact were

3  established, Defendants assert that Plaintiffs have failed to provide

4  a workable method of calculating damages.

5      a.  Individual Issues Concerning Fact of Damages/Impact Would

6          Preclude Class Certification

7      The parties disagree over whether the existence of individualized

8  issues concerning fact of damages would preclude class certification.

9  Beginning with the Ninth Circuit's decision in Blackie v. Barrack, 524

10  F.2d 891, 905 (9th Cir. 1975), courts in the Ninth Circuit have

11  consistently held that the existence of individualized issues of

12  damages does not automatically preclude class certification.  See

13  Blackie, 524 F.2d at 905 ("The amount of damages is invariably an

14  individual question and does not defeat class action treatment.").

15  See also Harmsen v. Smith, 693 F.2d 932, 946 (9th Cir. 1982) (same);

16  Winkler v. DTE, Inc.. 205 F.R.D. 235, 244 (D.Ariz. 2001) (same);

17  Wilkinson v. F.B.I.,, 99 F.R.D. 148, 157 (C.D. Cal. 1983) (same);

18  Arthur Young & Co. v. U. S. Dist. Court, 549 F.2d 686, 696 (9th Cir.

19  1977) ("We reach this result not because the individual and reserved

20  issues do not appear real as they concern damages suffered by the

21  class members, but because these damage issues do not, as a rule,

22  defeat class certification in cases such as these"); Alba v. Papa

23  John's USA, Inc., 2007 WL 953849, at *13 (C.D. Cal. 2007) ("[I]t is

24  well established that even where the amount of damages must be

25  individually determined, that "does not defeat class action

26  treatment") (quoting Blackie, 524 F.3d at 905);  Haley v. Medtronic,

27  Inc., 169 F.R.D. 643, 651 (C.D. Cal. 1996) ("As for the issue of

28  damages, it seems clear that the fact that plaintiffs will be entitled

1  to different damages does not mean that common questions do not

2  predominate.").  As one district court explained, individualized

3  issues of damages cannot be said to predominate merely because the

4  calculation of individualized damages would occupy more time than the

5  resolution of common issues at trial:

6      In determining "predominance," defendants attempt to establish as

7      a test the total amount of time which will be spent on proof of

8      the common issue of conspiracy in a class action compared to time

9      spent on individual damage and fraudulent concealment proof in

10     the trial of the same class action. They thus argue that the

11     question of conspiracy does not predominate. If this be the

12     correct approach to the question, arguably it is true that as a

13     class action more time in total will be spent in proof of

14     individual damage claims in any of the class actions than will be

15     spent in proof of conspiracy. Following defendants' line of

16     reasoning, it would seem, however, that the situation should be

17     considered and compared to that which would exist were no class

18     action to be allowed. So for instance, if there were to be but a

19     single case for trial, the court would expect that the great bulk

20     of the time of that trial would be consumed with proof or the

21     attempted proof of the existence and effect of a conspiracy and

22     that the fraudulent concealment and damage issues would be far

23     less predominant in the sense of time consumed at the trial. Were

24     there to be 500 separate suits, this same pattern undoubtedly

25     would prevail as to each. It seems specious and begging the

26     question to say that if these 500 law suits were brought into a

27     class so that proof on the issues of conspiracy need be adduced

28     only once and the result then becomes binding on all 500, that

1 | thereby the common issue of conspiracy no longer predominates
2 | because from a total time standpoint, cumulatively individual
3 | damage proof will take longer. Of course, if defendants are
4 | upheld in their current posture of denying any conspiracy, then
5 | this is clearly the only issue that ever will be tried and
6 | certainly it cannot then be gainsayed but that such is the
7 | predominant question.

8 | State of Minn. v. U. S. Steel Corp., 44 F.R.D. 559, 569 (D. Minn.
9 | 1968).

10 | In the context of antitrust cases, numerous courts and treatises
11 | have similarly remarked that individual issues concerning damages do
12 | not automatically preclude class certification.  See, e.g., In re Visa
13 | Check/MasterMoney Antitrust Litig., 280 F.3d at 139 ("Common issues
14 | may predominate when liability can be determined on a class-wide
15 | basis, even when there are some individualized damage issues.");
16 | Bogosian v. Gulf Oil Corp., 561 F.2d 434, 456 (3d Cir. 1977) ("[I]t
17 | has been commonly recognized that the necessity for calculation of
18 | damages on an individual basis should not preclude class determination
19 | when the common issues which determine liability predominate"); Gold
20 | Strike Stamp Co. v. Christensen, 436 F.2d 791, 796-98 (10th Cir. 1970)
21 | (affirming determination that common issues predominated and
22 | explaining that "[t]he fact that there may have to be individual
23 | examinations on the issue of damages has never been held, however, a
24 | bar to class actions"); In re NCAA I-A Walk-On Football Players
25 | Litig., 2006 WL 1207915, at *9 (W.D. Wash. 2006) ("In the antitrust
26 | context, 'issues of conspiracy, monopolization, and conspiracy to
27 | monopolize have been viewed as central issues which satisfy the
28 | predominance requirement' . . . 'individual damage questions do not

1  preclude a Rule 23(b)(3) class action when the issue of liability is

2  common to the class.'") (quoting Newberg § 18:26-27, at 86-91);

3  Phillip E. Areeda et al., <u>Antitrust Law: An Analysis of Antitrust</u>

4  <u>Principles and Their Application</u>, ¶ 331d (2d ed. 2000) ("Although the

5  evidence establishing damages usually varies from class member to

6  class member, this fact alone does not defeat certification."); 4

7  Herbert Newberg & Alba Conte, <u>Newberg on Class Actions</u> § 4.26 (3d ed.

8  1992) ("A particularly significant aspect of the Rule 23(b)(3)

9  approach is the recognition that individual damage questions do not

10  preclude a Rule 23(b)(3) class action when the issue of liability is

11  common to the class.").

12       Despite such general pronouncements that individual issues of

13  damages do not preclude class certification, the Court notes that

14  these cases fail to distinguish between fact of damages/impact and the

15  calculation of the amount of damages.  Plaintiffs contend that the

16  holdings of these cases are equally applicable to impact and amount of

17  damages.  Defendants argue that the case law should be interpreted as

18  holding that individual issues concerning the amount of damages do not

19  preclude class certification, but individual issues concerning impact

20  may preclude class certification.

21       Although the Ninth Circuit does not appear to have addressed this

22  precise issue, other circuits have adopted Defendants' position.  For

23  example, the Fifth Circuit has held that "where fact of damage cannot

24  be established for every class member through proof common to the

25  class, the need to establish antitrust liability for individual class

26  members defeats Rule 23(b)(3) predominance."  <u>Bell Atlantic Corp. v.</u>

27  <u>AT&T Corp.</u>, 339 F.3d 294, 302-303 (5th Cir. 2003).  Similarly, the

28  Third Circuit has held that "[w]hile obstacles to calculating damages

may not preclude class certification, the putative class must first

demonstrate economic loss on a common basis." Newton v. Merrill

Lynch, Pierce, Fenner and Smith, Inc., 259 F.3d 154, 189 (3d Cir.

2001); see also Blades v. Monsanto Co., 400 F.3d 562, 571 (8th Cir.

2005) (denying certification where "not every member of the proposed

classes can prove with common evidence that they suffered impact,"

because "[t]he ability to use common evidence to show impact on all

class members cannot always be assumed"); 8 von Kalinowski et al.,

supra, § 160.03[3][a] ("In antitrust cases, courts are more likely to

consider the critical issue to be whether common liability issues

predominate and to disregard individual damages (although not impact)

questions.").    Absent clear precedent from the Ninth Circuit, the

Court will apply the holdings of the Third and Fifth Circuit.

Thus, if individual issues concerning fact of damages

predominate, class certification is precluded.  However, class

certification will not be precluded merely because calculations

regarding the quantum of damages involve individual questions.  See,

e.g., Bradburn Parent/Teacher Stores, Inc. v. 3M,  2004 WL 1842987, at

*12 (E.D. Pa. 2004) ("[I]t is well settled that, if impact can be

established by the use of common proof, the fact that individualized

determinations of the amount of the damages that each individual class

member suffered will be needed does not, in itself, preclude class

certification.") (citing In re. Mercedes Benz Antitrust Litig., 213

F.R.D. 180, 190 (D.N.J. 2003) (collecting cases).

b. Proof of Fact of Damages/Impact Will Involve Common Evidence

As discussed above, fact of damage involves two intertwined

questions: (1) whether "the plaintiff suffered some loss in his

business or property," and (2) whether "there is a casual relationship

between the violation and the loss." Bogosian, 561 F.2d at 454; see also MetroNet, 329 F.3d at 1008 (same). "Any evidence which is logically probative of a loss attributable to the violation will advance plaintiff's case." Bogosian, 561 F.2d at 454. "The fact of injury may be proved by inference of circumstantial evidence." ABA Section of Antitrust Law, Antitrust Law Developments (5th ed. 2002) at 870 (citing numerous cases including: Zenith, 395 U.S. at 125; Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 700 (1962)). Fact of damage can be established on a common basis "so long as the common proof adequately demonstrates some damage to each individual." Bogosian, 561 F.2d at 454.

Plaintiffs argue that fact of damage can be proved through common evidence. At the hearing, Phillips testified that he could determine whether Clear Channel imposed a monopoly overcharge through a variety of methods. First, Phillips testified that he could use the relevant market in 1999 as a benchmark because Clear Channel possessed a small market presence in 1999 and its ticket prices were comparable with competitors' ticket prices in 1999.[32] (Hearing Tr. at 39:25-40:19.) Second, Phillips testified that he could use the ticket prices for other promoters as a benchmark.[33] (Id.) Phillips explained that Clear Channel's concert ticket prices began to diverge from the prices charged by other promoters in August 2000 once Clear Channel acquired SFX and AM/FM. (Id.) Phillips stated that by October 2002, Clear Channel's ticket prices were approximately 30% higher than the rest of the market. (Id.) Finally, Phillips testified that he could perform

---

[32] This approach is commonly referred to as the "before-and-after" approach.

[33] This approach is commonly referred to as the "yardstick" approach.

a regression analysis to control for artist quality and other factors

in evaluating impact.[34]  (Hearing Tr: at 39:25-40:19.)  Specifically,

Phillips explained that the Pollstar data would allow him to perform

"cross sectional time series analysis" of prices in each template

market to determine whether, and by how much, Clear Channel's prices

are above the rest of the market.  (Phillips Report ¶ 76.)  Phillips

also stated that he could account for differences in the artist or

concert through the use of a "fixed effects approach" through the

insertion of dummy variables into the regression analysis.

While some older cases have noted the difficulty in proving

class-wide impact in monopolization cases,[35] in more recent cases

circuit and district courts have determined that impact can be

demonstrated through common evidence based on the use of methodologies

similar to those proposed by Phillips. For example, in <u>In re</u>

<u>Linerboard Antitrust Litigation</u>, the Third Circuit accepted the

professional opinions, authenticated by "supporting data, including

charts and exhibits," of plaintiffs' expert witnesses that plaintiffs

"could establish injury on a class-wide basis." 305 F.3d 145,155 (3d

[34]  The Ninth Circuit explained in <u>Dukes</u> that a regression analysis can
be used to estimate the extent to which an independent variable has
influenced a dependent variable.  <u>Dukes</u>, 474 F.3d at 1228 n4.
[35]  <u>See, e.g., San Antonio Tel. Co., Inc. v. American Tel. & Tel. Co.</u>,
68 F.R.D. 435, 438 (W.D. Tex. 1975) ("It should be pointed out that in
the abstract a monopoly does not ipso facto cause injury or damage. .
. whether a monopoly causes damage to an individual in his business
such that he may bring an action therefor and recover monetary or
equitable relief pursuant to the [Clayton Act] is a factual
determination to be made on each individual case."); <u>Dafforn v.</u>
<u>Rousseau Associates, Inc.</u>, 1976 WL 1358, at *4 (N.D. Ind. July 27,
1976) ("Monopolization is a per se violation of the antitrust laws; so
is price-fixing. A per se violation does not, however, ipso facto
establish the fact of injury.") (citations omitted).

Cir. 2002). The panel affirmed the lower court's decision to not "require the experts to pick one particular method over another at the class certification stage, recognizing that the certification stage is early in the overall litigation process." Id.

Additionally, In re Rubber Chemicals Antitrust Litig., the district court explained that the plaintiffs' economics expert proposed "a correlation analysis as a method for demonstrating common impact that has been upheld by numerous courts." 232 F.R.D. 346, 353 (N.D. Cal. 2005) (citing In re Catfish Antitrust Litig., 826 F. Supp. 1019 (N.D. Miss.1993)). Although the defendants' expert criticized the correlation analysis, the court stated that "[t]he certification stage of this litigation is not . . . the proper forum in which to resolve this battle [of the experts]." Id. (quoting Potash, 159 F.R.D. at 697). The court found that the plaintiffs had presented a realistic method of proving common impact and therefore the court concluded that individualized issues regarding impact do not predominate over common issues. Id. at 354.

Similarly, in J.B.D.L. Corp. v Wyeth-Ayerst Laboratories, Inc., plaintiff's expert proposed that antitrust impact could be demonstrated through the use of common evidence and methodologies. 225 F.R.D. 208, 217-18 (S.D. Ohio 2003). Plaintiff's expert explained that class-wide impact could be proved through governmental and academic studies, internal forecasts, standard microeconomic theory about monopoly pricing, and the actual marketplace behavior of similar products. Id. at 217. The defendants argued that individual issues would predominate over common issues and that the proposed methodologies were fatally flawed. Id. at 218. The court held that the plaintiffs had demonstrated "a colorable method for demonstrating

1  class-wide impact" regardless of whether the proposed methods of proof

2  of impact were ultimately meritorious. Id. at 219. Therefore, the

3  court concluded that common issues would predominate over individual

4  issues. Id. See also Weisfeld v. Sun Chemical Corp., 210 F.R.D. 136,

5  143 (D.N.J. 2002) (observing that courts have "recognized the

6  validity" of both the yardstick and regression analysis methods for

7  demonstrating class-wide impact); In re Bulk (Extruded) Graphite

8  Products Antitrust Litig., 2006 WL 891362, at *10 (D.N.J. Apr. 4,

9  2006) (finding that plaintiffs produced a plausible theory that class-

10 wide impact may be proved through common evidence where plaintiffs

11 proposed using multiple regression and benchmark methodologies");

12 Bradburn Parent/Teacher Stores, Inc. v. 3M, 2004 WL 1842987, at *14

13 (E.D. Pa. Aug. 18, 2004) (holding that plaintiff's satisfied their

14 burden of demonstrating the class-wide impact could be proved through

15 common evidence where plaintiffs expert proposed the use of common

16 benchmarking formulas); Nichols v. SmithKline Beecham Corp., 2003 WL

17 302352, at *8 (E.D. Pa. Jan. 29, 2003) (holding that expert's proposed

18 benchmark methodology for calculating antitrust impact was a generally

19 accepted methodology for purposes of determining impact and damages on

20 class-wide basis); In re Polypropylene Carpet Antitrust Litig., 996 F.

21 Supp 18, 25-29 (N.D. Ga. 1997) (finding that plaintiffs satisfied

22 their burden of demonstrating that they will rely predominantly on

23 common evidence to prove class-wide impact where plaintiffs proposed

24 to rely on a multiple regression analysis).

25    Although Defendants do not contest that Plaintiffs could utilize

26 such methodology to prove impact in general, Defendants argue that

27 proof of impact will require an individual, case-by-case analysis

28 under these circumstances for several reasons. First, Defendants

1  argue that their alleged anticompetitive conduct could not have caused

2  harm to some class members because some artists set price-ceilings on

3  tickets that were no higher than the competitive price. (Gilbert

4  Report ¶ 40.)    Second, Defendants claim that many plaintiffs suffered

5  no injury because they attended sold-out concerts. (Gilbert Report ¶

6  40.)   Third, Defendants assert that proof of impact requires

7  individualized inquiries because each rock concert constitutes a

8  separate market.   Finally, Defendants raise various merits issues in

9  an attempt to prove that some class members suffered no injury.

10      1. Some Artists Impose Price-Ceilings on Ticket Prices

11      Defendants' expert, Professor Gilbert, states that artists

12  deliberately charge prices for their concerts significantly below

13  market norms.   (Gilbert Report ¶ 49.)   Gilbert explains that class

14  members who only attended concerts by such performers would have

15  suffered no injury at all.   (Gilbert Report ¶ 50.)   Thus, Gilbert

16  contends that determining whether a particular class member was

17  injured would require a fourfold inquiry: "(1) what concerts they saw;

18  (2) the preferences of the artists performing the concerts for below-

19  market prices; (3) the ability of the artists to impose their

20  preferences; and (4) what the market price would have been for the

21  concert but for the artists' preferences."   (Gilbert Report ¶ 50.)

22      First, there is considerable debate over the extent to which

23  artists negotiate ticket prices or impose price-ceilings.   Defendants

24  have also submitted several declarations in support of their argument

25  that artists often dictate ticket prices.   For example, Defendants

26  submit the declaration of Mark Campana, the President of the Midwest

27  Region at Live Nation.   (Campana Decl. ¶ 1.)   Campana oversees a staff

28  that books artists for live concerts throughout the Midwest, including

Chicago.  (Id.)  Campana claims that concert ticket prices are primarily determined by the artists.  (Id. ¶ 3.)  Campana explains that the artist will state how much the artist needs to make on a concert and this "practically predetermines what the final ticket price has to be." (Id.)  Campana emphasizes that "the artist is the ultimate authority on the final ticket price." (Id.)  Campana asserts that some artists purposefully set the ticket prices below the competitive price:

> Pearl Jam is an example of a group that, for social reasons or otherwise, caps their ticket prices under $80.  Each set in the first 10 rows of a Pearl Jam concert could easily sell for $1,000, but Pearl Jam insists on the lower price.  When you factor in that Pearl Jam concerts are sold out in a matter of hours and there are thousands of people willing to pay hundreds of dollars or more for tickets in the secondary markets, I know that Pearl Jam left a lot of money on the table.  Other artists who have a similar pricing strategy are Tool, Foo Fighters, Jack Johnson, Bruce Springsteen, and Ben Harper.

(Campana Decl. ¶ 6.) See also (Kessler Decl. ¶ 7) ("I believe that bands like Pearl Jam, The Cure, and Bright Eyes make a social decision to keep their ticket prices below what they could obtain.")

Defendants also submit a declaration by James Guerinot who is the owner and president of an artist management firm which has managed artists including The Offspring, Gwen Stefani, and Nine Inch Nails. (Guerinot Decl. ¶ 1.)  Similar to Campana, Guerinot insists that ticket prices are largely determined by the artists. (Id. ¶¶ 2-6.) Guerinot states that his experience in negotiations with Live Nation has been that Live Nation tries to encourage artists to charge lower

ticket prices so that Live Nation can recoup "more money on beer,
parking, and popcorn." (Id. ¶ 8.)  Guerinot also notes that some
groups, such as The Offspring, insist on setting ticket prices below
what Guerinot believes the groups could command. (Id. ¶ 9.)  The
director of theatre booking for the New England Region of Live Nation,
the manager of Depeche Mode, the president for the Rocky Mountain
region of Live Nation, and the vice president of booking for Southern
California for Live Nation similarly explain that artists dictate the
price for concert tickets. (Innamorato Decl. ¶¶ 1, 3-12); (Kessler
Decl. ¶¶ 1, 3-4, 6); (Lavoisne Decl. ¶¶ 1, 3-4) (Best Decl. ¶¶ 2-7.)
Finally, Defendants submit contracts for concert agreements with
various artists in an attempt to show that "each concert originates
from a unique set of agreements between Live Nation/CCE and an artist
or artists' representative." (Pak Decl. ¶ 5, Exs. 3-9.)

   However, Plaintiffs contend that this phenomenon occurs
relatively infrequently.  At the hearing Phillips testified that he
has reviewed hundreds of contracts between artists and promoters and
very few contracts specify ticket caps.  (Hearing Tr: at 66:16-20.)

   Second, even assuming that artists impose ticket price-ceilings
when they negotiate contracts with Clear Channel, it is incorrect to
assume that class members do not pay more than the price-ceiling.
Plaintiffs submitted concert promotion deal sheets for various artists
reflecting that Clear Channel imposed various fees and surcharges on
top of the ticket prices negotiated with the artists.  See (Pl.'s
Hearing Ex. K) (concert promotion deal sheet for John Mellencamp
showing Clear Channel's imposition of facility maintenance and parking
fee is not included in "gross box office receipts" used to calculate
artist's fees); (Pl.'s Hearing Ex. R) (concert contract for Ray Davies

showing that Clear Channel's imposition of facility fee is not included in "net box office receipts" used to calculate artist's fees); (Pl.'s Hearing Ex. L) (concert promotion deal sheet for Panic at the Disco showing Clear Channel's imposition of facility maintenance fee is not included in "gross box office receipts" used to calculate artist's fees); (Def.'s Hearing Ex. 6) (Hootie and the Blowfish contract stating that facility maintenance and parking fees are deducted before computing gross ticket receipts); (Pl.'s Hearing Ex. J) (Clear Channel memo showing that Clear Channel imposed a ticket surcharge on each ticket sold through Ticketmaster). See also (Walker Depo. at 13-62) (former head of North American Music for Live Nation explaining that artists' agents often set parameters for ticket prices but ticket prices are determined by a variety of factors). Through the imposition of such surcharges, it is possible for Clear Channel to effectively raise ticket prices above price-ceilings allegedly imposed by artists.

Finally, even if consumers pay no more than the price-ceiling set by the artist, this fails to demonstrate whether the ticket price was surpacompetitive. Gilbert's argument boils down to the claim that Clear Channel's anticompetitive conduct could not have caused harm to ticket purchasers if the artist dictated the ticket price. However, as Phillips testified at the hearing, the fact that an artist places a cap on ticket prices does not mean that the price is competitive. This is because "[e]ven when price caps are set, the price cap can be above the competitive price." (Tr. 48:17-24.) "[It] just means that they are not letting Clear Channel charge an even higher price than the price that is being charged for the tickets." (Tr. 45:7-15.)

Therefore, Clear Channel's argument that the imposition of a price-ceiling eliminates any potential for injury is incorrect. If the artist negotiates a supracompetitive ticket price, the fact that the artist demands the price does not immunize Clear Channel's conduct because it is Clear Channel's alleged anticompetitive conduct which allows the setting of monopoly prices.[36] Thus, antitrust impact still exists so long as the price is above the competitive level. Conversely, no impact exists if the artist demands that the price be set below the competitive level. The key insight is that whether or not the price is set above or below the competitive level can only be determined through one of the methodologies proposed by Plaintiffs' expert (yardstick approach, before-and-after approach, or regression analysis). Thus, whether or not an artist negotiated or dictated the price of the tickets is irrelevant to whether Clear Channel charged a supracompetitive price for the concert tickets. As a result, it will not be necessary to engage in an analysis of each artist's negotiations with Clear Channel to prove or disprove impact.[37]

---

[36] Although Plaintiffs' theory is not always precisely articulated, it appears to be as follows. First, all rock concerts fall within a single product market and are reasonable substitutes. Second, in a competitive market with multiple promoters, a promoter cannot charge supracompetitive ticket prices because consumer demand will shift to other concerts and the promoter would lose revenue. Consequently, promoters would not cede to an artist's demand to charge supracompetitive ticket prices because promoters would be better off charging a competitive price for an artist that is a substitute. However, Plaintiffs allege that Clear Channel possesses monopoly power and therefore Clear Channel can set supracompetitive prices. In other words, by eliminating competing promoters, ticket prices for rock concerts are no longer constrained.

[37] A district court rejected a similar argument in J.B.D.L. Corp.. 225 F.R.D. at 218. In J.B.D.L. Corp., purchasers of a prescription drug brought an antitrust class action against the drug manufacturer alleging restraint of trade and monopolization. Id. at 210. As discussed above, plaintiffs' expert claimed that antitrust impact could be demonstrated on a class-wide basis through the use of common

## 2. Some Concerts Are Sell-Outs

Defendants' expert, Professor Gilbert, states that sold-out concerts by definition have "a price no higher than the competitive price that would equate supply and demand for that venue." (Gilbert Report ¶ 51.)  Gilbert explains that class members who only attended such sold-out concerts would have suffered no injury at all.  (Gilbert Report ¶¶ 51,53.)  Defendants contend that a large number of rock concerts are sell-outs, and therefore a large number of class members suffered no injury.[38]

evidence and methodologies.  Id. at 217-18.  The defendants argued that the impact analysis involved individual questions because some purchasers negotiated discounts and thus class members paid different prices for the drug.  Id.  Applying a rationale similar to the Court's reasoning, the court rejected the defendants' argument:

> [T]he fact that some direct purchasers may have purchased Premarin at a price achieved through individual negotiations does not affect the common impact analysis because [defendant's] alleged anticompetitive conduct artificially raised the base price for Premarin on which discounts were based. Thus, any variation in the price actually paid for Premarin by the sundry direct purchasers is really a matter of calculation of individual damages as opposed to evidence showing that impact of the alleged anticompetitive conduct was not common among direct purchasers.

Id. at 218.  See also In re Bromine Antitrust Litigation, 203 F.R.D. 403, 414 -415 (S.D. Ind. 2001) (finding that defendant's "arguments that substantial buyer power and variation in prices preclude finding that common issues predominate is a red herring").

[38] There is a substantial dispute over the extent to which rock concerts sell-out.  Gilbert states that 27% of the tickets purchased for rock concerts promoted by Clear Channel during the class period were for sold-out concerts.  (Gilbert Report ¶¶ 51,53.)  However, Plaintiffs have produced evidence that sell-outs are relatively rare occurrences.  For example, Clear Channel's "Music Division Strategic Plan for July 2002 states that the total number of Clear Channel amphitheatre sellouts dropped to 139 in 2001 from 213 in 2000.  (Pl'.s Supp. Ex. 1. LN 00-1267.)  The plan also states that the "large majority of [Clear Channel] shows are not sell-outs."  (Pl.'s Supp. Ex. 1. LN 001313.)

Defendants' conclusion is correct if the market for rock concerts is presumed to be perfectly competitive.[39]  However, Plaintiffs allege that Clear Channel possesses monopoly power in the rock concert market.  By definition, a monopolist selects a price and output where the price exceeds marginal revenue and marginal cost.  Therefore, the price is not set at a competitive level even though the quantity demanded equals the quantity produced by the monopolist.[40]

Thus, Gilbert's conclusion is apparently premised on the assumption that Clear Channel has no control over the size of the venue.  Accordingly, Gilbert reasons that Clear Channel cannot select a level of output like a typical monopolist.  However, Plaintiffs allege that Clear Channel in fact has control over the selecting the size of a concert venue.  For example, Phillips lists in detail the various venues which Clear Channel controls in the Denver market. (Phillips Decl. ¶¶ 53-58.)    Thus, just as any other monopolist

---

[39]  In a perfectly competitive market, the aggregate supply curve represents the sum of the individual firms' marginal cost curves, and the aggregate demand curve represents total market demand.  The equilibrium price is determined by the intersection of the aggregate supply and demand curves.  This equilibrium price becomes the marginal revenue curve for each firm because each firm is a price taker. Because firms select an output where marginal costs equal marginal revenue, price equals marginal cost at the equilibrium level of output in a competitive market. In other words, price = MR = MC. See Lipsey, Richard G. et al., Microeconomics, 232-36 (12th ed. 1998).

[40]  While both monopolists and competitive firms select an output where marginal revenue equals marginal cost, price does not equal marginal cost for a monopolist.  This is due to the fact that as the sole producer, a monopolist's demand curve is the market demand curve for the product.  As a result, a monopolist faces negatively sloped demand and marginal revenue curves while a perfectly competitive firm faces a constant marginal revenue curve.  While the monopolist selects a level of output where marginal revenue equals marginal cost, the price is determined by the intersection of this level of output and the demand curve.  Therefore, a monopolists' marginal revenue and marginal cost is less than the price at which it sells its output.  Lipsey, supra, at 232-36.

reduces output below the competitive level to charge a supracompetitive price, Plaintiffs contend that Clear Channel artificially restricts the supply of tickets for rock concerts through the selection of smaller venues in order to charge supracompetitive prices.[41]   Therefore, a "[s]ell-out by no means suggests competitive behavior."   (Phillips Rebuttal Report at 11.)

The significance of this analysis is that the Court cannot simply assume that numerous potential class members suffered no injury because they attended sold-out concerts.   Thus, similar to the fact that the imposition of price-ceilings does not demonstrate whether the ticket price is competitive, the existence of a sell-out does not demonstrate whether the ticket price is competitive.   Whether or not the price is set above or below the competitive level can only be determined through one of the methodologies discussed above, which obviously must take into account venue considerations.

As discussed in more detail below, Plaintiffs may ultimately fail in proving impact.   However, for purposes of Plaintiffs' motion for class certification, the Court's focus is whether or not common evidence and methodologies can be used to demonstrate impact.   As demonstrated above, the existence of sell-outs does not preclude the use of common evidence and methodologies to prove impact.

Finally, to the extent that Defendants might ultimately demonstrate on the merits that some class members were not harmed

---

[41]   Defendants contest the allegation that Clear Channel controls selection of the venue.   For example, the vice president of booking for Southern California for Live Nation states that "the artist makes the final choice on venue" and explains that "[m]ost artists know the venues available in Los Angeles and have very strong ideas about the ones that they like and the ones in which they will not play." (Best Decl. ¶ 9.)

1  because they only attended sold-out shows, this does not preclude

2  class certification.  In re Rubber Chemicals Antitrust Litig., 232

3  F.R.D. at 353; In re Cardizem CD Antitrust Litig., 200 F.R.D. 297, 321

4  (E.D. Mich. 2001) ("Even if Plaintiffs could not show injury-in-fact

5  as to a few class members, this would not be fatal.  The courts have

6  routinely observed that the inability to show injury as to a few does

7  not defeat class certification where the plaintiffs can show

8  widespread injury to the class."); In re NASDAQ Market-Makers

9  Antitrust Litig., 169 F.R.D. at 523 (observing that "[t]he fact that a

10  defendant may be able to defeat the showing of causation as to a few

11  individual class members does not transform the common question into a

12  multitude of individual ones; plaintiffs satisfy their burden of

13  showing causation as to each by showing [generalized damage] as to

14  all."); In re Northwest Airlines Corp., 208 F.R.D. 174, 225 (E.D.

15  Mich. 2002) ("[I]t is not necessary, at the class certification stage,

16  for Plaintiffs to show that each and every class member could satisfy

17  an individualized standing inquiry."); In re Sugar Industry Antitrust

18  Litigation, 73 F.R.D. 322, 347 (E.D. Pa. 1976) ("The fact that a

19  defendant may be able to defeat the showing of causation as to a few

20  individual class members does not transform the common question into a

21  multitude of individual ones."); J.B.D.L. Corp., 225 F.R.D. 208, 218

22  (S.D. Ohio 2003) ("[T]he record thus far demonstrates that the direct

23  purchasers who allegedly [suffered no injury] is a small percentage of

24  the entire class, and this fact does not defeat class

25  certification.").

26      3.  Existence of Individual Markets

27      Gilbert claims that whether the challenged conduct affected the

28  prices of each concert would require an individualized concert-by-

concert inquiry.  (Gilbert Report ¶ 39.)  Gilbert's conclusion is based on the reasoning that "some challenged action by Clear Channel directed at a particular artist can at most affect the prices of concerts by that artist and the prices of concerts that are close substitutes to the concerts of targeted artists."  (Gilbert Report ¶ 41.)  For example, Gilbert explains that if Clear Channel targeted Rush with threatened withholding of airplay or venue access which led to an elevation in ticket prices, there could possibly be injury to class members who purchased Rush tickets.  (Gilbert Report ¶ 44.)  However, Gilbert emphasizes that purchasers of Pearl Jam tickets would be uninjured because consumers allegedly do not view Rush and Pearl Jam as close substitutes. (Gilbert Report ¶ 45.)

This argument lacks merit because it is based on the assumption that the Court will determine that each concert constitutes a separate product market.  As discussed in Part V.D.1.i.c, market definition is typically a jury question.  Given that the case will likely be bifurcated, if Plaintiffs fail to prove that the product market should be defined as all rock concerts at trial, liability will not be established and it will be unnecessary to even reach the issue of impact.

4.  Merits Arguments about Impact

Defendants also raise several arguments in attempting to prove that many class members suffered no injury.  For example, Defendants submitted an expert report prepared by Professor Jerry A. Hausman.[42]

---

[42] Hausman is a Professor of Economics at the Massachusetts Institute of Technology.  (Hausman Report ¶ 1.)  Among other positions, Hausman has been a consultant for firms in the music industry, including Clear Channel, for the past ten years. (Id. ¶¶ 2-7.)

Hausman claims that Phillips has failed to demonstrate that Clear Channel's anti-competitive conduct caused harm to consumers:

> Prof. Phillips presents average ticket price data that demonstrates that average ticket prices increased significantly faster than the Consumer Price Index (CPI) over the period 1996-2000. . . Prof. Phillips presents no economic or econometric analysis that demonstrates that these price increases arose from Clear Channel's assumed anti-competitive conduct rather than other factors, such as top artists demanding higher payments to give live concerts. One of the most famous sayings in econometrics (and statistics) is: 'correlation does not prove causation.' Prof. Phillips has not provided any econometric analysis beyond a purported correlation of Clear Channel's conduct and an increase in ticket prices. . . Prof. Phillips has found a correlation (increasing ticket prices and Clear Channel ownership), but he has not demonstrated the economic linkage between the two sets of events in order to establish causation.

(Hausman Report ¶¶ 15-16.)

As an example of the difference between correlation and causation, Hausman cites the oft-quoted observation that at the end of World War II in Belgium, the number of storks increased as did the number of babies. (Id. n.2) Hausman explains that "most [people] do not think that storks cause babies." (Id.) While Hausman's observation is certainly correct, the Court is not permitted to weigh the merits of the case at the class certification stage. Thus, if the issue of whether storks caused babies were the subject of litigation, the Court would not be permitted to determine whether storks indeed caused babies at the class certification stage. Instead, the Court

would be required to presume that the substantive allegations were true, and wait until summary judgment or trial to resolve the issue. Blackie, 524 F.2d at 901 n.17. Similarly, the Court is not permitted to weigh evidence related to causation at the class certification stage even if the Court believes that Plaintiffs' claims will ultimately fail in subsequent proceedings. The dispositive issue for purposes of class certification is whether impact can be proved through the use of common evidence and methodologies.

Second, Hausman argues that class-wide antitrust impact does not exist. (Hausman Report ¶ 17.) Hausman explains that consumers can be impacted by anti-competitive conduct through either changes in price or changes in quality. (Hausman Report ¶ 17.) While Hausman admits that an increase in price can harm consumers, Hausman cautions that sometimes an increase in price simply represents an increase in quality. (Hausman Report ¶ 18.) Specifically, when the price of a product increases and the quality of the product is held constant, the increased price causes movement along the demand curve. (Hausman Report ¶ 18.) However, when the quality of a product increases, Hausman states that consumers will buy more of the product. (Hausman Report ¶ 18.) This increase in demand causes an outward shift in the demand curve, resulting in increases in both price and quantity demanded. (Hausman Report ¶ 18.) Therefore, Hausman explains that "[t]he net effect of a simultaneous increase in price and increase in quality can be quite complicated to ascertain and is likely to vary across individuals." (Hausman Report ¶ 18.) Hausman concludes that the possibility that price increases were coupled with quality increases shows that common proof is not sufficient to demonstrate class-wide impact. (Hausman Report ¶ 20 n.8.)

1    For example, Hausman claims that average ticket prices for

2 concerts for the "top 100 acts" increased by over 50% between 2001 and

3 2006.  (Hausman Report ¶ 19.)  Hausman also notes that total number of

4 tickets sold increased between 2000 and 2005.  (Hausman Report ¶ 19.)

5 Hausman concludes that "[e]ven though prices increased significantly,

6 quality must have also increased significantly because the number of

7 tickets sold did not decrease."  (Hausman Report ¶ 19.)  Therefore,

8 Hausman reasons that while some people were made worse off by the

9 price increase, "other individuals, who replaced the individuals who

10 would have gone if prices were lower, were made better off by the

11 increase in quality and decided to attend a concert."  (Hausman Report

12 ¶  20.)

13    Hausman's conclusion is flawed in several respects.  First,

14 Hausman uses two different sets of data in his analysis: he uses data

15 from the top 100 acts to determine that prices increased, but he uses

16 data from all concerts to determine that the amount of tickets sold

17 increased.  Second, analyzing similar data, Professor Alan B. Kreuger

18 calculated that the number of concerts declined by 16% between 1996

19 and 2003. Krueger, Alan B., The Economics of Real Superstars: The

20 Market for Rock Concerts in the Material World, 23 Journal of Labor

21 Economics 1, 12 (2005).  Kreuger also observed that the number of

22 tickets sold to concerts has decreased since 2000.  Id.  Specifically,

23 around thirty million concert tickets were sold each year from the

24 late 1980s to 2000.  Id.  However, Krueger found that the number of

25 tickets sold began dropping in 2000 until 2003 when only twenty-two

26 million tickets were sold.  Id.  Moreover, Krueger observed that the

27 percentage of tickets sold out of the available tickets decreased from

28 around 90% in the late 1980s to around 75% in 2003.  Id.  Thus,

1  Krueger states that "it seems that price growth is affecting demand

2  for tickets." Id. Krueger later concludes that "[t]hese trends are

3  inconsistent with a demand-side shift in the face of a stable supply

4  curve." Id. at 15.  Krueger also contests Hausman's conclusion that

5  the quality of rock concerts must have increased.  Krueger, Alan B.,

6  The Economics of Real Superstars: The Market for Rock Concerts in the

7  Material World, 23 Journal of Labor Economics 1, 6 (2005) ("While many

8  economists believe that the [consumer price index] overstates the rise

9  in cost of living because of unmeasured quality improvements, hardly

10  any economist I know believes the quality of rock & roll music has

11  improved.")

12      Fourth, Phillips explains that population growth could be a major

13  reason for the increased demand.  (Phillips Rebuttal Report at 15.)

14  Even if nationwide population growth is minimal, Phillips explains

15  that population growth in various metropolitan areas often grows at a

16  much higher rate.  For example, Phillips states that some of the

17  Denver metro areas have had annual population growth in excess of 10%

18  since 1990. (Id.)  Finally, Hausman also admits that

19  "[h]ypothetically, anti-competitive behavior could include both an

20  increase in price and a decrease in quality." (Hausman Report ¶ 25

21  n.15.)

22      Regardless of any potential flaws in Hausman's analysis, the

23  Court cannot consider Hausman's claims because they relate to the

24  merits.  The Court's role is to determine whether impact can be

25  demonstrated through common evidence – not whether Plaintiffs will

26  succeed in proving impact on the merits.[43]

27  _____

[43] Additionally, Phillips testified that his impact analysis could
28  control for differences in quality through the use of various

1    Defendants also submitted an article written by Professor Alan

2    Kruger about the market for rock concerts.  The Economics of Real

3    Superstars: The Market for Rock Concerts in the Material World, 23

4    Journal of Labor Economics 1 (2005).  Using the Pollstar database,

5    Professor Alan Krueger calculated the average price for a concert

6    ticket between 1981 and 2003. Id. at 6.  Between 1981 and 1996,

7    Krueger found that concert prices grew slightly faster than inflation.

8    Id.  However, between 1996 and 2003, Krueger found that concert ticket

9    prices grew at a much faster rate than inflation.  Id. Krueger ruled

10   out cost increases and a shift in composition as causes of the

11   divergence in prices.  Id. at 8-9.  Additionally, Krueger observed

12   that while concert price growth tracked price growth for other

13   entertainment events between 1981 and 1996, the growth rate for

14   concert ticket prices started diverging in 1997. Id. at 8.

15       After conducting a regression analysis, Krueger ultimately

16   expresses skepticism that Clear Channel's horizontal and vertical

17   concentration was a "major reason for the hike in concert prices."

18   Id. at 25.  Krueger explains that "[a]lthough anecdotal evidence

19   abounds-and the rising prices and declining ticket sales documented

20   [earlier in the paper] are certainly consistent with the exercise of

21   greater monopoly power after the mid-1990s-I have found it

22   surprisingly difficult to find clear evidence linking Clear Channel to

23   the exorbitant growth in concert ticket prices."  Id. at 23.

24       However, Phillips points out two major flaws in Kreuger's

25   assertion that he cannot find a significant relationship between Clear

26   Channel's market concentration and the increases in ticket prices.

27   First, Phillips claims that Kreuger's analysis fails to cover all of

28   regression techniques.

the names/affiliations under which Clear Channel does business.
(Phillips Rebuttal Report at 19.)  For example, Phillips states that
even after Clear Channel acquired the Denver promoters Jacor and SFX,
Jacor and SFX continued to be listed as promoters in the Pollstar data
set.  (Id. at 18.)  Second, Phillips points out that Krueger's
analysis ends in 2001.  Plaintiffs' allege that Clear Channel's
dominance through acquisitions began in August 2000.  Therefore,
Phillips explains that it is not surprising that a relationship would
not yet have manifested in the data analyzed by Krueger.  (Id. at 18.)

Regardless of whether such arguments might succeed on the merits,
the Court cannot resolve these issues at this stage in the litigation.
"The operative question here is not whether the plaintiffs can
establish class-wide impact, but whether class-wide impact may be
proven by evidence common to all class members."  In re Bulk
(Extruded) Graphite Products Antitrust Litig., 2006 WL 891362, at *10
(D.N.J. Apr. 4, 2006).  See also Dukes, 474 F.3d at 1229 ("[O]ur job
on this appeal is to resolve whether the 'evidence is sufficient to
demonstrate common questions of fact warranting certification of the
proposed class, not whether the evidence ultimately will be
persuasive' to the trier of fact.") (quoting In re Visa
Check/MasterMoney Antitrust Litig., 280 F.3d at 135); Bradburn
Parent/Teacher Stores, Inc. v. 3M, 2004 WL 1842987, at *14 (E.D. Pa.
Aug. 18, 2004) ("Plaintiff is not required at [the class action] stage
of the litigation to establish, as fact, that each class member has
suffered economic injury.");Lumco Indus., Inc. v. Jeld-Wen, Inc., 171
F.R.D. 168, 173-74 (E.D. Pa. 1997) ("At this stage of litigation,
however, the Court need not concern itself with whether Plaintiffs can
prove their allegations regarding common impact; the Court need only

assure itself that Plaintiffs' attempt to prove their allegations will predominantly involve common issues of fact and law."); In re Polypropylene Carpet Antitrust Litig., 178 F.R.D. 603, 618 (N.D. Ga. 1997) ("Plaintiffs must show that antitrust impact can be proven with common evidence on a class-wide basis; Plaintiffs need not show antitrust impact in fact occurred on a class-wide basis"); In re Cardizem CD Antitrust Litigation, 200 F.R.D. 326, 340 (E.D. Mich. 2001) ("To show impact is susceptible to class-wide proof, Plaintiffs are not required to show that the fact of injury actually exists for each class member."); In re Hydrogen Peroxide Antitrust Litigation 240 F.R.D. 163, *174 (E.D. Pa. 2007) ("Defendants are correct that plaintiffs must establish that each class member has, in fact, been injured by the alleged conduct. They do not, however, have to prove it prior to class certification. All they need demonstrate now is that antitrust impact on each member is susceptible to proof by predominantly common evidence.") (quotation and citation omitted).

The Court finds that Plaintiffs have demonstrated that several generally accepted methodologies can be used to prove class-wide impact through the use of common evidence.  Additionally, the Court finds that Defendants' experts have not shown that the alleged imposition of price ceilings or existence of sell-outs will inject sufficient individual questions of law or fact that common questions will cease to predominate.  The Court's determination does not reflect how it might resolve the issue of impact on the merits at a later date.[44]  However, Plaintiffs showing is sufficient for the Court to

[44] For example, Plaintiffs might not even succeed in qualifying Dr. Phillips as an expert.  However, "courts need not apply the full Daubert "gate-keeper" standard at the class certification stage." Dukes, 474 F.3d at 1227.

1   conclude that common issues of law and fact will predominate with

2   respect to impact.

3      c.  Calculating the Amount of Damages Involves Common Evidence

4      and Methodologies

5      "The required quantum of proof necessary to prove the amount of

6   damages is less than that required to prove the fact of damages."[45]

7   Blanton v. Mobil Oil Corp., 721 F.2d 1207, 1215-16 (9th Cir. 1983).

8   Proof is sufficient "if the evidence show the extent of the damages as

9   a matter of just and reasonable inference, although the result be only

10  approximate."  Knutson v. Daily Review, Inc., 548 F.2d 795, 811 (9th

11  Cir. 1976) (quoting Story Parchment Co. v. Paterson Parchment Paper

12  Co., 282 U.S. 555, 563 (1931)).  "In other words, an antitrust

13  plaintiff is only obligated to provide the trier-of-fact with some

14  basis from which to estimate reasonably, and without undue

15  speculation, the damages flowing from the antitrust violations."  Moore

16  v. Jas. H. Matthews & Co., 682 F.2d 830, 836 (9th Cir. 1982) (citing

17  Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264 (1946)).  "The

18  essential requirement is only that plaintiffs develop a reasonable

19  theory for calculating the amount of damages and that they introduce

20  the data necessary to make this calculation."   Knutson v. Daily

21  [45] The district court in Knutson summarized the rationale for imposing
    a lower burden of proof on the amount of damages:

22     There are two reasons why plaintiff's burden of proving the

23     amount of damages is relaxed in an antitrust case: first, the
       self-evident intangible nature of the subject matter; and second,

24     the recognition that most difficulties in computing antitrust
       damages arise as a result of defendant's own wrongful conduct. .

25     . . [If Defendants were] permitted to argue that inexact and
       imprecise damages are improper . . . potential defendants would

26     be encouraged to act in a manner that would render damages as
       uncertain and speculative as possible, and this would of course

27     undercut the policies underlying the antitrust laws.
    Knutson v. Daily Review, Inc., 468 F. Supp. 226, 229 (C.D. Cal. 1979).

28

1  Review, Inc. , 468 F. Supp. 226, 229-230 (C.D. Cal. 1979); see also In

2  re Brand Name Prescription Drugs Antitrust Litig., 1994 WL 663590, at

3  *5 (N.D. Ill. Nov. 18, 1994) (finding that the plaintiffs satisfied

4  the court that a class-wide formula for proving damages exists where

5  "plaintiffs have come forward with seemingly realistic methodologies

6  for proving damages on a class-wide basis.")

7       Plaintiffs' expert, Dr. Phillips, has proposed several

8  methodologies by which damages can be calculated on a class-wide

9  basis.  First, Phillips testified that he could use a before-and-after

10  approach.  Phillips explained that he would use the relevant market in

11  1999 as a benchmark because Clear Channel possessed a small market

12  presence in 1999 and its ticket prices were comparable with

13  competitors' ticket prices in 1999.  (Hearing Tr. at 39:25-40:19.)

14  This before-and-after methodology has been accepted by numerous

15  courts. See, e.g., In re Dynamic Random Access Memory Antitrust

16  Litig., 2006 U.S. Dist. LEXIS 39841, at *45-46 (N.D. Cal. June 5,

17  2006) (citing In re Citric Acid Antitrust Litig., 1996 U.S. Dist.

18  LEXIS 16409 (N.D. Cal. Oct. 2, 1996)) (noting that the before-and-

19  after methodology has been "upheld by numerous courts"); Bradburn

20  Parent/Teacher Stores, Inc. v. 3M, 2004 WL 1842987, at *14-18 (E.D.

21  Pa. Aug. 18, 2004)  (holding that plaintiffs satisfied their burden of

22  demonstrating that class-wide impact could be proved through common

23  evidence where plaintiff's expert proposed the use of a before-and-

24  after methodology); Nichols v. SmithKline Beecham  Corp., 2003 WL

25  302352, at *8 (holding that before-and-after methodology for

26  calculating antitrust impact is a generally accepted methodology for

27  purposes of determining impact and damages on class-wide basis).

28

Second, Phillips testified that he could use the yardstick approach in which the ticket prices for other promoters act as a benchmark. (Id.)  This approach is also widely upheld by courts. See, e.g., In re Dynamic Random Access Memory Antitrust Litig., 2006 U.S. Dist. LEXIS 39841 at *45-46 (citing In re Linerboard Antitrust Litig., 203 F.R.D. 197, 220 (E.D. Pa. 2001)) (noting that the yardstick methodology has been "upheld by numerous courts"); In re Rubber Chemicals Antitrust Litig., 232 F.R.D. at 354 (finding that the yardstick approach is a "reasonable and commonly-used formulaic [approach] to calculating damages"); Weisfeld v. Sun Chemical Corp., 210 F.R.D. 136, 143 (D.N.J. 2002) (observing that courts have "recognized the validity" of the yardstick analysis method for demonstrating class-wide impact).

Finally, Phillips testified that he could perform a regression analysis to control for artist quality and other factors in evaluating impact.  (Hearing Tr: at 39:25-40:19.)  Regression analysis is a well-recognized tool in determining antitrust damages. See, e.g., Petruzzi's IGA Supermarkets, Inc. v. Darling -Delaware Co., Inc., 998 F.2d 1224, 1237-39 (3d Cir. 1993) (admitting multiple regression analysis for use in calculating antitrust damages); In re Hydrogen Peroxide Antitrust Litig., 2007 U.S. Dist. LEXIS 4402, at *32-33 (E.D. Pa. Jan. 19, 2007) ("when used properly multiple regression analysis is one of the mainstream tools in economic study and it is an accepted method of determining damages in antitrust litigation," citing In re Flat Glass Antitrust Litig., 191 F.R.D. 472, 486 (W.D. Pa. 1999)); Weisfeld v. Sun Chemical Corp., 210 F.R.D. 136, 143 (D.N.J. 2002) (observing that courts have "recognized the validity" of the regression analysis method for demonstrating class-wide impact).

Therefore, the Court finds that Plaintiffs have proposed generally-accepted methodologies for calculating damages that would involve the use of common evidence.

However, Defendant's expert, Dr. Hausman, argues that Phillip's proposed econometric approach to calculating damages is flawed in several respects. First, Phillips states that Hausman's 1981 paper about consumer surplus[46] provides "a well received estimation method of consumer surplus (compensating variation) using the estimated parameters of an ordinary demand function." (Phillips Report ¶¶ 75-77.) However, Hausman contends that the technique discussed in his 1981 paper is inapplicable to the present circumstances. (Hausman Report ¶ 30.) Hausman explains that his technique was developed to study the demand for gasoline. (Id.) In contrast to brands of gasoline, which have very little differentiation, Hausman asserts that various rock concerts are highly differentiated. (Id.) Thus, Hasuman claims that Phillips would have to develop econometric techniques "to permit estimation over the entire group of concerts a consumer chooses from." (Id.)

Second, Hausman points out that Phillips has conceded that there are several problems he would need to overcome to estimate damages using an econometrics analysis. (Hausman Report ¶ 31.) These problems include differing quality across concerts, changes in market size, shifts of the demand curve, and changes in the competitive outcome in terms of quantity. (Hausman Report ¶ 31) (citing Phillips Report ¶ 74.)

---

[46] See J. Hausman, Exact Consumer Surplus and Deadweight Loss, American Economic Review, 71 (1981).

Third, Hausman contends that Phillips fails to take into account supply-side effects in determining the extent of ticket price increases which were caused by the alleged anti-competitive conduct. (Hausman Report ¶ 32.)  Hausman contends that a change in supply side conditions likely caused the increase in rock concert ticket prices. (Id.) (citing Alan B. Krueger, The Economics of Real Superstars: The Market for Rock Concerts in the Material World, 23 Journal of Labor Economics 1, 17 (2005)).

Fourth, Hausman claims that Phillips has incorrectly excluded certain variables such as "specific talent effects" from his analysis because such variables are "potentially unobservable."  (Hausman Report ¶ 35) (quoting Phillips Report ¶ 76.)  Hausman contends that such variables are correlated with price and therefore the results of the econometric model will be biased and unreliable if the variables are excluded.  (Hausman Report ¶ 35.)  Also, Hausman argues that Phillips' approach is unreliable because Phillips has not performed the actual econometric analysis in order to know whether his approach would be valid.  (Id.) (quoting Phillips Depo. at 219) ("At this point, I don't even know what would be on the right side or the left side of the equation.").

Finally, Hausman also contends that an accurate economic analysis requires the calculation of a consumer demand curve for each individual concert because each concert is a differentiated product. (Hausman Report ¶ 27.)  Hausman points out that Phillips testified that he would only use a single demand curve for each market. (Hausman Report ¶ 29) (citing Phillips Depo. at 222.)

As demonstrated above, Hausman's criticism of the proposed regression analysis goes to the merits of Phillip's methodology rather

than whether Phillip's methodology utilizes evidence common to the class members.  As emphasized by the numerous cases detailed in Part V.B, the task before the court "is not to consider the merits . . . [but instead] whether generalized evidence exists which will prove or disprove Plaintiffs' claims on a simultaneous, class-wide basis.  In re Cardizem CD Antitrust Litig., 200 F.R.D. at 350 (quotation and citations omitted).

Phillips' proposed regression analysis would be based on a common set of data, and Defendants have not shown that individual calculations would be required.  This is sufficient to satisfy the predominance requirement.  See, e.g., In re Rubber Chemicals Antitrust Litig., 232 F.R.D. at 354 (finding that predominance requirement is satisfied where the plaintiffs' expert proffered two "reasonable and commonly-used formulaic approaches to calculating damages"); In re Cardizem CD Antitrust Litig., 200 F.R.D. at 350-51 (finding predominance requirement is satisfied where plaintiffs presented a "likely" method for calculating damages based on generalized evidence).

Moreover, while a plaintiff must present a model for calculating damages on a class-wide basis, common issues may predominate even if some individualized issues exist with respect to the calculation of damages as discussed above. See supra Part V.D.1.iv.a. See also Blackie, 524 F.2d at 905 ("The amount of damages is invariably an individual question and does not defeat class action treatment."); In re Visa Check/MasterMoney Antitrust Litig., 280 F.3d at 139 ("Common issues may predominate when liability can be determined on a class-wide basis, even when there are some individualized damage issues."); Bogosian, 561 F.2d at 456 ( "it has been commonly recognized that the

1 necessity for calculation of damages on an individual basis should not

2 preclude class determination when the common issues which determine

3 liability predominate"); <u>Gold Strike Stamp Co. v. Christensen</u>, 436

4 F.2d 791, 796, 798 (10th Cir. 1970) ("where the question of basic

5 liability can be established readily by common issues . . . [t]he fact

6 that there may have to be individual examinations on the issue of

7 damages has never been held, however, a bar to class actions").  Thus,

8 even if Hausman's criticisms are valid and the calculation of the

9 amount of damages requires the analysis of some individual issues,

10 this does not preclude class certification.

11 In sum, the Court holds that common issues of fact and law

12 predominate with respect to market definition, market power,

13 anticompetitive conduct, and antitrust impact.  Therefore, the Court

14 concludes that the predominance requirement of Rule 23(b)(3) is

15 satisfied.  The Court must proceed to analyze whether a class action

16 is a superior form of adjudication.

17 2.  A Class Action Is Superior to Other Available Methods for the

18 Fair and Efficient Adjudication of the Controversy

19 In assessing whether a class action is superior to other available

20 methods for the fair and efficient adjudication of the controversy,

21 the court must consider the following factors:

22 · "the interest of members of the class in individually controlling

23 the prosecution or defense of separate actions;"

24 · "the extent and nature of any litigation concerning the

25 controversy already commenced by or against members of the class;"

26 · "the desirability or undesirability of concentrating the

27 litigation of the claims in the particular forum;" and

28

1    · "the difficulties likely to be encountered in the management of a

2    class action."

3    Fed. R. Civ. P. 23(b)(3).

4        "In adding 'predominance' and 'superiority' to the qualification-

5    for-certification list, the Advisory Committee sought to cover cases

6    'in which a class action would achieve economies of time, effort, and

7    expense, and promote . . . uniformity of decision as to persons

8    similarly situated, without sacrificing procedural fairness or

9    bringing about other undesirable results.'" Amchem Prods. Inc. v.

10   Windsor, 521 U.S. 591, 623 (1997).

11       i.  Interest of Class Members in Individually Controlling the

12   Prosecution of Separate Actions

13       The first factor strongly suggests that a class action is

14   superior to other available methods for the fair and efficient

15   adjudication of the controversy.  First, class members likely incurred

16   minimal damages and prosecution of an antitrust case of this magnitude

17   would be complex and time-consuming. As a result, few if any class

18   members "have incurred damages in an amount sufficient to justify the

19   costs of pursuing an individual action." In re Lupron Marketing and

20   Sales Practices Litigation, 228 F.R.D. 75, 92 (D. Mass. 2005).

21   Additionally, thousands of prospective class members exist in each

22   region.  Thus, "[e]ven if the claims could be prosecuted individually,

23   their sheer number would make it unlikely that any significant number

24   would be resolved during the lifetimes of the consumer class members."

25   Id.

26   ///

27   ///

28

ii.  Extent and Nature of Litigation Already Commenced and

Desirability of Concentration of the Litigation in this Forum

The "extent and nature of litigation already commenced" factor "is intended to serve the purpose of assuring judicial economy and reducing the possibility of multiple lawsuits. . . . If the court finds that several other actions already are pending and that a clear threat of multiplicity and a risk of inconsistent adjudications actually exist, a class action may not be appropriate since, unless the other suits can be enjoined, . . . a Rule 23 proceeding only might create another action . . . ."  Zinser v. Accufix Research Inst., Inc., 253 F.3d 1180, 1191 (9th Cir. 2001) (quoting 7a Charles Alan Wright, et al., Federal Practice and Procedure §1780 (2d ed. 1986)); see also Haley v. Medtronic, Inc., 169 F.R.D. 643, 652 (C.D. Cal. 1996) ("[B]ecause the Court will probably not encounter a problem in terms of being able to enjoin other litigation, this factor also slightly weighs in favor of granting class certification.").

The "desirability of concentration" factor assesses whether potential plaintiffs, witnesses, and evidence are scattered across the country or located close to this forum.  See, e.g., Zinser v. Accufix Research Inst., Inc., 253 F.3d 1180, 1191-92 (9th Cir. 2001) (quoting Haley, 169 F.R.D. at 653) ("[W]here the potential plaintiffs are located across the country and where the witnesses and the particular evidence will also be found across the country, plaintiffs have failed to establish any particular reason why it would be especially efficient for this Court to hear such a massive class action lawsuit."); Sweet v. Pfizer, 232 F.R.D. 360, 373 (C.D. Cal. 2005) (same); Breeden v. Benchmark Lending Group, Inc., 229 F.R.D. 623, 631 (N.D. Cal. 2005) ("[S]ince the parties, evidence, and witnesses are

all likely to be located relatively close to this particular forum, this Court does not perceive any reason why section (b)(3)(C) counsels against certifying the putative class.").

Because all of the cases from across the country are being handled by this Court as an MDL, these two factors support adjudication of the cases as class actions.

iii. <u>Difficulties Likely to Be Encountered in Management of the Case</u>

The "failure to certify an action under Rule 23(b)(3) on the sole ground that it would be unmanageable is disfavored and "should be the exception rather than the rule." <u>In re Visa Check/MasterMoney Antitrust Litig.</u>, 280 F.3d at 140 (quoting <u>In re S. Cent. States Bakery Prods. Antitrust Litig.</u>, 86 F.R.D. 407, 423 (M.D. La. 1980)). <u>See also DeLoach v. Philip Morris Companies, Inc.</u>, 206 F.R.D. 551, 567 (M.D.N.C. 2002) ("Though any case of such magnitude certainly poses problems of manageability . . . the Manual for Complex Litigation states that '[d]ismissal for management reasons, in view of the public interest involved in class actions, should be the exception rather than the rule.'") (quoting Manual, Part I § 1.43 n.72 (1977)); 8 von Kalinowski et al., <u>supra</u>, § 166.03[3][b][iv] ("Generally, though, class action status will be denied on the ground of unmanageability only when it is found that efficient management is nearly impossible; some courts have stated that there is a presumption against refusing to certify a class on manageability grounds.").

Courts have a variety of management techniques available to deal with the individualized issues of damages. The Second Circuit has explained that "[t]here are a number of management tools available to a district court to address any individualized damages issues that

might arise in a class action, including: (1) bifurcating liability and damage trials with the same or different juries; (2) appointing a magistrate judge or special master to preside over individual damages proceedings; (3) decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages; (4) creating subclasses; or (5) altering or amending the class." In re Visa Check/MasterMoney Antitrust Litigation, 280 F.3d at 141. See also Manual for Complex Litigation, Federal Judicial Center, §21.5 (4th ed. 2004) (explaining that a court "may consider trying common issues first, preserving individual issues for later determination . . . encourage parties to stipulate to a test case approach . . . [use] court-appointed experts to examine cases and report their findings to a jury, subject to cross-examination . . . or [adopt] administrative models to administer damages awards, to the extent that such administrative models meet Seventh Amendment standards.")

However, courts primarily rely on bifurcation to deal with the issue of individualized damages.[47] See 8 Julian O. von Kalinowski et al., Antitrust Laws and Trade Regulations § 166.03[3][a][i] (2d ed. 1997) ("Once liability is established, questions pertinent only to

_____

[47] Bifurcation is limited by the Seventh Amendment to the extent that the Seventh Amendment generally "entitles parties to have facts decided by one jury and prohibits a second jury from reexamining those facts." Manual for Complex Litigation, Federal Judicial Center, § 22.93 (4th ed. 2004) (citing Castano v. Am. Tobacco Co., 84 F.3d 734, 750 (5th Cir. 1996)); see also Blyden v. Mancusi, 186 F.3d 252, 268 (2d Cir. 1999) ("At bottom, issues may be divided and tried separately, but a given issue may not be tried by different, successive juries."). "The test is whether the issues can be presented separately to different juries without generating 'confusion' and 'uncertainty.'" Manual for Complex Litigation, § 22.93 (citing Gasoline Prods. Co. v. Champlin Ref. Co., 283 U.S. 494, 500 (1931)).

individuals, such as the nature and extent of injury and damages incurred by each class member, may be adjudicated in separate actions.")  For example, in the In re Exxon Valdez class action, the Ninth Circuit observed that the district court did a "masterful job" where it divided the litigation into four phases: (1) liability for punitive damages, (2) class compensatory damages, (3) punitive damages, and (4) individualized compensatory damages.  270 F.3d 1215, 1225 (9th Cir. 2001).  Similarly, in Arthur Young & Co. v. U. S. Dist. Court, the Ninth Circuit affirmed the district court's decision to bifurcate the issues of liability from individual damages in a class action.  549 F.2d 686, 697 (9th Cir. 1977).  See also Sterling v. Veliscol Chemical Corp., 855 F.2d 1188, 1194 (6th Cir. 1988) (explaining that the district court had trifurcated common liability issues, causation for the class plaintiffs, and damages for the class plaintiffs, and deferred individualized hearings on causation and damages for other purported class members until after the trial in mass tort class action); In re Bendectin Litig., 857 F.2d 290, 307-320 (6th Cir. 1988) (affirming district court's trifurcation of liability, causation, and damages in products liability class action); In re Master Key Antitrust Litig., 528 F.2d 5, 12 n.11 (2d Cir. 1975) (explaining that liability could be determined at trial and "[t]he amount of such injury could then be computed at a separate trial for damages, and appropriate substratification of classes could be utilized to facilitate that determination."); In re Copley Pharmaceutical, Inc., 161 F.R.D. 456, 468-70 (D. Wyo. 1995) (creating trial plan whereby liability, causation for the class plaintiffs, and damages for the class plaintiffs were determined at trial and issues involving causation and damages for the rest of the purported class

1  members were deferred until after trial); Wainwright v. Kraftco.

2  Corp., 54 F.R.D. 532, 534-35 (N.D. Ga. 1972) (ruling that "[i]f

3  liability is established, other issues, including damages, can be

4  handled later, perhaps on a class member-by-class member basis.")

5      As discussed above, impact and the amount of damages can be

6  proved through the use of common evidence and methodologies.

7  Moreover, the Court observes no reason why the issues of liability and

8  damages could not be bifurcated for the purposes of summary judgment

9  or trial. Therefore, the Court holds that all of the Rule 23(b)(3)

10  factors support the determination that a class action is superior to

11  other available methods of adjudication.

12      In sum, the Court concludes that Plaintiffs have satisfied the

13  four requirements of Rule 23(a), demonstrated that common issues of

14  law and fact predominate, and have shown that a class action is the

15  superior method of adjudicating these controversies.  Therefore, class

16  certification is appropriate.

17

18  **VI. DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS**

19      Defendants have also filed a motion for judgment on the pleadings

20  on Plaintiffs' second cause of action for attempted monopolization in

21  violation of 15 U.S.C. § 2.

22      A.  Legal Standard Governing a Rule 12(c) Motion for Judgment on

23      the Pleadings

24      Federal Rule 12(c) provides that "[a]fter the pleadings are

25  closed but within such time as not to delay the trial, any party may

26  move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).

27  "Judgment on the pleadings is proper when the moving party clearly

28  establishes on the face of the pleadings that no material issue of

1  fact remains to be resolved and that it is entitled to judgment as a

2  matter of law." Hal Roach Studios, Inc. v. Richard Feiner & Co.,

3  Inc., 896 F.2d 1542, 1550 (9th Cir. 1990). "The standard on a motion

4  for judgment on the pleadings is the same as that applied on a motion

5  pursuant to Fed.R.Civ.P. 12(b)(6)." Martinez v. Snow, 2006 WL

6  3654618, at *3 (E.D. Cal. Dec. 12, 2006). Where the argument is that

7  Plaintiff fails to state a claim, "the motion for judgment on the

8  pleadings faces the same test as a motion under Rule 12(b)(6)."[48]

9  McGlinchy v. Shell Chemical Co., 845 F.2d 802, 810 (9th Cir. 1988).

10  The complaint should be construed in Plaintiff's favor for purposes of

11  a 12(c) motion. Martinez, 2006 WL 3654618, at *3. Since Plaintiffs

12  are the non-moving party, the allegations of the complaint "must be

13  accepted as true." Hal Roach, 896 F.2d at 1550.

14      Generally speaking, "judgment on the pleadings is improper when

15  the district court goes beyond the pleadings to resolve an issue; such

16

17  [48] In Conley v. Gibson, 355 U.S. 41, 45-46 (1957), the Supreme Court
held that "a complaint should not be dismissed for failure to state a

18  claim unless it appears beyond doubt that the plaintiff can prove no
set of facts in support of his claim which would entitle him to

19  relief." For fifty years, this legal standard remained unchanged.
However, the Supreme Court has recently abrogated Conley 's rule. In

20  referring to Conley's "no set of facts" language, the Court determined
that it "has earned retirement" and that "[t]he phrase is best

21  forgotten as an incomplete, negative gloss on an accepted pleading
standard," Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955, 1969

22  (2007). The Twombly Court did not seemingly evince an intent to
overrule Rule 8(a)'s limited notice pleading requirements. Id. at 1964

23  ("[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not
need detailed factual allegations."). Yet, the Court now requires a

24  plaintiff to proffer "enough facts to state a claim to relief that is
plausible on its face." Id. at 1974. Consequently, a Rule 12(b)(6)

25  motion should be granted where the plaintiffs have failed to "nudge[ ]
their claims across the line from conceivable to plausible." Id. "[A]

26  plaintiff's obligation to provide the 'grounds' of his 'entitle[ment]
to relief' requires more than labels and conclusions, and a formulaic

27  recitation of the elements of a cause of action will not do." Id. at
1964-65 (citation omitted).

28

1  a proceeding must properly be treated as a motion for summary

2  judgment." <u>Id.</u> There are two exceptions to this rule: (1) documents

3  cited in the complaint that are not submitted with it, and (2)

4  "matters of public record." <u>See</u> <u>Lee v. City of Los Angeles</u>, 250 F.3d

5  668, 688-90 (9th Cir. 2001); <u>see</u> <u>also</u> <u>Morgan v. County of Yolo</u>, 436 F.

6  Supp. 2d 1152, 1155 (E.D. Cal. 2006). As to the latter, "a court may

7  not take judicial notice of a fact that is 'subject to reasonable

8  dispute.'" <u>Lee</u>, 250 F.3d at 689 (quoting Fed. R. Evid. 201(b)). For

9  example, "when a court takes judicial notice of another court's

10  opinion, it may do so 'not for the truth of the facts recited therein,

11  but for the existence of the opinion, which is not subject to

12  reasonable dispute over its authenticity.'" <u>Id.</u> at 690 (quoting <u>S.</u>

13  <u>Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group Ltd.</u>, 181

14  F.3d 410, 426-27 (3d Cir. 1999)).

15     <u>B. Elements of a Sherman Act § 2 Attempted Monopolization Claim</u>

16     "The following facts must be proved to establish an attempt to

17  monopolize claim: (1) specific intent to control prices or destroy

18  competition; (2) predatory or anticompetitive conduct to accomplish

19  the monopolization; (3) dangerous probability of success; and (4)

20  causal antitrust injury." <u>Pacific Exp., Inc. v. United Airlines, Inc</u>.

21  959 F.2d 814, 817 (9th Cir. 1992) (citing <u>Movie 1 & 2 v. United</u>

22  <u>Artists Communications' Inc</u>., 909 F.2d 1245, 1254 (9th Cir. 1990),

23  cert. denied, 501 U.S. 1230 (1991)); <u>see also</u> <u>Amarel v. Connell</u>, 102

24  F.3d 1494, 1521 (9th Cir. 1996) (same); <u>Rebel Oil Co., Inc. v.</u>

25  <u>Atlantic Richfield Co.</u>, 51 F.3d 1421, 1432-33 (9th Cir. 1995) (same).

26  ///

27  ///

28

C.  Does Plaintiffs Lack Standing to Bring an Attempted Monopolization Claim?

Defendants argue that Plaintiffs lack antitrust standing to bring a Sherman Act § 2 attempted monopolization claim.  A plaintiff's antitrust claim may be dismissed for a lack of standing as a matter of law.  Solinger v. A&M Records, Inc., 586 F.2d 1304, 1309 (9th Cir. 1978).

1.  Antitrust Standing

"Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation . . . . [T]here is a point beyond which the wrongdoer should not be held liable."  Associated General Contractors v. California State Council of Carpenters, 459 U.S. 519, 534-535 (1983).  Because it is "virtually impossible to identify a black-letter rule that will dictate the result in every case," the Supreme Court has identified five factors in determining whether a plaintiff has standing: (1) whether the nature of the plaintiff's injury is the type the antitrust laws were intended to forestall; (2) the directness and speculative nature of the injury; (3) the existence of more direct victims; (4) the risk of duplicative recovery; and (5) the complexity of apportioning damages.  Id. at 537-45.  The Ninth Circuit has explained that a court should balance these factors, see Amareal. v. Connell, 102 F.3d 1494, 1507 (9th Cir. 1996), and no single factor should be controlling.  American Ad Mgmt., Inc. v. General Tel. Co., 190 F.3d 1051, 1055 (9th Cir. 1999).

2.  Application of the Five Associated General Factors

Defendants argue that Plaintiffs lack standing because Plaintiffs' injury claim is too indirect or speculative and because

124

1  Defendants' competitors are the proper plaintiffs for this claim of

2  relief.  (Def.'s Mot. At 7-11.)  Defendants do not address the other

3  three factors.

4      i.  Whether Plaintiff's Injury Is the Type Antitrust Laws Were

5      Designed to Prevent

6      The Ninth Circuit has explained that "the nature of the

7  plaintiff's alleged injury is of 'tremendous significance' in

8  determining whether a plaintiff has antitrust standing."  Amarel, 102

9  F.3d at 1507 (quoting Bhan v. NME Hospitals, Inc., 772 F.2d 1467, 1470

10  n.3 (9th Cir. 1985). Defendants do not discuss this factor and it

11  likely would strongly favor a finding of standing. The Ninth Circuit

12  has held that a showing of "antitrust injury" is necessary for the

13  first factor to weigh in favor of a finding of standing. Knevelbaard

14  Dairies v. Kraft Foods, Inc., 232 F.3d 979, 987 (9th Cir. 2000).

15  "Antitrust injury" is defined as: "(1) unlawful conduct, (2) causing

16  an injury to the plaintiff, (3) that flows from that which makes the

17  conduct unlawful, and (4) that is of the type the antitrust laws were

18  intended to prevent." Id. at 987. See also Atlantic Richfield Co. v.

19  USA Petroleum Co., 495 U.S. 328, 333 (1990) (Antitrust injury is

20  "injury of the type the antitrust laws were intended to prevent and

21  that flows from that which makes defendants' acts unlawful." (quoting

22  Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977)).

23  As explained above, Plaintiffs allege Defendants have engaged in a

24  range of anticompetitive conduct in violation of the law. Furthermore,

25  Plaintiffs allege they have suffered injury in the form of the payment

26  of supra-competitive prices for tickets. This harm, if proven, would

27  flow from the illegal anticompetitive effect of Defendants' conduct

28  allowing it to engage in monopolistic pricing practices. Finally, as

1    the harm alleged results from decreased competition and increased

2    prices it is "of the type antitrust laws were intended to prevent."

3    190 F.3d at 1057.

4        ii.   Whether Plaintiffs' Claim Is Too Indirect or Speculative

5        Plaintiffs' claim that they suffered damage by being charged

6    supra-competitive ticket prices by Clear Channel.  (Riley Compl. ¶¶

7    64, 68.)  Because monopoly power is required to charge

8    supracompetitive prices, Defendants claim that Plaintiffs could not

9    have suffered damages in the form of supracompetitve prices based on

10   an attempted monopolization as a matter of law.  Therefore, Defendants

11   claim that Plaintiffs' damages are non-existent as a matter of law.

12   Defendants rely principally on In re Air Passenger Computer

13   Reservation Systems, 727 F. Supp. 564 (C.D. Cal. 1989).

14       In Air Passenger Computer Reservation System, a group of airlines

15   bought an antitrust action against the owners of the two leading

16   airline computer reservations systems.  Id.  Similar to this case, the

17   airlines alleged two causes of action: (1) monopolization and (2)

18   attempted monopolization.  With respect to the monopolization claim,

19   the airlines alleged injury based on the overcharges paid for tickets

20   booked through the defendants' computer reservation systems.  Id. at

21   566-67.  With respect to the attempted monopolization claim, the

22   airlines alleged injury based on defendants' liquidated damages

23   clauses imposed on travel agents who breached contracts with the

24   defendants for usage of their reservation system.  Id.

25       The district court held that the airlines lacked standing for the

26   attempted monopolization claim.  Id. at 569-70.  The district court

27   explained that "supracompetitive rates are the result of monopoly, not

28   attempted monopoly . . . supracompetitive pricing does not result from

1   an attempt to monopolize when the monopolization is not achieved."

2   Id.   The court concluded that "[o]nly when the defendants achieve a

3   monopoly and are in a position to harm consumers by engaging in

4   monopoly overcharging, is there harm to the consumers." Id. at 569.

5   As a result, the court determined that the plaintiff airlines could

6   not have suffered damages as a matter of law with respect to the

7   attempted monopolization claim and therefore the plaintiffs lacked

8   standing.

9       Defendants' argument fails when the specific allegations in the

10  complaint are examined.   In cases such as Air Passenger, the alleged

11  anticompetitive conduct was predatory pricing.   See, e.g., Air

12  Passenger, 727 F. Supp. at 566; Hahn v. Rifkin/Narragansett South

13  Florida CATV Ltd. Partnership, 941 F. Supp. 1196, 1199 (S.D. Fla.

14  1996).   Predatory pricing is "pricing below an appropriate measure of

15  cost for the purpose of eliminating competitors in the short run and

16  reducing competition in the long run." Cargill, Inc. v. Monfort of

17  Colorado, Inc., 479 U.S. 104, 117 (1986).   Air Passenger was correct

18  in recognizing that consumers could not be harmed by predatory pricing

19  because consumers actually benefit in the short-run in the form of

20  lower prices.   Consumers would not be harmed until the predator

21  attained monopoly power through the predatory pricing and subsequently

22  raised prices to supra-competitive levels to recoup the lost profits.

23      Plaintiffs do not allege that Defendants engaged in predatory

24  pricing in an attempt to attain monopoly power in the concert

25  promotion market.   Instead, Plaintiffs claim that Clear Channel bids

26  up the fees for artists to levels at which competing promoters cannot

27  compete.   (Riley Compl. ¶ 46.)   For example, Plaintiffs allege that

28  Clear Channel will guarantee artists more than 100 percent of gross

1    sales in exchange for the right to promote the artist's concert. (_Id._)

2    As a result, competing producers must either pass on such artists or

3    promote the artists at a guaranteed loss. (_Id._)

4        This conduct is aimed at achieving the same result as predatory

5    pricing - the elimination of competitors.  Additionally, both this

6    conduct and predatory pricing cause the aspiring monopolist to incur

7    short-term losses.  However, the crucial difference between the

8    alleged conduct and predatory pricing is the effect on the ultimate

9    consumer.  Under a predatory pricing scheme, consumers benefit in the

10   short-run in the form of lower prices because the predator is selling

11   at below cost.  In contrast, Plaintiffs allege that Defendants bid up

12   the fees for artists and pass on these higher costs to consumers in

13   the form of higher ticket prices.[49]  As a result, consumers suffer

14   harm in the short-run even though Defendants have not yet attained

15   monopoly power.

16       Defendants also cite _Paycom Billing Services v. Mastercard_

17   _International_, 467 F.3D 283 (2d Cir. 2006), for the proposition that

18   consumers' antitrust injuries, when they derive from attempted

19   monopolization conduct directed at defendant's rivals, are too remote

20   to create standing. However, the court in _Paycom Billing_ arrived at

21   its conclusion after analysis of the particular anticompetitive scheme

22   alleged and its likely impact on plaintiffs. _Id_. at 293.[50]  As this is

23   [49]  Defendants are allegedly able to pass on these higher costs to
24   consumers because the elasticity of demand for individual artists is
     low.  As discussed in Part V, the fact that the elasticity of demand
25   for individual artists is low does not mean that the price cross-
     elasticity between artists is low.  As a result, the fact that
26   Defendants can pass on the higher costs to consumers does not compel
     the conclusion that each artist constitutes a distinct product market.
27   [50] Defendants cite a number of other district court opinions from
     other circuits denying standing to consumers for attempted
28   monopolization claims, some with virtually no analysis of the scheme

a motion for judgment on the pleadings, the Court must assume that

Plaintiffs' allegations are true.  Plaintiffs, as noted above, have

alleged that Defendants engaged in supracompetitive pricing in the

course of and as a result of their attempted monopolization. If true,

this would mean that Defendants charging of supracompetitive prices

was a "necessary step" in their anticompetitive practices and injury

to the Plaintiffs was "inextricably intertwined" with the injuries to

Defendants' competitors so as to allow consumer standing. Blue Shield

of Va. V. McCready, 457 U.S. 465, 479, 484 (1982).  Though these

claims prompt some skepticism, they are not implausible allegations in

the concert promotion context, as discussed above.  For example,

Defendants may have charged supracompetitive prices while engaging in

anticompetitive practices and the charging of such prices may have

at issue. Wojcieszek v. New England Telephone and Telegraph Company, 977 F. Supp. 527, 535 (D. Mass. 1997); Simpson v. U.S. West Communications, Inc., 957 F. Supp. 201, 205-206 (D. Or. 1997); Hahn v. Rifkin/Narragansett South Florida CATV Limited Partnership, 941 F. Supp. 1196 (S.D. Fla. 1996); Davis v. Southern Bell Telephone & Telegraph, 1994-1 Trade Cas (CCH) ¶ 70,510 (S.D. Fla. 1994); O'Neill v. Coca-Cola Co., 669 F. Supp 217, 222-24 (N.D. Ill. 1987). However, to the extent these opinions deny standing to consumers as a matter of course, they rely on the assumption that a defendant cannot engage in supracompetitive pricing until they have achieved monopoly power.  As already noted, this is not necessarily true due to the unique circumstances of this case. At the same time, in Davis v. Pacific Bell, 204 F. Supp. 2d 1236, 1241 (N.D. Cal. 2002), a federal district court found antitrust standing for consumers making an attempted monopolization claim on the basis of injuries arising both from anticompetitive practices directed at consumers and from the charging of supracompetitive prices enabled by those practices. See also Strong v. Bellsouth Telecommunications, Inc., 1994 WL1016699, at *3 (W.D. La. 1994) (noting that "consumers may have standing"). Defendants argue that these cases are distinguishable because the harm to the consumers resulted, in part, directly from the defendant phone companies' anticompetitive conduct. However, in neither opinion was there any indication that consumers' suffering of direct harm from defendants' anticompetitive practices was dispositive in the overall finding of antitrust standing. Thus, these cases demonstrate that the issue of consumer standing is not subject to a per se rule, but instead a case-by-case determination.

1   been an integral aspect of their attempted monopolization scheme. On

2   further factual development, it is possible that Plaintiffs will fail

3   to establish their allegations and this factor will consequently weigh

4   heavily against them. However, at this stage of the litigation,

5   Plaintiffs' allegations are sufficient to establish that the

6   Plaintiffs' allegations regarding damages are neither too indirect nor

7   too speculative.  Therefore, this factor weighs in favor of a finding

8   of standing.

9       iii.  Whether Defendants' Competitors Are More Direct Victims

10      Defendants emphasize that the attempted monopolization claims

11  focus on Defendants' conduct against competitors rather than

12  consumers.  (Def.'s Mot. At 11.)  Defendants therefore conclude that

13  Plaintiffs' alleged injury is purely derivative of any direct injury

14  to competitors.  (Id.)  As discussed supra Part III, at least one

15  competitor has already sued Defendants for essentially the same

16  attempted monopolization in the Denver market.  NIPP, 311 F. Supp. 2d

17  at 1048. The harm suffered by competitors is distinct from the harm

18  suffered by consumers rather than purely derivative, as discussed

19  immediately below. Nonetheless, it is a straightforward proposition

20  that competitors' injury in being forced out of the market is a more

21  direct result of Defendants' alleged attempted monopolization than the

22  harm to Plaintiffs in paying supracompetitive prices. Defendants'

23  charging of supracompetitive prices is alleged to be enabled and

24  motivated by its anticompetitive practices. Injuries resulting from

25  such prices therefore must be regarded as a less direct result of

26  Plaintiffs' anticompetitive practices than injuries resulting from the

27  practices themselves.  See Lucas v. Bechtel Corp. 800 F.2d 839, 845

28  (9th Cir. 1986) (finding competitors to be more direct victims of

1  conspiracy to monopolize market than employees who suffer depressed

2  wages as a result of monopoly). The Supreme Court has held that "[t]he

3  existence of an identifiable class of persons whose self-interest

4  would normally motivate them to vindicate the public interest in

5  antitrust enforcement diminishes the justification for allowing a more

6  remote party … to perform the office of a private attorney general."

7  Associated Gen. Contractors, 459 U.S. at 542. The existence of

8  competitors who have economic incentive to sue Defendants for more

9  direct harm resulting from the same attempted monopolization conduct

10  at issue here weighs against a finding of standing. However, this

11  factor, as discussed below, is not conclusive.[51]

12      iv.  Whether There Is a Risk of Duplicative Recoveries

13      The Ninth Circuit has explained that "[t]he risk to be avoided

14  under [this factor] is that potential plaintiffs may be in a position

15  to assert conflicting claims to a common fund . . . thereby creating

16  the danger of multiple liability for the fund." American Ad, 190 F.3d

17  at 1059.  In this case, there is no risk of duplicative recovery

18  because the harm to consumers is distinct from the harm to Defendants'

19  competitors.  For example, ticket purchasers allegedly suffered

20  damages in the form of higher ticket prices, whereas competing

21  promoters suffered damages in the form of lost profits.  Additionally,

22  Defendants have not addressed this factor in their motion.

23      v.  Whether Apportionment of Damages Would Be Complex

24

25  [51] Defendants claim this factor "weighs 'heavily' against Plaintiffs'
   standing to bring suit." (Def. Mot. at 11). However, the opinion cited
26  for this proposition is in fact describing the relative weight of four
   factors when using the term "heavily" rather than only this factor.
27  See Associated Gen. Contractors, 459 U.S. at 545. There is no
   indication that this factor has any special weight in the antitrust
28  standing analysis.

1    As compared to the apportionment of damages necessary in

2  Associated Gen. Contractors, where the court held this factor weighed

3  against finding, the apportionment of damages in this case is

4  relatively straightforward. Unlike Associated Gen Contractors, there

5  is no need to apportion among directly and indirectly harmed

6  Plaintiffs, nor is there a need to determine to what extent Plaintiffs

7  absorbed or passed on damages. As discussed above supra Part V.D.1.iv

8  concerning the proposed regression analysis, all that is necessary to

9  calculate damages for each class member is application of the

10  regression analysis.  Additionally, Defendants have not addressed this

11  factor in their motion.  Therefore, this factor weighs in favor of

12  standing.

13    vi.  Weighing of the Five Factors

14    Overall, all except one of the factors likely weighs in favor of

15  standing.  Additionally, the Ninth Circuit has emphasized that the

16  first factor – which weighs in favor of standing – deserves particular

17  weight.  Therefore, the Court holds that Plaintiffs have antitrust

18  standing to bring the attempted monopolization claims against

19  Defendants for purposes of resolving Defendants' motion for judgment

20  on the pleadings.[52]

21  ///

22  ///

23

24  [52] Plaintiffs also argued that they have standing because they are

25  seeking injunctive relief under § 16 of the Clayton Act.  The Court
    need not reach this issue because the Court finds that standing exists

26  for the reasons discussed above.  Additionally, Plaintiffs have
    represented that they are no longer pursuing a claim for injunctive

27  relief because Defendants have spun-off their concert promotion
    business into an independent, publicly traded entity named Live

28  Nation, Inc.. (Def.'s Reply at 11.)

## VII.   CONCLUSION

In certifying the classes, the Court is not indicating whether it believes Plaintiffs may succeed in proving their claims on the merits. When the Court is at liberty to conduct a full <u>Daubert</u> analysis, Defendants' arguments may very well carry the day.  However, this order views the allegations, expert testimony, and evidence through the very narrow prism permitted by <u>Dukes</u>.[53]  Accordingly, Plaintiffs have satisfied the requirements of Rule 23(a) and demonstrated that common issues of fact and law predominate.  Additionally, a class action is a superior method for adjudicating this controversy because resolution of common questions of market definition, market power, anticompetitive conduct, and antitrust impact in these class actions is more efficient than re-litigating these common issues on a case-by-case basis thousands of times.  Therefore, the Court GRANTS Plaintiffs' motions to certify the class.

With respect to the Chicago class, <u>Malinda Riley v. Clear Channel Communications, et al.</u>, CV 06-2381-SVW (RCx) (Chicago Region), the Court certifies the class as "All persons who purchased tickets to any live rock concert in the Chicago Region directly from any of the Defendants or their affiliates or predecessors or agents during the period from June 19, 1998 to the present."  With respect to the Boston class, <u>Kevin MacLaughlan v. Clear Channel Communications Inc.</u>, CV 06-5012 SVW (RCx) (New England Region), the Court certifies the class as "All persons who purchased tickets to any live rock concert in the New

---

[53] The Court also notes that the result might have been vastly different if the MDL panel had selected a district court in a different circuit to serve as the MDL court.  For example, if the MDL panel had assigned the cases to the Southern District of New York, the district court could have engaged in a more probing analysis of the Rule 23 factors pursuant to <u>In re IPO Securities Litig.</u>.

1    England Region directly from any of the Defendants or their affiliates

2    or predecessors or agents during the period from June 19, 1998 to the

3    present." With respect to the New York/New Jersey class, <u>Hayes Young</u>

4    <u>v. Clear Channel Communications Inc.</u>, CV 06-3701-SVW (RCx), the Court

5    certifies the class as "All persons who purchased tickets to any live

6    rock concert in the New York/New Jersey Region directly from any of

7    the Defendants or their affiliates or predecessors or agents during

8    the period from June 19, 1998 to the present." With respect to the

9    Denver class, <u>Lauren Hammer v. Clear Channel Communications Inc.</u>, CV

10   06-4987-SVW (RCx) (Colorado Region), the Court certifies the class as

11   "All persons who purchased tickets to any live rock concert in the

12   Colorado Region directly from any of the Defendants or their

13   affiliates or predecessors or agents during the period from June 19,

14   1998 to the present." With respect to the Southern California class,

15   <u>Margaret Thompson v. Clear Channel Communications, Inc., et al.</u>, CV

16   05-6704-SVW (RCx) (Southern California Region), the Court certifies

17   the class as "All persons who purchased tickets to any live rock

18   concert in the Southern California Region directly from any of the

19   Defendants or their affiliates or predecessors or agents during the

20   period from June 19, 1998 to the present."

21   ///

22   ///

23

24

25

26

27

28

1   The Court vacates Plaintiffs' motion for a modification of the

2   pretrial scheduling orders and sets a status conference for Monday,

3   November 5, at 1:30 P.M..  The parties should be prepared to discuss

4   the following issues: (1) whether Defendants will appeal this Court's

5   order pursuant to Rule 23(f); (2) whether and how the case should be

6   bifurcated for purposes of motions for summary judgment; (3)

7   modification of the pretrial scheduling order regarding the five cases

8   in which the class has been certified; (4) whether the other seventeen

9   cases should continue to be stayed; and (5) any other scheduling

10  issues.

11  IT IS SO ORDERED.

12

13

14  DATED: _11/22/07_____

15                                              STEPHEN V. WILSON
                                                UNITED STATES DISTRICT JUDGE

16

17

18

19

20

21

22

23

24

25

26

27

28