1  Elaine T. Byszewski (SBN 222304)
   elaine@hbsslaw.com
2  Lee M. Gordon (SBN 174168)
   lee@hbsslaw.com
3  **HAGENS BERMAN SOBOL SHAPIRO LLP**
   700 South Flower Street, Suite 2940
4  Los Angeles, CA 90017-4101
5  Telephone: (213) 330-7150
   Facsimile: (213) 330-7152
6
7  *Additional Plaintiffs' Counsel Appear*
   *on the Signature Page*



8            **IN THE UNITED STATES DISTRICT COURT**
9
           **FOR THE CENTRAL DISTRICT OF CALIFORNIA**
10

11 In re: LIVE CONCERT ANTITRUST    )    MDL no. 06-ML-1745
   LITIGATION                        )    SVW-(RCx)
12                                    )    06-CV-02382 SVW-(RCx)
                                      )    (E.D. Pa. 05-cv-04492)
13                                    )
14                                    )
                                      )    CLASS ACTION
15 _____        )
16 This document relates to:          )    **THIRD AMENDED**
   *Nina Willner v. Clear Channel*    )    **CLASS ACTION**
17 *Communications, Inc., et al.,* 06-CV- )  **COMPLAINT**
   02382 SVW-RCx                      )
18                                    )    Courtroom: 6
19 _____        )    [Hon. Stephen V. Wilson]
20

21        Plaintiff, Nina Willner, for her Third Amended Class Action Complaint, upon

22 personal knowledge as to facts pertaining to herself and upon information and belief as

23 to all other matters, based on the investigation of her counsel, against Defendants Clear

24 Channel Communications, Inc., Clear Channel Entertainment, Inc., Clear Channel

25 Radio, Inc., Clear Channel Broadcasting, Inc., and Live Nation, Inc. (collectively,

26 "Clear Channel" or "Defendants"), states as follows:

27
                                            **ORIGINAL**
28

                                    1

## NATURE OF ACTION

1.    Plaintiff brings this regional civil antitrust class action for damages and injunctive relief on behalf of direct purchasers of tickets to live rock concerts from Clear Channel in Philadelphia, Pennsylvania, and all areas of the United States within a 150 mile radius (the "Philadelphia Region"). This lawsuit arises out of the unlawful and anticompetitive practices of a major radio broadcasting and concert promotion conglomerate, Clear Channel Communications, Inc. – by itself and through its various subsidiaries and affiliates (including but not limited to the named Defendants herein) – to prevent competition for concert promotion services nationwide and thereby increase the cost of tickets Plaintiff and the Class purchased to live rock concerts.  Through a series of mergers valued at nearly $20 billion, and through other anticompetitive and predatory practices described below, Clear Channel has built a monopolistic, multimedia empire that has substantially harmed competition resulting in higher concert ticket prices and fewer offerings for Plaintiff and the Class.  This is true across the nation, as well as in the Philadelphia Region.  While the ticket prices in one city may sometimes differ from those in another city, tickets have increased in a material amount across the Philadelphia Region as a result of Clear Channel's monopolistic behavior.

2.    Defendants' anticompetitive conduct includes the following, as examples:

- Limiting radio airplay of artists who refuse to use Clear Channel's concert promotion services;

- Denying promotional air-time to artists who use competing promoters;

- Refusing to accept advertising by other concert promoters, charging excess fees for such advertising, or limiting such advertising to undesirable time slots;

- Excluding concerts promoted by competitors from radio updates of upcoming concerts; and

2

1          •        Inflating fees paid to artists, in some cases more than 100% of

2                   gross sales, in order to exclude competitors from the market.

3          3.       This regional class action was filed to protect the direct purchasers of

4    tickets to live rock concerts from Clear Channel in the Philadelphia Region.  The

5    following venues were, during the class period, owned, operated and/or exclusively

6    programmed by Clear Channel:    Beacon Theatre, Hilton Theatre, Hammerstein

7    Ballroom, Irving Plaza, Mohegan Sun Arena, PNC Bank Arts Center, Tommy Hilfiger

8    at Jones Beach Theatre, Westbury Music Fair, Nissan Pavilion, Warner Theater,

9    Mechanic Theater, Pier 6, Electric Factory, Ford Pavilion Montage Mountain, Hershey

10   Star Pavilion, Merriam Theater, Theater of the Living Arts, Tower Theater, Tweeter

11   Center by the Waterfront, Liacouras Center, Festival Pier, Trocadero, Mann Music

12   Center, Wachovia Center, The Forum, Hershey Park Stadium, The Star Pavilion at

13   Hershey Park, GIANT Center, Collingswood Theatre, Tropicana Casino, Borgata

14   Event Center, Music Box at the Borgata, Mark G. Etess Arena, Boardwalk Hall and

15   Kahuna Concert Hall.

16         4.       In 2002, a class action titled *Heerwagen v. Clear Channel*

17   *Communications, Inc.*,  Case No. 02 CV 4503 (S.D.N.Y.), was filed against certain of

18   the Defendants in the United States District Court for the Southern District of New

19   York on behalf of a nationwide class of concert ticket purchasers.  Plaintiff and the

20   Class here would have been members of that putative nationwide class. However, in

21   August 2003, the *Heerwagen* Court found that the relevant market was regional, rather

22   than national, and denied a motion for certification.  The District Court's decision was

23   affirmed by the Second Circuit on January 10, 2006.  *Heerwagen v. Clear Channel*

24   *Communications*, 435 F.3d 219 (2d Cir. 2006).  Accordingly, Plaintiff files this class

25   action on behalf of rock concert ticket purchasers in the Philadelphia Regional market.

26         5.       Clear Channel's anticompetitive practices have resulted in highly inflated

27   concert ticket prices that are unrelated to inflation.  For example, from 1991 to 1996

28   (immediately before Clear Channel began acquiring many of its major competitors in

THIRD AMENDED CLASS ACTION COMPLAINT

1    the promotion market), concert ticket prices rose on a nationwide basis by 21 percent,

2    while the Consumer Price Index shows that all prices grew by 15 percent. Yet during

3    the time when Clear Channel's consolidation of the industry and anticompetitive

4    practices were implemented, concert ticket prices ballooned by 61 percent nationwide

5    while the Consumer Price Index increased by just 13 percent. Similarly, a study

6    comparing the prices of concert tickets against the Consumer Price Index for movies,

7    theater and sports during the period of consolidation reveals that concert prices have

8    increased across the country by 54 percent while the prices for movies, theater and

9    sporting events increased just 24 percent. As a result of Clear Channel's illegal

10   conduct, Plaintiff and the Class paid and continue to pay artificially high prices for

11   concert tickets. In short, due to Defendants' actions, Plaintiff and the Class have been

12   deprived of the benefits of free and open competition across the nation.

13        6.    Plaintiff seeks damages and injunctive relief on behalf of the Class.

14                          **JURISDICTION AND VENUE**

15        7.    The Court has jurisdiction over the claims relating to violations of Section

16   2 of the Sherman Act under 28 U.S.C. §§ 1331 and 1337 and 15 U.S.C. § 15. The

17   Court has supplemental jurisdiction over the state law claim pursuant to 28 U.S.C. §

18   1367(a). The federal and state law claims arise from the same events and transactions,

19   involve substantially identical issues of fact and law, and are so related to each other

20   that they form part of the same case or controversy under Article III of the United

21   States Constitution.

22        8.    Venue is proper in this judicial district under 15 U.S.C. § 22 and 28

23   U.S.C. § 1391. Clear Channel transacts business and many of the acts and events

24   giving rise to this action occurred within this district.

25                               **PARTIES**

26        9.    Plaintiff Nina Willner is a resident of Pennsylvania. Plaintiff purchased

27   one or more tickets for rock concerts promoted and held by Defendants in the

28   Philadelphia Region during the Class Period defined below.

1    10.    Defendant Clear Channel Communications, Inc. ("Clear Channel
2 Communications") is a corporation organized and existing under the laws of the State
3 of Texas, with its principal place of business located at 200 East Basse Road, San
4 Antonio, Texas 78209. Upon information and belief, Clear Channel Communications
5 sometimes also does business as, among other things, "Clear Channel Worldwide" and
6 "Clear Channel Concerts."

7    11.    Defendant Clear Channel Entertainment, Inc. ("Clear Channel
8 Entertainment"), upon information and belief, is a corporation organized and existing
9 under the laws of the State of Delaware, in good standing, with its principal place of
10 business located at 650 Madison Avenue, New York, New York 10022. Upon
11 information and belief, Clear Channel Entertainment is a wholly-owned subsidiary or
12 affiliate of Clear Channel Communications that, until July 2001, did business as SFX
13 Entertainment, Inc.

14    12.    Defendant Clear Channel Radio, Inc. ("Clear Channel Radio"), upon
15 information and belief, is a corporation organized and existing under the laws of the
16 State of Nevada, with its principal place of business located at 50 East Rivercenter
17 Blvd., 12th Floor, Covington, Kentucky 41011. Upon information and belief, Clear
18 Channel Radio is a wholly-owned subsidiary or affiliate of Clear Channel
19 Communications.

20    13.    Defendant Clear Channel Broadcasting, Inc. ("Clear Channel
21 Broadcasting") is a corporation organized and existing under the laws of the State of
22 Nevada with its principal place of business located at 200 East Basse Road, San
23 Antonio, Texas 78209.

24    14.    Defendant Live Nation, Inc. ("Live Nation") is a Delaware corporation
25 headquartered at 9348 Civic Center Drive, Beverly Hills, California 90210. Prior to
26 2000, Live Nation was independently owned and known as SFX. Clear Channel
27 Communications, Inc. acquired SFX in 2000 and SFX changed its name to Clear
28 Channel Entertainment in 2001. In December 2005, Live Nation was spun-off from

THIRD AMENDED CLASS ACTION COMPLAINT

Clear Channel and became a publicly traded company. Live Nation is one of the world's largest promoters and venue operators for live entertainment events. Although Live Nation is now a separate, publicly owned company, it is dominated and controlled by the same individuals who control Clear Channel Communications: L.Lowry Mays, Mark P. Mays, and Randall T. Mays.

## **TRADE AND COMMERCE**

15.    Clear Channel is involved in interstate trade and commerce, and the activities of Clear Channel substantially and adversely affect interstate commerce. In the conduct of its business, Clear Channel, directly or indirectly, has used and uses the means and instrumentalities of interstate commerce in furtherance of the acts and communications alleged herein, including but not limited to, the United States postal system, the nationwide system, through and by means of which a substantial amount of the nation's communications, information exchanges, and transportation take place.

16.    For example, Clear Channel uses all of these instrumentalities of interstate commerce to contact, book and bring performers to various venues throughout the United States, including in the Philadelphia Region. Concerts in various metro areas are regularly performed by entertainers from outside those areas, who themselves use the instrumentalities of interstate commerce to book and travel to the concerts, and upon information and belief, such concerts are attended by ticket-buyers from outside those areas, who use the instrumentalities of interstate commerce to purchase tickets and attend the concerts.

## **PRODUCT MARKET / GEOGRAPHIC MARKET**

17.    The relevant product market is the market for the sale of tickets to live rock concerts.

18.    The relevant geographic market is the Philadelphia Region.

THIRD AMENDED CLASS ACTION COMPLAINT

# GENERAL ALLEGATIONS

### A.    Overview of the Concert Promotion Industry

19.    Concert promoters are essentially the wholesalers for the live music industry. Promoters "buy" concerts from booking agents at wholesale prices negotiated separately between the agent and promoter. The promoter then "resells" the product as a live music event to the general public at retail prices in the form of a concert ticket. The booking agents are the authorized representatives for the musical groups, or artists. Agents work directly with the artists and their managers to determine the best venue opportunities.

20.    The promoter is responsible for promoting the concert, which entails determining and executing the proper advertising and marketing plan. Marketing strategies may include use of a variety of channels to promote the event, including print, TV, and street promotion (flyers); however, radio is by far the most effective tool for promoting concerts because of its close relationship to the product being advertised. Promoters also are responsible for, among other things: covering various expenses associated with a concert, including transportation, hotel costs and production costs; providing sound and lighting equipment, security, ushers, ticket takers and stage managers; and securing a proper venue for the concert. The venue can be one that the promoter either owns or rents. These promotions services have a direct impact on ticket price.

21.    The promoter ultimately takes full financial responsibility for the concert. If ticket sales revenues are higher than the expenses for the concert, then the promoter will make a profit; if not, the promoter will take a loss. As the concert industry has matured, promoters have relied on different sources of income to offset risks associated with promoting concerts. These sources of income include sponsorship deals, food and beverage sales, and merchandise sales.

7

**B.    The Concert Promotion Business**

22.    The modern concert business began in the mid-1960s when a string of regional independent promoters began opening or renting out small theaters and dance ballrooms across the country. There were very few artists that could fill larger venues in those days. In the early 1970s, the audiences grew to the point where artists began filling arenas. At this point, some of these small "regional" promoters grew into large companies built around the oversized personalities of their founders. Some of the more famous examples were Bill Graham Presents in Northern California, Fey Concerts in Colorado, Jam Productions in Chicago, and Don Law in Boston.

23.    Around 1997, a major shift occurred when SFX, Inc., a company with no prior concert experience, raised billions of dollars and subsequently bought out nearly all of the major independent promoters in the business. An even more dramatic shift occurred in August 2000, when Clear Channel Communications purchased SFX. The result of this massive consolidation has been that Clear Channel has been able to book an entire tour nationwide, virtually eliminating the remaining individual promoters in any local geographic markets and allowing Clear Channel to set prices for tickets without competition in the Philadelphia Region. Clear Channel is the epicenter of the live concert promoting world in the United States. In its Annual Report on Form 10-K for 2001, Clear Channel stated: "Our recent entry into live entertainment operations allowed us to take advantage of the natural synergies between radio and live music events and to gain…leadership."

**C.    The Clear Channel Empire**

24.    Clear Channel Communications is a publicly-traded, multimedia corporation which, on its own and through various subsidiaries and affiliates, including the other Defendants, owns, programs, and/or sells air time for nearly 1,200 radio stations in the U.S. and has equity interests in another 240 radio stations overseas; promotes and/or produces more than 26,000 live entertainment events that are attended by approximately 62 million people per year; owns or controls more than 135 live

1   entertainment venues, (by far more than any other promoter), including clubs, theaters,
2   and large amphitheaters; owns or controls approximately 900 websites, including sites
3   that allow visitors to listen to music and the radio on-line; owns or operates 19
4   television stations; and operates more than 700,000 outdoor advertising displays,
5   including billboards, street furniture and transit panels worldwide. Clear Channel's net
6   revenues in the year 2000 topped $5.3 billion, a 100 percent increase over the
7   company's 1999 revenues. No competitor exists on the same nationwide scale as Clear
8   Channel. As of October 2001, the next largest radio company, Infinity Broadcasting
9   Corp., operated only 183 stations. By design, Clear Channel dominates the market for
10  live concert tickets.

11        25.    Through its radio broadcasting arm, Clear Channel Radio, Clear Channel
12  reaches more than 110 million listeners nationwide every week. According to Clear
13  Channel's 2000 Shareholder Report and its own website, www.clearchannel.com:

14              "Clear Channel *is* radio" [bold and italics in original]
15              "No one is bigger, better or more intense than Clear Channel
16              Radio"
17              Clear Channel Radio "reaches more people than the
18              population of many countries"
19              "One out of every ten radio stations across the United States
20              broadcasts under the Clear Channel's banner" [sic]
21              "Clear Channel broadcasts in every top ten market and in 47
22              of the top 50"
23              Clear Channel's stations "take to the airwaves across all 50
24              states, in almost every major market, reaching nearly every
25              demographic with dozens of distinct formats from
26              News/Talk to New Wave"
27              Clear Channel is "the first . . . and only" radio company to
28              own more than 900 radio stations

9

1            "Clear Channel's radio stations are powerful weapons,

2            especially when they unite to target a common goal"

3      26.    Randy Michaels, Chairman of Clear Channel's radio division, boasts that

4  Clear Channel has created "the first national footprint for radio." Forty seven of Clear

5  Channel's radio stations are known as "Kiss-FM" reportedly part of the Company's

6  vision of creating a national radio franchise.

7      27.    Clear Channel's Premiere Radio Networks is the most widely distributed

8  and syndicated radio network in the nation, offering programming that has included

9  such highly recognizable names as Rush Limbaugh, Dr. Laura Schlessinger, Jim Rome

10  and Casey Kasem.

11      28.    Just as Clear Channel Communications' radio arm dominates the

12  airwaves, its live entertainment arm, Clear Channel Entertainment, dominates the

13  concert promotion business. According to published reports, in 2001, Clear Channel

14  generated approximately 70% of concert ticket revenues in the U.S. and produced more

15  than 30 major music tours by such performers as U2, Madonna, Janet Jackson and

16  N'SYNC. The list of nationwide concert tours Clear Channel has promoted reads like

17  a Who's Who in the popular music industry, and in addition to those listed above, it

18  also includes the national tours of Britney Spears, Backstreet Boys, Dave Matthews

19  Band, The Rolling Stones and Tina Turner.

20      29.    As recently as July 6, 2006, Live Nation has agreed to purchase one of its

21  biggest competitors in the concert promotion industry, House of Blues Entertainment,

22  Inc., for a reported $350 million. This purchase will strengthen Defendants'

23  consolidation of the promotion business and thus monopolization of the relevant

24  market.

25

26

27

28

THIRD AMENDED CLASS ACTION COMPLAINT

**D.    Clear Channel's Domination of the National Concert Market Results in Its Ability To Inflate Prices in the Philadelphia Region**

30.    In August 2000, the same month that Clear Channel closed its $23.8 billion merger with AMFM, Clear Channel also merged with SFX Entertainment, Inc., ("SFX") in a deal valued between $2.9 - $4.6 billion. Clear Channel continued to do business as "SFX Entertainment" for almost a year following the merger but in July 2001 announced that it was dropping the SFX moniker and replacing it with the name "Clear Channel Entertainment."

31.    As a result of the merger, Clear Channel immediately became the nation's largest promoter and producer of live entertainment events across the country, selling almost nine million tickets alone in the first half of 2001 while its next closest competitor sold only about a million.

32.    Brian Becker, Chairman of Clear Channel Entertainment, attributes his company's domination of the concert promotion industry to its status as "a nationwide company with facilities in every major market and the ability to partner with [Clear Channel] radio." According to Becker, "if you have forty markets, then you can put together national promotions."

33.    Critical decisions regarding those national promotions are made at the national level by Clear Channel. In Clear Channel's Form 10-K, it admits that its live entertainment division is based in New York. One commentator used the "lock, stock and sequins" cancellation of the "Supremes Reunion" tour to explain the impact which Clear Channel has had on the concert industry:

> In the past, if a tour had ticket sale problems, what would happen is that the promoters - typically local entrepreneurs - would scramble around trying to book at smaller venue so they could cut their losses. You'd almost never see a complete cancellation, because the promoter would rather sell 40 percent of his tickets than have to come up with the

1    full amount he'd promised the musicians out of his own
2    pocket. In any case, it would be a city-by-city decision.
3                                    * * *
4    Now, the concert business is owned almost exclusively by
5    one giant corporation . . . [i]t is now virtually impossible to
6    mount a national tour without making a deal with [Clear
7    Channel]. More and more often the company simply
8    "purchases" a tour, buying a band out for one big lump sum
9    and telling 'em where they're going to play and when.
10   That's what [Clear Channel] did this summer with N'Sync,
11   Ozzy Osbourne and Pearl Jam.

12       34.    Clear Channel not only acknowledges but also *boasts* about its national
13   presence, often referring to its "national footprint." For example, in a press release
14   touting a new advertising sales product, Clear Channel claimed:

15       "Clear Channel Advantage leverages the power of Clear
16       Channel's unique national footprint . . . the Clear Channel
17       Advantage advertiser may now exploit any combination of
18       radio, TV, outdoor and entertainment advertising or
19       marketing opportunities across geographies as custom as a
20       single market, a *regional trading area*, the entire country, or
21       globally."
22   (emphasis supplied).

23       **E.    Clear Channel's Unlawful Conduct**

24       35.    Clear Channel has engaged in a vast array of anticompetitive, predatory
25   and exclusionary practices in the course of acquiring, maintaining and extending its
26   monopoly power in the relevant market.

27       36.    Clear Channel has eliminated competition in the relevant market by
28   acquiring or merging with many of its principal competitors both in the radio

1  broadcasting market and in the concert promotion market. This includes, most notably,
2  the AMFM and SFX mergers in August 2000, but also includes Clear Channel's more
3  recent acquisitions of smaller promoters.

4      37.    Clear Channel has weakened or eliminated competition in the relevant
5  market by hiring away from competitors experienced personnel, including
6  representatives with well established followings in the concert promotion industry.
7  Moreover, upon information and belief, when Clear Channel's mergers and acquisitions
8  with other concert promoters have resulted in lay-offs, Clear Channel routinely has
9  required personnel leaving the company to enter into non-competition agreements, thus
10 ensuring a widespread preclusion of competition from some of the most experienced
11 people in the business.

12     38.    The dynamics of FM radio broadcasting in the United States are such that
13 many radio stations dedicate their daily programming to certain distinct musical
14 formats, each of which attracts its own unique set of loyal listeners. Clear Channel
15 Communications Form 10-K, for the fiscal year ended December 31, 2000,
16 acknowledges that "[a] station's format is important in determining the size and
17 characteristics of its listening audience," and that "[a]dvertisers tailor their
18 advertisements to appeal to selected population or demographic segments."

19     39.    Radio station formats, therefore, are critically important to promoters and
20 the artists they promote. According to John Scher, a director of Metropolitan
21 Entertainment Group, a promotion company in New York which attempted to compete
22 with Clear Channel: "It's an awesome task to compete against a company that controls
23 most of the music radio in a market."

24     40.    Thus, other promoters' ability to promote their concerts on Clear
25 Channel's stations -and the artists' ability to secure air play of their music on those
26 stations - can and does determine the financial success (or failure) of promoters, the
27 artists and their concerts. This is especially true with new artists.

28

41.    Clear Channel repeatedly has used it size and clout to coerce artists - including artists who had pre-existing business relationships with competitors - to use Clear Channel to promote their concerts or else risk losing airplay and other on-air promotional support on radio stations owned or otherwise controlled by Clear Channel. Upon information and belief, because of the critical importance of having access to air play and other promotional time on Clear Channel's radio stations, which span the country and therefore can critically affect a national tour, many artists believe they have no choice but to use Clear Channel to promote their concerts.

42.    Clear Channel is leveraging its market power over certain dedicated formats of local FM radio - where it enjoys complete control over the content aired - to unlawfully acquire, maintain and extend its market power over the concert promotion business in the relevant market. Jerry Michelson, a partner in Jam Productions, has publicly stated: "Clear Channel uses the leverage of their radio stations to intimidate groups to play [concerts] for them." Such conduct has been and will continue to be devastating to Clear Channel's competitors, because access to air play and on-air promotional support is critical to the development and success of its artists and, accordingly, to the success of other promoters' concert promotion business.

43.    Clear Channel's nationwide practice of threatening to deny, and in fact denying, critical air play and other on-air promotional support to competitors' artists unless they agree to use Clear Channel to promote their concerts has caused competitors to lose many business relationships and prospective relationships. In Southern California in 2001, the band "POD" cancelled an exclusive concert for a non-Clear Channel station because of the perceived threat that airplay on Clear Channel stations would be denied.

44.    Clear Channel's conduct has placed other promoters at a competitive disadvantage by adversely impacting their ability to attract and retain clients for their businesses.

45.    Upon information and belief, Clear Channel intends to continue and extend its anticompetitive, predatory and exclusionary conduct.  In the "Company Strategy" section of its Form 10-K, for the fiscal year ended December 31, 2000, Clear Channel Communications stated as follows: "We can now leverage our broadcasting assets to reach listeners who have an affinity for music to promote our live entertainment events and ultimately increase ticket revenue."    Similarly, Clear Channel's website states that the "opportunities for synergies" among Clear Channel's various business divisions "are explosive ... and are in the very early innings."

46.    Clear Channel has been bidding up the fees paid to artists to such levels that other promoters cannot profitably compete.  In some cases, Clear Channel has guaranteed artists more than 100 percent of gross sales to promote their concerts, leaving other promoters no choice but to either pass on such concerts or promote them at a guaranteed loss.  Upon information and belief, Clear Channel will be able (and has already begun) to recoup, through artificially inflated ticket prices to consumers and lower payments to artists, its losses from such tactics when other promoters are driven from the market.  In an article published in The New York Times on August 12, 2002, *The Lost Boys: How A Pop Sensation Came Undone*, by Neil Strauss, it was reported that Clear Channel purchased the entire Backstreet Boys 2001 national tour for $100,000,000 and then set "extremely high ticket prices" to recoup the costs.  In competing with a Denver based promoter for Bonnie Raitt concerts, Clear Channel bid more than double for the shows than the Denver based promoter and consequently charged ticket buyers far more than the $30.00 ticket price planned by the Denver promoter.

47.    Clear Channel has eschewed the historical industry practice of promoting concerts at the local level and instead has been leveraging its dominant position in radio and its control over venues to secure control over artists' entire national tours.  Among other things, Clear Channel offers these artists large, up-front premiums, which other promoters cannot afford to match.  Clear Channel's reach thus extends nationwide, and

1  allows it to determine pricing of tickets on a regional basis without fear of competition
2  or competitive pressures from other promoters or competing venues.

3      48.     With respect to competitors' efforts to place advertisements and otherwise
4  promote its artists on local radio stations owned or operated by Clear Channel or its
5  subsidiaries, Clear Channel has either limited advertising availability to undesirable
6  time slots and placements or eliminated it completely; charged excessive advertising
7  rates; misrepresented the availability of advertising time (e.g., by stating that Clear
8  Channel is "out of inventory" when it actually ran its own advertisements instead);
9  intentionally excluded artists promoted by others from their "concert calendars"
10 (regular updates of upcoming concerts); and eliminated miscellaneous promotions (such
11 as ticket giveaway contests) for artists not promoted by Clear Channel.

12  **F.     Anticompetitive Effects of Clear Channel's Unlawful Conduct**

13      49.     Clear Channel's monopolistic and predatory practices have had the
14  following anticompetitive effects, among others, in the relevant market:

15          a.     Competition in the relevant market has been unreasonably
16                 restrained, suppressed, and, in some cases, destroyed;

17          b.     Potential competitors have been restrained from entering into the
18                 relevant market and have been prevented from competing
19                 effectively against Clear Channel;

20          c.     Clear Channel's monopoly has been entrenched and expanded,
21                 resulting in greater domination of the relevant market and the
22                 enhancement of barriers to entry;

23          d.     Clear Channel's unlawful leveraging of its economic strength in the
24                 FM radio business has resulted in the diversion to Clear Channel of
25                 artists who in a free and open market would otherwise turn to
26                 others for concert promotion services;

27

28

THIRD AMENDED CLASS ACTION COMPLAINT

1     e.     Fans of music artists promoted by others have been denied the
2     benefits of competition in a free and open market and have been
3     forced to pay artificially high ticket prices;

4     f.     The airing of artists' music promoted by others has been reduced,
5     thereby depriving consumers of entertainment they would
6     otherwise have available to them;

7     g.     The on-air promotion of concerts has been reduced, thereby
8     depriving consumers of information they otherwise would have
9     available to them;

10     h.     Upon information and belief, Clear Channel has enjoyed, and will
11     continue to enjoy, monopolistic profits to the detriment of
12     competitors and purchasers of concert tickets from Clear Channel;

13     i.     Although the price of tickets within the Philadelphia Region may
14     be different, Clear Channel's monopolistic behavior has raised
15     ticket prices in the Philadelphia Region in a measurable amount
16     and, therefore, Clear Channel's behavior has impacted and injured
17     the Class in its entirety, regardless of the particular venue of an
18     individual concert.

19    50.    The aforementioned anticompetitive effects of Clear Channel's conduct on
20 competition in the relevant market outweigh any conceivable pro-competitive benefits.

21                  **CLASS ACTION ALLEGATIONS**

22    51.    Plaintiff brings this action pursuant to Rule 23(b)(2) and (b)(3) of the
23 Federal Rules of Civil Procedure, on behalf of herself and the following Class:

24     All persons who purchased tickets to any live rock concert
25     in the Philadelphia Region directly from any of the
26     Defendants or their affiliates or predecessors or agents
27     during the period from June 19, 1998 to the present.

28

THIRD AMENDED CLASS ACTION COMPLAINT

1  The Class does not include, Defendants, their respective parents, subsidiaries and

2  affiliates and any judge or magistrate presiding over this action and members of their

3  families within the third degree of relationship.

4      52.   Plaintiff does not know the exact size of the Class since such information

5  is exclusively in the control of Defendants.  However, due to the nature of the trade and

6  commerce involved and the size of the venues owned, operated and/or exclusively

7  programmed by Clear Channel in the Philadelphia Region, Plaintiff believes that there

8  are thousands of Class members, and that they are sufficiently numerous and

9  geographically dispersed throughout the United States so that joinder of all Class

10 members is impracticable.

11     53.   Plaintiff's claims are typical of the claims of the members of the Class,

12 because Plaintiff and all Class members were damaged by the same wrongful conduct

13 of Defendants as alleged in this Complaint.

14     54.   Plaintiff will fairly and adequately protect the interests of the Class. The

15 interests of Plaintiff coincide with, and are not antagonistic to, those of the Class.  In

16 addition, Plaintiff is represented by counsel who are experienced and competent in the

17 prosecution of complex class action and antitrust litigation.

18     55.   Questions of law and fact common to members of the Class predominate

19 over any questions which may affect only individual members.  Common questions of

20 law and fact include:

21          a.   whether the relevant market consists of the market for the sale of

22               tickets to live rock concerts in the Philadelphia Region;

23          b.   whether Defendants have monopolized and attempted to

24               monopolize the relevant market;

25          c.   whether Defendants intentionally and unlawfully excluded

26               competitors and potential competitors from the relevant market;

27

28

THIRD AMENDED CLASS ACTION COMPLAINT

      d.     whether Defendants' unlawful conduct caused Plaintiff and the Class members to pay more for concert tickets than they otherwise would have paid;

      e.     whether Plaintiff and members of the Class are entitled to declaratory, equitable and/or injunctive relief; and

      f.     whether Plaintiff and the Class have been damaged and the amount of such damages.

56.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

57.    Plaintiffs know of no difficulty to be encountered in the litigation of this action that would preclude its maintenance as a class action.

## FIRST CLAIM FOR RELIEF

### (Violation of 15 U.S.C. § 2 Sherman Act Section 2 - Monopolization)

58.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 57 above.

59.    Clear Channel has monopoly power in the relevant market and has the ability to control prices and exclude competition.

60.    There are high entry barriers associated with the business of promoting concerts in the United States, including, among others, the industry expertise required to promote such concerts; the ability to develop a reputation in the industry as being a competent promoter; access to artists and the ability to develop relationships with them;

THIRD AMENDED CLASS ACTION COMPLAINT

1 access to the radio airwaves; access to concert venues; the goodwill and name
2 recognition of Clear Channel achieved via advertising and other means; financial
3 wherewithal; and the position which Clear Channel now occupies as a monopoly
4 promoter in the U.S. and in the Philadelphia Region with respect to nationwide tours

5      61.    Through its mergers and acquisitions and other anticompetitive conduct
6 described above, Clear Channel has willfully acquired and maintained monopoly power
7 with the intent to gain an unfair competitive advantage and charge supra-competitive
8 prices for tickets in the relevant market.  Clear Channel continues to dominate this
9 market through the unlawful conduct described above, to the detriment of Plaintiff and
10 the Class.

11      62.    During the Class Period, by the conduct described herein, Defendants
12 engaged in exclusionary, anticompetitive conduct designed to prevent competition in
13 the relevant geographic and product market.

14      63.    The foregoing acts and conduct by Defendants have prevented or
15 suppressed competition, and continue to prevent or suppress competition, in violation
16 of Section 2 of the Sherman Act, 15 U.S.C. § 2.

17      64.    As a direct and proximate result of Clear Channel's monopolistic conduct,
18 competition in the relevant market has been unreasonably restrained and injured, and
19 consumers have been damaged through the supra-competitive ticket prices they have
20 been charged and will continue to be charged.  Plaintiff and the members of the Class
21 have suffered and will continue to suffer damages as a result of Clear Channel's
22 wrongdoing as alleged herein.

23 **SECOND CLAIM FOR RELIEF**
24 **(Violation of 15 U.S.C. § 2 - Sherman Act Section 2 - Attempted**
25 **Monopolization)**

26      65.    Plaintiff incorporates by reference the allegations contained in paragraphs
27 1 through 64 above.

28

20

66.     Clear Channel has engaged in the predatory and anticompetitive conduct described above with the specific intent to monopolize the relevant market.

67.     Clear Channel possesses, and has demonstrated, a dangerous probability of achieving monopoly power in the relevant market.  Clear Channel continues to dominate this market through the unlawful conduct described above, to the detriment of Plaintiff and the Class.

68.     As a direct and proximate result of Clear Channel's monopolistic conduct, competition in the relevant market has been unreasonably restrained and injured, and Plaintiff and the members of the Class have paid supra competitive prices for tickets. As a result of Defendant's unlawful conduct, Plaintiff and members of the Class have suffered and will continue to suffer damages.

## THIRD CLAIM FOR RELIEF

### (Unjust Enrichment)

69.     Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 68 above.

70.     As a direct and proximate result of the unlawful conduct described above, Clear Channel has been and will continue to be unjustly enriched.  Clear Channel's unlawful acts, including tying and the use of monopoly power, are designed to extract supra-competitive prices for concerts from ticket purchasers.   Specifically, Clear Channel has been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and illegal monopoly profits on its sale of concert tickets.

71.     Clear Channel has benefited from its unlawful acts and it would be inequitable for Clear Channel to be permitted to retain any of the ill-gotten gains resulting from the overpayments for concert tickets made by Plaintiff and the Class.

72.     Plaintiff and members of the Class are entitled to the amount of Clear Channel's ill-gotten gains resulting from its unlawful, unjust and inequitable conduct. Plaintiff and members of the Class are entitled to the establishment of a constructive

1  trust consisting of all overcharges from which Plaintiff and the Class members may
2  make claims on a pro rata basis.

3    73.    Plaintiff and the Class have no adequate remedy at law.

4

5    WHEREFORE, Plaintiff prays that:

6    A.    The Court determines that this action may be maintained as a class action
7  pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure with respect to
8  Plaintiff's claims for injunctive relief, and Rule 23(b)(3) of the Federal Rules of Civil
9  Procedure with respect to the claims for damages, and declaring Plaintiff as the
10  representative of the Class and her counsel as counsel for the Class;

11    B.    The Court declares the conduct alleged herein to be unlawful in violation
12  of the federal antitrust laws and the common law of unjust enrichment;

13    C.    Plaintiff and each member of the Class recover punitive and treble
14  damages to the extent such are provided by the law;

15    D.    Plaintiff and each member of the Class recover the amounts by which the
16  Defendants have been unjustly enriched in accordance with state law;

17    E.    Defendants be enjoined from continuing the illegal activities alleged
18  herein;

19    F.    Plaintiff and the Class recover their costs of suit, including reasonable
20  attorneys' fees and expenses as provided by law; and

21    G.    Plaintiff and the Class be granted such other, further, and different relief as
22  the nature of the case may require or as may be determined to be just, equitable and
23  proper by this Court.

24  / / /
25  / / /
26  / / /
27  / / /
28  / / /

THIRD AMENDED CLASS ACTION COMPLAINT

1

## DEMAND FOR JURY TRIAL

2     Plaintiff hereby demands a trial by jury.

3

4     DATED: April 14 2008                          HAGENS BERMAN SOBOL
                                                     SHAPIRO LLP
5

6                                                    By: _____

7                                                          Elaine T. Byszewski

8     Lee M. Gordon
      700 South Flower Street, Suite 2940
9     Los Angeles, California 90017-4101
      Telephone: (213) 330-7150
10    Facsimile: (213) 330-7152

11
      ***Liaison Counsel for Plaintiffs***
12

13    Elizabeth A. Fegan
      Timothy Mahoney
14    Daniel J. Kurowski
      **HAGENS BERMAN SOBOL**
15        **SHAPIRO LLP**
      820 North Boulevard, Suite B
16    Oak Park, IL 60301

17

18
      Steve W. Berman
19    George Sampson
      **HAGENS BERMAN SOBOL**
20    **SHAPIRO LLP**
      1301 Fifth Avenue, Suite 2900
21    Seattle, WA 98101

22

23    Kenneth A. Wexler
      Jennifer Fountain Connolly
24    **WEXLER TORISEVA WALLACE**
      **LLP**
25    55 W. Monroe, Suite 3300
      Chicago, IL 60603
26

27

28

THIRD AMENDED CLASS ACTION COMPLAINT

Lee Squitieri
Maria Ciccia
**SQUITIERI & FEARON LLP**
32 East 57th Street, 12th Floor
New York, NY 10022

***Co-Lead Counsel and Executive
Committee Members***

Jeffrey Kodroff
Rachel Kopp
Spector, Roseman & Kodroff, P.C.
1818 Market Street
Suite 2500
Philadelphia, PA 19103

Nicholas Chimicles
Chimicles & Tikellis LLP
361 W. Lancaster Avenue
Haverford, PA 19401

Hollis Salzman
Kellie Safar
Labaton Sucharow & Rudoff LLP
100 Park Avenue
New York, NY 10017

Lance Harke
Harke & Clasby
155 S. Miami Avenue
Suite 600
Miami, FL 33130

***Proposed Executive Committee
Members***

THIRD AMENDED CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF SERVICE

I, the undersigned, declare:

1.     That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of Los Angeles, over the age of 18 years, and not a party to or interested in the within action; that declarant's business address is 700 South Flower Street, Suite 2940, Los Angeles, California 90017-4101.

On April 14, 2008 I served the foregoing document(s) described as

**THIRD AMENDED CLASS ACTION COMPLAINT**

on all interested parties in this action as follows:

[X]    **BY E-MAIL**       By causing the above listed document to be served by E-MAIL from Kevin G. Acosta to the e-mail addresses as follows: **See attached Service List.**

[ ]    **BY CM/ECF NOTIFICATION:** By causing the above listed document to be electronically filed through the Court's CM/ECF system and causing an automatic notice of said filing to be sent to the recipients on the attached service list:  SEE ATTACHED SERVICE LIST

[X]    **BY OVERNIGHT MAIL:** By placing a true copy thereof enclosed in sealed envelopes address as follows: **See Attached Service List**.  After sealing said envelope, declarant caused same to be delivered to the aforementioned by a qualified commercial overnight messenger with delivery fees thereon fully prepaid.

I declare under the penalty of perjury under the laws of the United States of America that foregoing is true and correct.

Executed on April 14, 2008, at Los Angeles, California.

KEVIN G. ACOSTA

233969_1.DOC

SERVICE LIST
*In re:  Live Concert Antitrust Litigation*
MDL: 2:06-ML-01745 SVW (RCx)
USDC - CENTRAL DISTRICT OF CALIFORNIA

COUNSEL FOR PLAINTIFFS

LEE M. GORDON
ELAINE T. BYSZEWSKI
**HAGENS BERMAN SOBOL
SHAPIRO LLP**
700 South Flower St., Suite 2940
Los Angeles, CA  90017-4101
Telephone: (213) 330-7150
Facsimile: (213) 330-7152

*Via E-mail*
Lee@hbsslaw.com
Elaine@hbsslaw.com

STEVE W. BERMAN
**HAGENS BERMAN SOBOL
SHAPIRO LLP**
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone:  (206) 623-7292
Facsimile:  (206) 623-0594

*Via E-mail*
Steve@hbsslaw.com

ELIZABETH A. FEGAN
TIMOTHY P. MAHONEY
DANIEL J. KUROWSKI
**HAGENS BERMAN SOBOL
SHAPIRO LLP**
820 North Boulevard, Suite B
Oak Park, IL 60301
Telephone: (708) 776-5600
Facsimile: (708) 776-5601

*Via E-mail*
Beth@hbsslaw.com
Timm@hbsslaw.com
Dank@hbsslaw.com

KENNETH A. WEXLER
JENNIFER F. CONNOLLY
MARK J. TAMBLYN
MARK R. MILLER
**WEXLER TORISEVA WALLACE
LLP**
A Limited Liability Partnership
55 West Monroe Street
Suite 3300
Chicago, IL 60603
Telephone: (312) 346-2222
Facsimile: (312) 346-0222

*Via E-mail*
KAW@wtwlaw.us
JFC@wtwlaw.us
MJT@wtwlaw.us
MRM@wtwlaw.us

233969_1.DOC

DECLARATION OF SERVICE

LEE SQUITIERI
**SQUITIERI & FEARON, LLP**
32 East 57th Street, 12th Floor
New York, NY 10022
Telephone: (646) 487-3049
Facsimile: (646) 487-3095

*Via E-mail*
Lee@SFClasslaw.com

NICHOLAS CHIMICLES
JAMES MALONE
MICHAEL GOTTSCH
JOSEPH SAUDER
TIMOTHY MATHEWS
**CHIMICLES & TIKELLIS LLP**
361 W. Lancaster Avenue
Haverford, PA 19401

*Via E-mail*
nchimicles@chimicles.com
jamesmalone@chimicles.com
michaelgottsch@chimicles.com
josephsauder@chimicles.com
timothymathews@chimicles.com

LANCE HARKE
HOWARD BUSHMAN
**HARKE & CLASBY**
155 S. Miami Avenue, Suite 600
Miami, FL 33130

*Via E-mail*
lharke@harkeclasby.com

JEFFREY KODROFF
RACHEL KOPP
**SPECTOR, ROSEMAN &
KODROFF, P.C.**
1818 Market Street, Suite 2500
Philadelphia, PA 19103

*Via E-mail*
jkodroff@srk-law.com
rkopp@srk-law.com

HOLLIS SALZMAN
KELLIE SAFAR
**LABATON SUCHAROW**
140 Broadway
New York, NY 10005

*Via E-mail*
hsalzman@labaton.com
ksafar@labaton.com

233969_1.DOC

**DECLARATION OF SERVICE**

1

2                          **COUNSEL FOR DEFENDANTS**

3

4   JAMES F.SPEYER                          JONATHAN M. JACOBSON
    ***HELLER EHRMAN LLP***                 SARA CIARELLI
5   333 South Hope Street, 39th Floor       ***WILSON SONSINI GOODRICH &***
    Los Angeles, CA 90071                   ***ROSATI***
6   Telephone: (213) 689-0200               **Profession Corporation**
    Facsimile: (213) 614-1868               1301 Avenue of the Americas, 40th Floor
7                                           New York, NY 10019
8   ***Via Overnight Delivery &***          Telephone: (212) 999-5800
    ***Via E-mail to***:                    Facsimile: (212) 999-5899
9   James.Speyer@hellerehrman.com
10                                          ***Via Overnight Delivery &***
11                                          ***Via E-mail to***:  jjacobson@wsgr.com
12                                                               sciarelli@wsgr.com

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

233969_1.DOC