HARVEY I. SAFERSTEIN (State Bar No. 49750)
hsaferstein@mintz.com
MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO, P.C.
2029 Century Park East, Suite 1370
Los Angeles, California 90067
Telephone:  (310) 586-3200

JONATHAN M. JACOBSON (*Pro Hac Vice*)
jjacobson@wsgr.com
LUCY YEN (State Bar No. 224559)
lyen@wsgr.com
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
1301 Avenue of the Americas, 40th Floor
New York, New York 10019
Telephone:  (212) 999-5800

COLLEEN BAL (State Bar No. 167637)
cbal@wsgr.com
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
One Market Plaza
Spear Tower, Suite 3300
San Francisco, California 94105
Telephone:  (415) 947-2000

*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| IN RE LIVE CONCERT ANTITRUST LITIGATION | Case No.:  2:06-MDL-01745 SVW (VBKx) |
| This document relates to: | **DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE TESTIMONY OF DR. OWEN R. PHILLIPS** |
| *Lauren J. Hammer v. Clear Channel Communications, Inc. et al.,* 2:06-cv-04987 SVW (VBKx) | |
| *Margaret A. Thompson v. Clear Channel Communications, Inc. et al.,* 2:05-cv-06704 SVW (VBKx) | Hearing Date:  December 5, 2011<br>Time:  1:30 p.m.<br>Courtroom:  6<br>Judge:  Honorable Stephen V. Wilson<br>Trial Date:  April 17, 2012 |

# **<u>TABLE OF CONTENTS</u>**

<u>Page</u>

TABLE OF AUTHORITIES ........................................................ ii

TABLE OF ABBREVIATIONS ...................................................... vi

INTRODUCTION ................................................................ 1

ARGUMENT ................................................................... 3

I.    DR. PHILLIPS' OPINIONS REGARDING THE FACT OF INJURY
      AND DAMAGES SHOULD BE EXCLUDED AS UNRELIABLE
      AND BECAUSE THEY FAIL TO FIT THE FACTS ................................ 4

      A.    Dr. Phillips Ignores Differences in Popularity and Other Factors
            That Affected Concert Ticket Prices ............................. 6

      B.    Numerous Concerts Were Priced Below Competitive Levels ........... 9

II.   DR. PHILLIPS' OPINION ON CAUSATION SHOULD BE
      EXCLUDED AS BASELESS ................................................. 11

III.  DR. PHILLIPS' OPINIONS REGARDING THE RELEVANT
      PRODUCT MARKET SHOULD BE EXCLUDED ................................... 15

IV.   DR. PHILLIPS' OPINIONS REGARDING MARKET SHARE
      SHOULD BE EXCLUDED AS UNRELIABLE .................................... 20

V.    DR. PHILLIPS' OPINIONS ON EXCLUSIONARY CONDUCT
      ARE CONTRARY TO LAW AND FAIL TO FIT THE FACTS ....................... 21

CONCLUSION ................................................................ 25

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Am. Banana Co. v. J. Bonafede Co.*,
   407 Fed. Appx. 520 (2d Cir. 2010) ...........................................................21

*Arminak & Assocs. v. Saint-Gobain Calmar*,
   __ F. Supp. 2d __, 2011 WL 2268066 (C.D. Cal. June 7, 2011).................21

*Beal Corp. Liquidating Trust v. Valleylab, Inc.*,
   927 F. Supp. 1350 (D. Colo. 1996) ..............................................................9

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
   603 F.2d 263 (2d Cir. 1979).......................................................................13

*Blades v. Monsanto Co.*,
   400 F.3d 562 (8th Cir. 2005)........................................................................4

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
   509 U.S. 209, 113 S. Ct. 2578, 125 L. Ed. 2d 168 (1993) ...........................2

*Chicago Prof. Sports Ltd. P'ship v. NBA*,
   95 F.3d 593 (7th Cir. 1996)........................................................................22

*City of Tuscaloosa v. Harcros Chems.*,
   158 F.3d 548 (11th Cir. 1998).....................................................................21

*City of Vernon v. S. Cal. Edison Co.*,
   955 F.2d 1361 (9th Cir. 1992).....................................................................14

*Concord Boat Corp. v. Brunswick Corp.*,
   207 F.3d 1039 (8th Cir. 2000)................................................. 3, 6, 10, 14, 21

*Continental TV v. GTE Sylvania*,
   433 U.S. 36, 97 S. Ct. 2549, 53 L. Ed. 2d 568 (1977) ...............................23

*Craftsmen Limousine, Inc. v. Ford Motor Co.*,
   363 F.3d 761 (8th Cir. 2004).............................................................3, 11, 14

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993) ...........................3

*Diviero v. Uniroyal Goodrich Tire Co.*,
   114 F.3d 851 (9th Cir. 1997).......................................................................18

-ii-

*Farley Transp. Co. v. Santa Fe Trail Transp. Co.*,
   786 F.2d 1342 (9th Cir. 1985).......................................................................14

*Fedway Assocs. v. United States Treasury*,
   976 F.2d 1416 (D.C. Cir. 1992) ....................................................................24

*Freeland v. AT&T Corp.*,
   238 F.R.D. 130 (S.D.N.Y. 2006)......................................................................7

*Heary Bros. Lightning Prot. Co. v. Lightning Prot. Inst.*,
   287 F. Supp. 2d 1038 (D. Ariz. 2003) ...........................................................12

*Indiana Telcom Corp. v. Indiana Bell Tel. Co.*,
   No. IP97-1532-C-H/G,
   2001 WL 1168169 (S.D. Ind. Sept. 25, 2011) ..............................................19

*In re Graphics Processing Units Antitrust Litig.*,
   253 F.R.D. 478 (N.D. Cal. 2008) .....................................................................7

*In re Live Concert Antitrust Litig.*,
   247 F.R.D. 98 (C.D. Cal. 2007) .........................................................4, 10, 11

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
   522 F.3d 6 (1st Cir. 2008) .............................................................................11

*Ky. Speedway v. Nat'l Ass'n of Stock Car Racing*,
   588 F.3d 908 (6th Cir. 2009)...........................................................3, 15, 16, 17

*Los Angeles Land Co. v. Brunswick Corp.*,
   6 F.3d 1422 (9th Cir. 1993)..............................................................................6

*Lust v. Merrell Dow Pharms.*,
   89 F.3d 594 (9th Cir. 1996).............................................................................18

*Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*,
   924 F.2d 1484 (9th Cir. 1991)..........................................................................15

*NARA v. Appraisal Found.*,
   64 F.3d 1130 (8th Cir. 1995)............................................................................14

*Nobody in Particular Presents v. Clear Channel Commc'ns*,
   311 F. Supp. 2d 1048 (D. Colo. 2004) ........................................2, 7, 17, 22

*Nw. Publ'ns, Inc. v. Crumb*,
   752 F.2d 473 (9th Cir. 1985)............................................................................11

-iii-

*Paladin Assocs., Inc. v. Montana Power Co.*,
    328 F.3d 1145 (9th Cir. 2003).......................................................................25

*PepsiCo, Inc. v. Coca-Cola Co.*,
    315 F.3d 101 (2d Cir. 2002)................................................................20, 21

*Rick-Mik Enters. v. Equilon Enters.*,
    532 F.3d 963 (9th Cir. 2008)........................................................................17

*Texaco Inc. v. Dagher*,
    547 U.S. 1, 126 S. Ct. 1276, 164 L. Ed. 2d 1 (2006)..................................25

*Thurman Indus. v. Pay'N Pak Stores*,
    875 F.2d 1369 (9th Cir. 1989).......................................................................15

*Times-Picayune Publ'g Co. v. United States*,
    345 U.S. 594, 73 S. Ct. 872, 97 L. Ed. 1277 (1953) ...................................17

*Trishan Air v. Fed. Ins. Co.*,
    635 F.3d 422 (9th Cir. 2011).........................................................................25

*TYR Sport v. Warnaco Swimwear*,
    709 F. Supp. 2d 821 (C.D. Cal. 2010) .........................................................18

*United States v. E.I. du Pont de Nemours & Co.*,
    351 U.S. 377, 76 S. Ct. 994, 100 L. Ed. 1264 (1956) .................................18

*United States v. Oracle Corp.*,
    331 F. Supp. 2d 1098 (N.D. Cal. 2004)........................................................20

*United States v. Syufy Enters.*,
    903 F.2d 659 (9th Cir. 1990).........................................................................17

*U.S. Healthcare v. Healthsource*,
    986 F.2d 589 (1st Cir. 1993) .........................................................................24

*Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398, 124 S. Ct. 872, 157 L. Ed. 2d 823 (2004) ............................12

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. __, 131 S. Ct. 2541, 180 L. Ed. 2d 374 (2011) ..............................4

*Wasco Prods. v. Southwall Techs.*,
    435 F.3d 989 (9th Cir. 2006).........................................................................25

*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*,
    549 U.S. 312, 127 S. Ct. 1069, 166 L. Ed. 2d 911 (2007) ......................2, 22

-iv-

*Williamson Oil Co. v. Philip Morris USA,*
     346 F.3d 1287 (11th Cir. 2003)...........................................................21, 25

*Worldwide Basketball & Sports Tours, Inc. v. NCAA,*
     388 F.3d 955 (6th Cir. 2004)......................................................................18

*W. Parcel Express v. United Parcel Serv. of Am.,*
     190 F.3d 974 (9th Cir. 1999).....................................................................24

## RULES

FED. R. EVID. 702................................................................ 2, 3, 15, 19, 21

## OTHER AUTHORITIES

2A PHILLIP E. AREEDA, et al.,
     ANTITRUST LAW ¶ 392 (3d ed. 2007) ........................................................4

3B PHILLIP E. AREEDA, et al.,
     ANTITRUST LAW ¶ 755c (3d ed. 2008).......................................................23

U.S. DEP'T OF JUSTICE & FED. TRADE COMM'N,
     *Horizontal Merger Guidelines* (2010)..................................................15, 20

1

## **TABLE OF ABBREVIATIONS**

2

Campana Decl.          Declaration of Mark Campana in Support of Defendants'

3                                Motion to Exclude Testimony of Dr. Owen R. Phillips

4

Ex. ___                Exhibit ___ to Declaration of Lucy Yen in Support of

5                                Defendants' Motion to Exclude Testimony of Dr. Owen R.
                                 Phillips

6

7

Fogel Decl.            Declaration of Arthur E. Fogel in Support of Defendants'
                                 Motion to Exclude Testimony of Dr. Owen R. Phillips

8

9

Guerinot Decl.         Declaration of James Guerinot in Support of Defendants'
                                 Memorandum in Opposition to Plaintiffs' Motion for

10                               Class Certification [Dkt. 91, Ex. G]

11

Kessler Decl.          Declaration of Jonathan Kessler in Support of Defendants'

12                               Memorandum in Opposition to Plaintiffs' Motion for
                                 Class Certification [Dkt. 91, Ex. J]

13

14

Masters Decl.          Declaration of Nick Masters in Support of Defendants'

15                               Motion to Exclude Testimony of Dr. Owen R. Phillips

16

*NIPP*                 *Nobody in Particular Presents, Inc., et al. v. Clear
                                 Channel Commc'ns, Inc., et al.*, 311 F. Supp. 2d 1048

17                               (D. Colo. 2004)

18

Yen Decl.              Declaration of Lucy Yen in Support of Defendants'

19                               Motion to Exclude Testimony of Dr. Owen R. Phillips

20

21

22

23

24

25

26

27

28

DEFENDANTS' MEMORANDUM IN SUPPORT OF                    2:06-MDL-01745 SVW (VBKx)
MOTION TO EXCLUDE TESTIMONY OF DR. OWEN R. PHILLIPS

**INTRODUCTION**

Plaintiffs' economist, Dr. Owen R. Phillips, proposes to testify that every ticket for a "rock" concert in Los Angeles and Denver promoted by Clear Channel was priced above the competitive level. If allowed, he will tell the jury that ticket prices for concerts below $20, below $10, below $5 were all above competitive levels – even when prices for Clear Channel concerts were much lower than those of concerts promoted by others for the very same artists. In fact, Dr. Phillips will testify that tickets for a hugely popular band, Blink 182, were priced above competitive levels at just $1 apiece for concerts held in 2003. He goes so far as to claim that any ticket Clear Channel might ever sell – even if only for 1 penny – would be priced above competitive levels. And to top it all off, he says that the only way Clear Channel can avoid pricing tickets above competitive levels is to "go out of business."

Dr. Phillips' testimony on other subjects was no less problematic. To cite just a few examples:

- Contrary to what he told the Court at the class certification phase, he proposes to define a "rock concert market" – not by relying on the testimony of an independent music expert, as he had said he would, but by unilaterally identifying particular artists as "rock" based on his own subjective feelings – even though, in most cases, he does not even know the particular artist or the type of music the artist performs. He then proceeds to classify some artists as "rock" when they perform for Clear Channel, but as "not rock" when they perform for a different promoter.

- He concludes that Clear Channel's conduct was the cause of higher prices without *any* analysis as to whether there was a connection, or not, between the challenged conduct and the prices that were charged. He is not able to identify a single concert in which prices were affected by anything Clear Channel is supposed to have done. His analysis simply assumes that Clear

-1-

Channel was the cause, without even considering whether there might have been lawful, alternative causes.

- His opinion that Clear Channel's conduct was anticompetitive would mislead the jury.  Contrary to decisions of the Supreme Court in the *Weyerhaeuser* and *Brooke Group* cases – as well as to the district court decision in *NIPP* – he proposes to testify that Clear Channel is guilty of predatory "overpaying" by paying more than it thought it should have, whether or not the prices were profitable and whether or not rival promoters had bid even higher.  He concludes that efficiencies in combining a radio company with a concert promoter are harmful rather than beneficial.

- Dr. Phillips computes market shares and assesses damages by attributing concerts to Clear Channel in circumstances where other promoters handled all the negotiations and Clear Channel had no role whatsoever in determining the ticket price charged.

Dr. Phillips' opinions are, in each instance, purely outcome-oriented.  In preparing his reports, he looked only at those documents which Plaintiffs' lawyers directed him to review.  Portions of his reports are almost verbatim reproductions of narratives drafted previously by counsel.  Significantly, although Clear Channel made available detailed "show files" for the concerts in these cases, Dr. Phillips chose to review none of them.  Instead, he relied on his recollection of show files produced in the prior *NIPP* case, even though all but a tiny handful of those files were for concerts not in issue in the cases now before the Court.  Instead of looking at the show files in the current cases, Dr. Phillips relied on the conclusion of one of Plaintiffs' paralegals that there was nothing worth seeing.  Ex. 1 at 13:17-14:9.

The proposed testimony of Dr. Phillips violates every requirement of Rule 702 and should be excluded in its entirety.  It is not "based on sufficient facts or data" but is contrary to the very evidence on which he relies, as well as the abundant evidence he ignores; it is not "the product of reliable principles and methods" but is,

-2-

at best, entirely subjective and in many cases based on methodologies that are objectively meaningless or just wrong; and he has not "reliably applied the principles to the facts of the case" but has, instead, ventured into conclusions that range from merely unsupportable to overtly preposterous.  Expert testimony is warranted when it will help the jury to understand better the facts and circumstances of the litigation.  There is nothing in Dr. Phillips' testimony that will be helpful in any respect.  His central thesis is simply "trust me because I'm the expert, with a degree in economics, and I'm telling you that everything that Clear Channel has ever done is bad."  That is just the sort of testimony for which he has been criticized in the past, and it is precisely the kind of "junk science" Rule 702 and the Supreme Court's decisions in *Daubert* and its progeny were designed to prevent.

### ARGUMENT

*Daubert* standards apply to antitrust cases no less than any other case.  *See, e.g.*, *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1055-57 (8th Cir. 2000) (rejecting economist testimony under *Daubert*).  Indeed, the validity of expert economics testimony is particularly crucial in antitrust cases, as the testimony of plaintiff's economist is generally essential to plaintiff's case.  *See, e.g.*, *Ky. Speedway v. Nat'l Ass'n of Stock Car Racing*, 588 F.3d 908, 919 (6th Cir. 2009) (lack of admissible expert testimony fatal to plaintiff's case).  Among the key issues in determining the admissibility of economic testimony is "the 'fit' of an expert's opinion to the data or facts in the case . . . ."  *Concord Boat*, 207 F.3d at 1055.  Where the expert fails to account for "all relevant circumstances," the expert's testimony is inadmissible.  *Id.* at 1056 ("Even a theory that might meet certain *Daubert* factors . . . should not be admitted if it does not apply to the specific facts of the case.");  *Craftsmen Limousine, Inc. v. Ford Motor Co.*, 363 F.3d 761, 776-77 (8th Cir. 2004) (expert testimony excluded because expert "assumed" defendant's conduct caused the harm and "did not determine whether other factors" contributed).

-3-

I.  **DR. PHILLIPS' OPINIONS REGARDING THE FACT OF INJURY AND DAMAGES SHOULD BE EXCLUDED AS UNRELIABLE AND BECAUSE THEY FAIL TO FIT THE FACTS**

The plaintiff in every antitrust case must prove the fact of injury, *In re Live Concert Antitrust Litigation*, 247 F.R.D. 98, 132-33 (C.D. Cal. 2007), and must do so with "reasonable certainty."  2A PHILLIP E. AREEDA, et al., ANTITRUST LAW ¶ 392, at 332 (3d ed. 2007).  So Plaintiffs here must demonstrate that all purchasers of tickets to Defendants' concerts paid artificially inflated ticket prices.  247 F.R.D. at 136 ("Fact of damage can be established on a common basis 'so long as the common proof adequately demonstrates some damage to *each individual*.'") (emphasis added); *Blades v. Monsanto Co.*, 400 F.3d 562, 573 (8th Cir. 2005) ("[E]ach plaintiff must be able to present evidence from which a jury could reasonably infer that the competitive price was less than the price the plaintiff paid."); *see also Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. __, 131 S. Ct. 2541, 2554-56, 180 L. Ed. 2d 374 (2011) (requiring proof that "all the individual . . . decisions" were unlawful).

Dr. Phillips correctly acknowledges that only those consumers who paid ticket prices above competitive levels could have been harmed by unlawful conduct.  Ex. 2 at 58:7-10 (Q.  "[W]e agree, don't we, that class members in this case suffer no injury unless they pay a price that is higher than the competitive level, correct?  A.  Correct."); Ex. 1 at 241:18-22; Ex. 3 at 55:11-14; *see also* Ex. 9 at Request for Admission No. 122; Ex. 7 ¶¶ 137-54.  Plaintiffs have identified 1086 "rock" concerts promoted by Clear Channel in Los Angeles and Denver during the five-year period at issue.  Exs. 10, 11.  If permitted, Dr. Phillips intends to testify that every ticket to every such "rock" concert was priced above competitive levels.  *Id.*; Ex. 5 at exs. 1, 2; Exs. 10, 11.

Dr. Phillips previously admitted the need to examine the specific facts of each concert to determine whether or not Clear Channel's ticket prices were set above the

-4-

competitive level. *See, e.g.*, Ex. 1 at 241:23-242:3 ("Q.  And you would need to analyze the facts as to each concert to determine whether, in fact, the price was at or above the competitive level?  A.  Correct.").[1]  Dr. Phillips not only failed to do that, he failed to examine the facts or circumstances of *any* concert in the case.  Ex. 3 at 261:15-23, 265:25-266:3.  He did not investigate how any specific ticket prices were set or what factors influenced the prices.  *See* Ex. 5 ¶¶ 249-50; Ex. 7 ¶¶ 72-73.  He did not review the show files or deal sheets for virtually any of the concerts at issue in the case.  Ex. 5 at ex. 11; Ex. 3 at 155:5-156:13; 259:23-260:11; Ex. 4 at 552:22-553:21; *see* Campana Decl. ¶ 6 (describing contents of show files).  He did not compare ticket prices charged by Clear Channel and its rivals when they separately promoted shows for the same artist.  Ex. 3 at 103:12-17.  In fact, he expressly did *not* determine whether the price for any concert was at or below competitive levels. *Id.* at 273:4-25.  He deemed that critical inquiry to be *irrelevant* to his analysis.  *Id.* at 265:21-268:22 ("So I'm using all of the concerts to do my analysis, without even thinking about an individual concert, if some are priced low, if some are priced high."); *see* Ex. 4 at 526:5-11.

Instead, Dr. Phillips purports to rely on three "economic models."  Each relies exclusively on a comparison of average ticket prices for all Clear Channel "rock" concerts against the actual or projected average prices of the concerts of rival promoters.  *See* Ex. 5 ¶¶ 260-75 & n.397; Ex. 3 at 61:17-24; Ex. 4 at 419:3-7; Ex. 7 ¶¶ 160-62.  Relying on the untenable assumption that Defendants' average ticket

---

[1] *Accord* Ex. 1 at 247:4-18; Ex. 2 at 63:5-12 ("Q.  But you have no idea, unless you look at the price of an individual concert and look at that negotiation and that individual ticket price to determine whether that ticket, subject to the price ceiling, is above or below the competitive level.  You have no idea, do you?  A.  That is correct.  I don't know at this point if the price were above the competitive level or near the competitive level without doing the analysis."); *id.* at 65:16-66:1 (admitting that prices for a Springsteen concert that sells out L.A. Coliseum in a matter of hours are likely below competitive level, but that he would need to engage in specific concert or artist inquiry to confirm).

price should be the same as the average of its rivals, Dr. Phillips says that Defendants' higher *average* ticket prices constitute anticompetitive overcharge for each *individual* concert, "injuring" every consumer.  Ex. 5 ¶¶ 17, 260; Ex. 7 ¶¶ 137-39; Ex. 3 at 61:17-24, 88:23-89:3; Ex. 4 at 499:9-20.  His analysis is valueless for two principal reasons:  (a) he deliberately ignores the critical fact that average prices for Clear Channel-promoted concerts were higher for reasons having nothing to do with any possible anticompetitive conduct, including the undisputable fact that Clear Channel promoted more popular artists; and (b) he ignores undisputed facts demonstrating that numerous individual concerts were not priced above competitive levels under any conceivable analysis.  *See Concord Boat*, 207 F.3d at 1055-57.

**A.  Dr. Phillips Ignores Differences in Popularity and Other Factors That Affected Concert Ticket Prices.**  Because none of Dr. Phillips' models adjusts for artist popularity or any of the other factors that admittedly affect ticket prices, the models have no value in assessing whether prices were above competitive levels. *See Los Angeles Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1426 (9th Cir. 1993) (rejecting inference of supra-competitive pricing based on "average" prices where actual prices were sometimes higher and sometimes lower than competitor's).

During the class certification hearing, this Court recognized, and Dr. Phillips agreed, that more popular artists naturally charge higher ticket prices.  Ex. 2 at 42:17-21 ("Q. [by the Court]:  It seems to me that if Clear Channel was attracting the best talent, th[en], as you said, that talent would command a higher ticket price, correct? A.  Correct."); *see* Ex. 4 at 401:11-22.  And, indeed, analysis of pricing data confirms the common sense observation that more popular artists tend to sell more tickets and charge higher prices.  Ex. 7 ¶ 166; *see also* Fogel Decl. ¶¶ 13-21.

The point is critical here because it is uncontroverted that Clear Channel's average ticket prices were higher than an average of other promoters *because Clear Channel promoted more popular artists*.   Ex. 7 ¶ 169; Exs. 10, 11; Ex. 6 at n.78.  These artists included all the best-selling acts – U2, The Rolling Stones, Madonna,

1   Paul McCartney, and the Eagles.  Exs. 10, 11; *see* Fogel Decl. ¶¶ 1, 5, 13, 18.  Thus,

2   Clear Channel's higher average price reflects no more than a higher quality product

3   mix, *not* an anticompetitive overcharge.  *E.g.*, *NIPP*, 311 F. Supp. 2d at 1100-01 ("If

4   Clear Channel promotes all of the most expensive, top artists, Clear Channel's ticket

5   prices will be higher than tickets sold by other promoters, and this price difference

6   does not indicate monopolistic pricing or conduct."); *Freeland v. AT&T Corp.*, 238

7   F.R.D. 130, 151 (S.D.N.Y. 2006) ("increase in average handset price might reflect

8   the fact that more customers are freely choosing to purchase more sophisticated (and

9   therefore more expensive) types of phones"); *In re Graphics Processing Units*

10  *Antitrust Litig.*, 253 F.R.D. 478, 493-95 (N.D. Cal. 2008).

11       There is no question that Dr. Phillips should have controlled for artist

12  popularity.  He has repeatedly admitted that any valid analysis would have to do so.

13  Ex. 2 at 41:16-19 ("But I think there needs to be a check done on the quality of the

14  artists that Clear Channel promotes versus the rest of the market so that damages

15  aren't estimated, overestimated in effect."); *id* at 43:8-10 ("[C]ertainly some studies

16  should be done to adjust for quality differences, at least check to see if they exist,

17  and if they exist, then correct for them."); *id.* at 50:20-51:1 ("Q.  Do you believe that

18  using those average ticket prices will bias damages against Clear Channel? A.  It's

19  possible. And that is why we have to look at differences in qualities of the artists . . .

20  we have to make some adjustments for quality…."); *id.* at 43:11-17 (equating

21  "quality" with "popularity").  And he previously testified that there were various

22  ways in which he could and would adjust for popularity.  *Id.* at 41:20-42:13.

23       But Dr. Phillips did *not* control for differences in popularity.  He admitted that

24  he made no adjustments to reflect these differences. Ex. 3 at 86:3-87:4; Ex. 4 at

25  428:4-21, 429:10-23.  He avoided doing so by asserting that artists promoted by

26  Clear Channel were *not* more popular than those of other promoters.  *Id.*  The *sole*

27  basis for this conclusion was Dr. Phillips' use of the "Top 100" artists.  Ex. 3 at

28  226:23-227:4; Ex. 4 at 429:10-23.  He calculated that Clear Channel's promoter

-7-

share among the "Top 100" acts was consistent with its overall share of the alleged relevant markets.  Ex. 5 ¶ 263.  From this he concluded that there was no significant difference between the popularity of artists promoted by Clear Channel and those promoted by others.  *Id*.  But the "Top 100" acts account for virtually all of the ticket revenue in the alleged relevant markets – so saying Clear Channel's share of the "Top 100" was the same as its share of all concerts is a tautology, saying *nothing* about relative popularity at all.  Ex. 7 ¶¶ 167-68.  When confronted with this fact at his deposition, Dr. Phillips was forced to agree that his "Top 100" analysis was "*meaningless*."  Ex. 3 at 102:11-103:11 ("Q.  The top 100 analysis is meaningless?  A.  Right.  Yeah.  The top 100 – the money is in the top 100 concerts.").  Yet this meaningless Top 100 comparison is the only analysis he did.

When the data account for artist popularity, it is undeniable that Clear Channel's prices were significantly *lower* than those of rival promoters.  Ex. 7 ¶¶ 170-78; Ex. 4 at 469:18-470:22.  The obvious comparison available to see if prices for Clear Channel concerts really are higher than for other promoters is to compare prices charged for the *identical* artists.  Numerous artists in fact were promoted both by Clear Channel and others.  The results are clear and Dr. Phillips does not dispute them.  Ex. 4 at 469:18-470:22.  *When promoting the same artist, prices for Clear Channel concerts were lower on average than prices of other promoters by a significant margin*.  Ex. 7 ¶¶ 170-78.  That fact alone renders Dr. Phillips' outcome-oriented approach entirely valueless.

Dr. Phillips failed to control for numerous other factors that also influence ticket price – such as the cost of using the concert venue, the concert production costs, seating capacity, and the artist's financial goals (Fogel Decl. ¶¶ 2-4) – even though he previously admitted that he would have to control for them to obtain a valid analysis.  Ex. 2 at 71:8-14 ("[T]hey have to have consideration."); *id*. at 70:15-19; Ex. 1 at 222:18-234:21; Ex. 4 at 474:25-475:22.  Importantly, Dr. Phillips' models commence in 2000, the year when artists began shifting their income goals

-8-

from record sales to concert tickets due to the increasing prevalence of illegal or inexpensive downloads of music from the Internet.  *See* Ex. 12 (suggesting that the "main reason" for ticket increases was downloading of music for free over Internet); Ex. 3 at 211:22-213:10 (admitting that digital downloading may have fundamentally changed ticket pricing).  Although this phenomenon affected Clear Channel's concerts disproportionately due to the popularity of the artists it promoted, Dr. Phillips ignored it in his analysis entirely.  Ex. 4 at 474:25-475:4, 475:8-10.

Dr. Phillips' failure to account for artist popularity and the various other factors that influence ticket prices renders his opinion that ticket purchasers were injured worthless, a defect for which he has previously been criticized.  *See Beal Corp. Liquidating Trust v. Valleylab, Inc.*, 927 F. Supp. 1350, 1368 (D. Colo. 1996).

**B.  Numerous Concerts Were Priced Below Competitive Levels.**  Even if Dr. Phillips' statistical analyses were not plagued with his failure to adjust for quality and other serious defects, *see* Ex. 7 ¶¶ 160-211, at best they could demonstrate only that Clear Channel's *average* ticket prices were above those of other promoters in the industry.  But in relying on a meaningless comparison of *aggregated* ticket prices to try to establish classwide injury, Dr. Phillips ignores the numerous instances where ticket prices were not priced above competitive levels:

- Many artists chose to set ticket prices below the competitive level – including dozens below $20 or $10, two Blink 182 concerts at $1, and a major concert by Staind where tickets were *free*.  Exs. 10, 11; Guerinot Decl. ¶ 4 [Dkt. 91, Ex. G]; Kessler Decl. ¶ 6 [Dkt. 91, Ex. J].[2]  Dr. Phillips could provide no explanation as to how prices this low could be above the competitive level, and the conclusion defies common sense.  *See* Ex. 4 at 519:22-520:16.  In

---

[2] Phillips agreed that tickets for the free Staind concert were not supracompetitive, but determined that they were therefore outside the class.  He said that, if the tickets had been sold for 1¢, they would have been above the competitive level because it should have been "two people for a penny."  Ex. 4 at 511:2-9.

fact, Dr. Phillips conceded that prices for these concerts would be higher if promoted by others, but deemed that irrelevant to his analysis. Ex. 3 at 271:9-22 (acknowledging that Blink 182 tickets would have sold above $1 at auction); 67:12-68:4.

- Dr. Phillips admitted that tickets for sold out concerts would be at competitive levels if venue size was not artificially restricted. Ex. 1 at 181:23-182:4; Ex. 2 at 65:16-24; Ex. 3 at 179:20-180:5.  About 40% of Clear Channel's concerts sell out.  Ex. 3 at 185:23-186:4; Ex. 13.  Dr. Phillips could not identify a single concert for which Defendants had restricted the size of the venue.  So he cannot say that the tickets for any sold out show were priced above the competitive level.  Ex. 7 ¶ 145; Exs. 10, 11; Ex. 14; Ex. 3 at 180:6-181:15; Ex. 4 at 399:15-400:6; *In re Live Concert Antitrust Litig.*, 247 F.R.D. at 140.

Dr. Phillips simply *assumed* that everyone was injured. Ex. 6 at 30; Ex. 4 at 507:9-16, 526:5-527:8.  His view is that, because Clear Channel is allegedly a "monopolist," every price it ever charges is necessarily above competitive levels. Ex. 3 at 68:17-69:19.  He clings to that assumption even while acknowledging that monopolists do not always price above the competitive level.  Ex. 4 at 504:23-505:21.  If permitted, he will testify that Clear Channel consumers were injured even when Clear Channel's prices for the same artists were *less than* its competitors. *Id.* at 525:22-526:4.  He goes so far as to conclude that Clear Channel's prices would be above the competitive level even if its tickets were priced at 1¢.  *Id.* at 509:21-511:16.  And, he said, Clear Channel could avoid pricing above competitive levels only by *going out of business*.  Ex. 3 at 68:17-22.

Dr. Philips has no basis to conclude that *any* ticket purchaser, much less *all* purchasers, paid a price above the competitive level.  His testimony as to the fact of injury to class members is entirely unsupported and should be excluded.  *Concord Boat*, 207 F.3d at 1055-57.

-10-

## II.    DR. PHILLIPS' OPINION ON CAUSATION SHOULD BE EXCLUDED AS BASELESS

Plaintiffs must not only prove injury, but also causation, i.e., that the claimed injury was caused by the antitrust violation. *Nw. Publ'ns, Inc. v. Crumb*, 752 F.2d 473, 477 (9th Cir. 1985); *In re Live Concert Antitrust Litig.*, 247 F.R.D. at 132-33. And they bear the burden of proof. *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 29 (1st Cir. 2008). Dr. Phillips' testimony that concertgoers paid higher ticket prices *as a result of claimed anticompetitive conduct by Clear Channel* has no support. He has, again, simply assumed causation rather examining whether it has been proven. *See Craftsmen*, 363 F.3d at 776-77.

Dr. Phillips effectively *admitted* the point, conceding that that none of his models distinguishes consumers who were injured by anticompetitive conduct from those who were not; and that, even in a competitive market where consumers were not injured, his analyses would all still show the same anticompetitive "overcharge." Ex. 4 at 417:23-418:17. *His analyses do not even attempt to answer to the critical question of whether any anticompetitive conduct was the cause.*

Dr. Phillips could not identify a single concert (much less all concerts) whose ticket price was supposedly affected by any claimed anticompetitive conduct.[3] His

---

[3] *Radio*: Dr. Phillips could not identify a single instance where the threat of loss of radio airplay led an artist to give promotion business to Clear Channel. Ex. 3 at 277:13-18 ("Q. What artist in that period was knocked off the radio if they didn't promote with Clear Channel? . . . A. I can't say offhand, and I don't know – and I don't know if any was."). Nor could he identify any instance in the relevant period where Clear Channel denied radio access to a rival promoter. *Id.* at 321:9-24 ("Q. Are you aware of any concert during the relevant time period where a rival promoter sought access to a Clear Channel radio station for advertising or promotion and was denied? . . . A. Well, I'm not sure.").

*Venues*: Dr. Phillips could not name a single concert or artist where a rival promoter sought to use a Clear Channel venue and was refused. *Id.* at 305:11-21. He was unaware of even a single instance in which a rival promoter could not promote a concert because it was denied access to a Clear Channel venue, and admitted that rival promoters always had alternate venues in the relevant markets. *Id.* at 307:3-308:8.

(continued...)

-11-

testimony is premised entirely on a baseless assumption that everything Clear Channel ever did affected every concert equally, but he has made no effort to show how that could be so. *See* Ex. 3 at 275:20-276:5. He groups together various activities under the label "exclusionary," but never identifies how any particular conduct supposedly impacted prices. *See* Ex. 5 ¶¶ 11-17, 256-60. Thus, even if Dr. Phillips could identify any illegal practice (which he has not), he has no basis to claim that Clear Channel prices resulted from that practice as opposed to lawful competition. *See Heary Bros. Lightning Prot. Co. v. Lightning Prot. Inst.*, 287 F. Supp. 2d 1038, 1049 (D. Ariz. 2003) ("Plaintiffs must show that Defendants' improper actions were the but-for cause of the antitrust injury.").

Lacking any connection between anything Clear Channel actually did and inflated ticket prices, Dr. Phillips purports to show through a regression analysis that Clear Channel's market share was associated with higher prices. Ex. 4 at 483:9-485:5. Even if valid, this analysis would be meaningless. The Supreme Court has made clear that there is nothing remotely unlawful about having a high market share and charging high prices; there must, instead, be proof that anticompetitive conduct caused the prices to be higher than they otherwise would have been. *E.g.*, *Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407, 124 S.

---

(...continued from previous page)

*Collusion*: Dr. Phillips could cite no evidence that the ticket price for even a single concert was affected by any claimed collusion. *Id.* at 106:9-13 ("I don't know about the collusive activity on any particular artist."). Moreover, he admitted that the collusion he asserts, if it occurred, would have been directed at reducing artist guarantees and, thus, would tend to drive ticket prices down, not up. *Id.* at 43:24-44:5.

*Overpaying*: Dr. Phillips' theory of "overpaying" was divorced from any economic principles and based instead solely on Clear Channel's subjective "belief." *Id.* at 25:24-26:4, 28:4-20, 39:10-17. Since he agreed that, under his definition, Clear Channel would have "overpaid" if it bid the same amount or less than a rival concert promoter, "overpaying" has no logical connection to increased ticket prices. *Id.* at 29:21-25, 41:19-22.

-12-

Ct. 872, 878-79, 157 L. Ed. 2d 823 (2004); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 296-98 (2d Cir. 1979).

Still, Dr. Phillips' regression fails on its own terms.  In his first effort, he admittedly misreported the variables in his own regression equation and failed to input data correctly.  Ex. 7 ¶¶ 155-59; Ex. 4 at 483:9-484:7.  When those errors were corrected by Defendants' economist, Dr. Phillips' equation showed no statistically significant relationship between Clear Channel's market share and its alleged ticket overcharge, a point Dr. Phillips could not dispute.  Ex. 7 ¶¶ 158-59; Ex. 4 at 486:23-487:22.  Dr. Phillips then re-ran the equation using data starting one year earlier (when Clear Channel's share in the alleged markets was just 15-17%) in order to change the outcome, but he could not justify use of the earlier year's data or explain how any robust mathematical model would provide different conclusions by modifying the year.  Ex. 4 at 489:6-492:14.  His analysis, moreover, was not based on either the Los Angeles or Denver markets.  Instead, to get the result he wanted, he lumped in other geographic markets as well.

In his rebuttal report, Dr. Phillips claimed that a new "pooled sample" model "allows" for a "structural break" in the year 2000, which he attributes to Clear Channel's entry that year into the relevant markets.  Ex. 6 at 40; Ex. 4 at 451:24-452:8.  But Dr. Phillips did not test for a break in any year other than 2000, even though he agreed that there could have been structural breaks in other years.  Ex. 4 at 450:14-22, 451:24-452:8, 465:16-466:6.  He did not look for any alternate causes for the structural break in 2000, other than Clear Channel's "entry" into concert promotion through the acquisition of SFX's existing market position.  *Id.* at 465:16-466:6.  And he did not take into account any factors that might have a disparate impact on Clear Channel.  *Id.* at 455:15-24.  In short, he again assumed the outcome (i.e., that Clear Channel's entry into the market affected ticket prices), proffering a numeric model to confirm the assumption, without ever testing the basis for the assumption in the first instance.

-13-

In all of his analyses, Dr. Phillips ignored other potential causes of the prices charged.  Fogel Decl. ¶¶ 2-4.  Most critically, he deliberately ignored the role of the artist.  The evidence is undisputed that artists, not concert promoters, can and often do dictate ticket prices.  *See, e.g.*, Guerinot Decl. ¶ 4 [Dkt. 91, Ex. G]; Campana Decl. ¶¶ 3-4; Fogel Decl. ¶ 21.  Inasmuch as artists typically get 75-95% of the ticket revenue, it is apparent that they have a greater interest in the ticket price than the promoter.  So when artists set the price, the identity and conduct of the concert promoter becomes irrelevant to price levels, and there can be no argument that any illegal conduct was the cause of the prices charged.  In his 2007 deposition testimony, Dr. Phillips conceded as much.  Ex. 1 at 199:17-24.  Confronted now with undeniable evidence that the artist and promoter agree on the ticket prices to be charged in *every* concert, Dr. Phillips was finally forced to concede that one cannot know whether it was the artist or the promoter that was the cause of any given price without the very concert-by-concert inquiry into the specifics of the negotiations that Dr. Phillips categorically refused to incorporate into his methodologies.  Ex. 4 at 569:11-570:2.

The law is clear that an "expert opinion should [not be] admitted [where it does] not incorporate all aspects of the economic reality of the [relevant] market and [does] not separate lawful from unlawful conduct."  *Concord Boat*, 207 F.3d at 1057; *Craftsmen*, 363 F.3d at 776-77.  Thus, causation cannot be found absent proof that it was the unlawful conduct, not some perfectly legitimate alternative cause, that caused the injury claimed to have been incurred.  *See, e.g.*, *NARA v. Appraisal Found.*, 64 F.3d 1130, 1135-36 (8th Cir. 1995) ("[Plaintiffs] 'may not recover for losses due to factors other than the [defendant's] anticompetitive violations.'"); *City of Vernon v. S. Cal. Edison Co.*, 955 F.2d 1361, 1372 (9th Cir. 1992) (affirming summary judgment to defendant where plaintiff failed to distinguish harm from illegal versus legal conduct); *Farley Transp. Co. v. Santa Fe Trail Transp. Co.*, 786 F.2d 1342, 1350-52 (9th Cir. 1985).  Dr. Phillips made literally no effort at all to

-14-

separate lawful from purportedly unlawful causes of ticket price levels, and his

testimony thus violates Rule 702.

### III.   DR. PHILLIPS' OPINIONS REGARDING THE RELEVANT PRODUCT MARKET SHOULD BE EXCLUDED

Definition of a relevant product market is the *sine qua non* of a

monopolization case, for if there is no defined market, there is nothing to

monopolize.  *See, e.g.*, *Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*, 924

F.2d 1484, 1491 (9th Cir. 1991) ("[D]efining the relevant market is indispensable to

a monopolization claim.") (quoting *Thurman Indus. v. Pay'N Pak Stores*, 875 F.2d

1369, 1373 (9th Cir. 1989)).  Dr. Phillips has failed to offer any plausible

methodology  to support the rock concert market he defines.  His opinion should be

excluded in its entirety for that reason.  *See Ky. Speedway*, 588 F.3d at 915-19

(affirming exclusion of expert's testimony due to failure to define relevant market).

**Unreliable and Contrary to Undisputed Facts.**  None of Dr. Phillips'

opinions on market definition survives even rudimentary scrutiny.  Although Dr.

Phillips purports to apply the "hypothetical monopolist" test from the *Horizontal

Merger Guidelines* (the "SSNIP" test), he in fact does no such thing.[4]  Dr. Phillips

admitted that he failed to observe a fundamental principle of the SSNIP test:

beginning at a narrow product level and ending with the smallest possible definition.

*See* Ex. 3 at 123:17-127:13; *see also* Ex. 7 ¶ 20.   He started broadly with "rock

---

[4] This test seeks to define a relevant market by starting at the individual product level and then adding close substitutes so as to construct the narrowest group of products over which a hypothetical monopolist profitably could impose a "small but significant and non-transitory increase in price ("SSNIP") ...."  U.S. DEP'T OF JUSTICE & FED. TRADE COMM'N, *Horizontal Merger Guidelines* (2010), at 9 ("Merger Guidelines"), *available at* http://www.justice.gov/atr/public/guidelines/hmg-2010.pdf.  If implementation of a SSNIP test would be profitable, then that is a strong indication that the definition under consideration is valid.  *See id.* at 8-10.  The reason the *Merger Guidelines* start with a single product (here, an artist's concerts), to which close substitutes are added until the SSNIP test is met, is to make sure that only meaningful substitutes are included in the market and to avoid over-inclusive markets.

music" (as he defines it), thereby necessarily foreclosing any consideration of potential narrower markets, and then proceeded to reason back to his own conclusion.

That approach was simultaneously over-inclusive and under-inclusive. Ex. 5 ¶ 50. It is over-inclusive because some "rock" concerts are simply not substitutable for each other. By never testing smaller possible markets (such as "alternative" or "heavy metal"), Dr. Phillips included artists in his proposed market that even he could not attest would substitute for one another. Ex. 3 at 115:9-11 ("Q. Is Eddie Spaghetti reasonably substitutable for the Rolling Stones? A. I'm not sure."); 122:14-18 ("Q. Is there any evidence that the prices for $20 and less tickets . . . constrain the pricing of Madonna, U2, or the Rolling Stones? A. I don't have any evidence as I sit here, but it's certainly possible that they do."); 165:17-166:21 (admitting that he did not know whether Justin Timberlake (not "rock" per Dr. Phillips) or Metallica ("rock") was a better substitute for Madonna ("rock"); 202:18-204:15; *see also* Ex. 7 ¶¶ 51-64 (demonstrating lack of aggregate substitutability). He even disregarded the most relevant testimony – from the very managers who are responsible for analyzing aggregate concertgoer demand – establishing that the cross-elasticity of demand among some of what Dr. Phillips calls "rock" artists is zero. *Compare* Ex. 3 at 23:6-24:12, 116:24-118:8 *with* Guerinot Decl. ¶¶ 6-7 [Dkt. 91, Ex. G], Kessler Decl. ¶ 2 [Dkt. 91, Ex. J].

Phillips' approach is also under-inclusive. That is because, for some concerts, "non-rock" concerts would be closer substitutes than concerts considered "rock." Dr. Phillips offered no explanation for failing to test broader markets that might include other music forms, such as pop or country or jazz, for any concert on Plaintiffs' list. *See Ky. Speedway*, 588 F.3d at 917 (noting "a professional sport competes with other sports and other forms of entertainment."); Ex. 7 ¶¶ 65-68.

Had Dr. Phillips correctly applied the SSNIP test, he could only have concluded that class members actually purchased tickets in multiple, distinct

-16-

1  markets, not just one "rock" concert market.  His failure to apply the SSNIP test in a

2  coherent way justifies exclusion of Dr. Phillips' opinions on market definition in

3  their entirety.  *See Ky. Speedway*, 588 F.3d at 918 (affirming exclusion of testimony

4  where SSNIP test not properly implemented).[5]

5        Dr. Phillips admitted, moreover, that he undertook no quantitative analysis of

6  substitutability.  Ex. 3 at 115:18-116:6.  Instead, he changed the inquiry to "what is

7  rock" and undertook an entirely arbitrary analysis of dozens of sources, picking just

8  one for each artist, and then decided who is rock and who is not.  *Id.* at 134:17-136:6

9  ("There's a lot of work done in designating them as rock or not rock or pop.").

10  These included "Billboard" (his primary source), "Google," artist websites, and

11  industry sources.  But most of these sources did not even contain a "rock" category

12  (Ex. 3 at 141:16-18 ), and so Dr. Phillips just chose to call certain artists "rock" in

13  an entirely subjective fashion.  *See id.* at 125:4-6 ("It's subjective.  It's a subjective

14  determination ….");  127:5-13 ("Q.  What did you do to examine the cross-elasticity

15  of demand of heavy metal acts such as Metallica and acts such as Madonna or No

16

17  ─────────────
   [5]  Dr. Phillips' reliance on the *NIPP* case to support his market definition is
18  unavailing.  Importantly, a market definition that would work for a promoter case
   (e.g., *NIPP*) is not necessarily workable for a consumer case, as the market
19  definition relevant to each case depends on the plaintiff and the claim.  *See
   Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594, 613, 73 S. Ct. 872,
20  883, 97 L. Ed. 1277 (1953); *Rick-Mik Enters. v. Equilon Enters.*, 532 F.3d 963,
   972-75 (9th Cir. 2008); *United States v. Syufy Enters.*, 903 F.2d 659, 666 n.9 (9th
21  Cir. 1990) ("We agree with the government that this is not the proper market
   definition in examining Syufy's power over film distributors.  While *moviegoers*
22  may well view these alternative methods of film exhibition as readily
   substitutable, *film distributors* do not.") (emphasis added).  As a promoter, NIPP
23  (the plaintiff there) would not care about the particular aesthetics of the artist it
   was promoting; its sole interest is to have profitable shows to promote.  *See* Ex. 7
24  ¶¶ 39-40; *see also* Ex. 4 at 578:4-579:20 (admitting that identity of plaintiff may
   be relevant to market definition).  By contrast, artists engender strong
25  preferences among their fans, which in turn limit the range of substitutes each
   artist must consider when evaluating who will come to the concert(s) and at what
26  price.  *See* Ex. 7 ¶¶ 52-64.  Moreover, the *NIPP* court never had occasion to
   evaluate the sufficiency of Dr. Phillips' market definition in the context of a
27  consumer class action in which Plaintiffs must use common proof to establish
   that every ticket buyer suffered injury.

28

Doubt?  A.  It's the broad-based study I've done in this case since 2002.  Q.  So it is your subjective opinion, correct?  A.  Yes, it is my expert opinion."); *see also id.* at 175:12-16 (admitting that he identified only "primary" source and not all sources used).  He did not pursue any investigation of cross-elasticity of demand between various concerts, ignored cross-elasticity of supply, and did not even attempt to reconcile divergences in the various industry sources' category labels for different artists.  *Id.* at 116:10-17, 150:21-24, 166:22-170:14; *see also* Ex. 7 ¶ 65.  He just subjectively assumed that applying an arbitrary "rock" label substituted for a properly-denoted market.  Ex. 3 at 116:24-117:10 (admitting that his decision to apply "rock" label or not defined what constituted relevant market).

This approach has been soundly rejected, for it fails to comport with Supreme Court precedent requiring analysis of cross-elasticity of demand.  *See, e.g.*, *Worldwide Basketball & Sports Tours, Inc. v. NCAA*, 388 F.3d 955, 962 (6th Cir. 2004) (finding expert testimony regarding purported market for "Division I men's college basketball" should have been excluded because "the proper analysis 'is an appraisal of the 'cross-elasticity' of demand in the trade,'" and expert failed to undertake such analysis) (quoting *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 394, 76 S. Ct. 994, 1006-07, 100 L. Ed. 1264 (1956)); *TYR Sport v. Warnaco Swimwear*, 709 F. Supp. 2d 821, 834 (C.D. Cal. 2010) (excluding expert opinion for failing to consider all relevant competition in market analysis).

**Outcome-Oriented, Unhelpful, and Not Qualified.**  Expert testimony must be useful to a finder of fact by deploying specialized knowledge and skills to aid in the interpretation of evidence.  *Diviero v. Uniroyal Goodrich Tire Co.*, 114 F.3d 851, 853 (9th Cir. 1997).   In other words, the expert must be qualified, and the testimony must give the jury something more than the average juror looking at the evidence could achieve.  Opinions based on unreliable methods should be excluded, as should opinions displaying obvious bias.  *Lust v. Merrell Dow Pharms.*, 89 F.3d 594, 597-98 (9th Cir. 1996).

-18-

1    Here, Dr. Phillips admitted at the class certification stage that an independent
2    music expert was needed to decide which concerts were "rock" or not, and that he is
3    not a music expert.  Ex. 1 at 68:3-7 ("I'm not going to present any artists as rock and
4    roll on my own opinion because I am not a music expert."); 67:17-20 ("I'm not
5    going to present myself as a music expert."); 66:24-25, 67:19-20, 68:5-7.  Directly
6    contradicting his prior representations, he has now inserted himself as the music
7    expert in the case.  Ex. 3 at 123:9-16 ("It is my opinion."); 144:15-21 ("I made the
8    call.").  His admitted lack of qualifications to make these determinations require,
9    without more, that his testimony on market definition be excluded.  FED. R. EVID.
10   702 (expert must be qualified).  Moreover, his methods (looking at the labels
11   applied to artists by arbitrarily-selected sources) could just as easily be done by a lay
12   juror.  *See* Ex. 3 at 128:22-129:2 ("Q.  Isn't a juror perfectly capable of determining
13   whether Paul McCartney is rock? A.  Yes.").

14   Dr. Phillips likewise makes arbitrary and subjective determinations.  *Id.* at
15   114:23-115:8: ("It's a subjective understanding of what is substitutable.").
16   Betraying his lack of qualifications, his classifications defy common sense.  He
17   includes as "rock" some major artists who clearly are not (e.g., classifying Madonna
18   as rock rather than pop); excludes others (such as the Kinks and Simon &
19   Garfunkel) who clearly are "rock"; classifies several bands (including Aerosmith,
20   No Doubt, Counting Crows, and the Red Hot Chili Peppers) as "rock" when
21   promoted by Clear Channel but not when promoted by others; and makes choices
22   that can only be considered bizarre, such as calling "rock" the Japanese drum band
23   Kodo and the hip-hop artist Erykah Badu.  *See* Ex. 17.  These outcome-driven
24   choices have a significant effect on his average ticket prices and market shares.  Ex.
25   5 ¶¶ 66-67.  His opinion on the relevant market is entirely arbitrary and should be
26   excluded as useless.  *Cf. Indiana Telcom Corp. v. Indiana Bell Tel. Co.*, No. IP97-
27   1532-C-H/G, 2001 WL 1168169 (S.D. Ind. Sept. 25, 2011) (finding that Dr. Phillips
28   relied on data not shown to be type used by economists).

-19-

## IV.   DR. PHILLIPS' OPINIONS REGARDING MARKET SHARE SHOULD BE EXCLUDED AS UNRELIABLE

Evidence of market share may be useful to an assessment of market power, though it is far from dispositive.  *See generally United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1121 (N.D. Cal. 2004) ("[I]t is generally misleading to suggest that a firm 'controls' a certain market share in the absence of an analysis beyond market concentration.").  In particular, a market share below certain levels can be indicative of a lack of monopoly power.  *See, e.g., PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 109 (2d Cir. 2002) ("Absent additional evidence . . ., a 64 percent market share is insufficient to infer monopoly power.").

Dr. Phillips' market definition errors, discussed above, make his market share estimates for "rock" concert ticket revenue untenable as he has failed to define a proper market in which such shares may be assessed.  He compounds the problem by classifying some artists as "rock" when they perform for Clear Channel, but as "not rock" when they perform for a different promoter.  Ex. 7 ¶ 67; Ex. 3 at 175:24-177:11 (admitting that "[i]t's possibly a mistake" to include a concert by Foo Fighters in market when promoted by Clear Channel and excluding it when promoted by different promoter).  Further, he ignores the fluctuations in shares from year to year (Ex. 5 ¶¶ 68-71), a crucial mistake because fluctuation in market share (rather than level share or constant growth) indicates a *lack* of market power.  *See Horizontal Merger Guidelines* at 18 ("[E]ven a highly concentrated market can be very competitive if market shares fluctuate substantially over short periods of time in response to changes in competitive offerings.").  Moreover, his attributions are riddled with errors and are obviously outcome-oriented.  *See* Ex. 7 ¶¶ 76-84 (discussing Dr. Phillips' failure to include concerts by artists whom he had previously classified as "rock"; inclusion of concerts that multiple sources classify as a genre other than "rock"; inclusion of concerts outside of the relevant geographic markets; and improper attribution to Clear Channel of concerts promoted by House

-20-

of Blues and other third-party promoters).  As just one example, he attributed entirely to Clear Channel every concert co-promoted with another promoter, even where Clear Channel's role was entirely passive and it had no input into the ticket prices charged.  Ex. 3 at 316:22-318:10.  This is improper given the different circumstances under which co-promotions can arise.  Masters Decl. ¶¶ 9-10.  During his deposition, Dr. Phillips betrayed a complete disregard of what the facts may show in favor of his assumptions.  *See* Ex. 3 at 316:22-318:10 (admitting that he did not bother to examine circumstances of any co-promotions and attributed all such co-promotions to Clear Channel).

Even correcting for just a few of these errors would reduce Clear Channel's market shares well below any established threshold for monopoly power.  Ex. 7 ¶ 83; *see PepsiCo*, 315 F.3d at 109.  By cherry picking from the evidentiary record, Dr. Phillips has offered an essentially meaningless analysis designed solely to inflate Clear Channel's purported shares.  *See Am. Banana Co. v. J. Bonafede Co.*, 407 Fed. Appx. 520, 523 (2d Cir. 2010) (excluding economist's opinion for relying on "selective facts").  Rule 702 is designed to prevent just this kind of gerrymander.

## V.   DR. PHILLIPS' OPINIONS ON EXCLUSIONARY CONDUCT ARE CONTRARY TO LAW AND FAIL TO FIT THE FACTS

Expert testimony that fails to differentiate between lawful and unlawful conduct is unreliable and unhelpful to the trier of fact.  *See Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1323 (11th Cir. 2003) ("This testimony could not have aided a finder of fact to determine whether appellees' behavior was or was not legal, and the district court properly excluded it."); *Concord Boat*, 207 F.3d at 1057; *see also Arminak & Assocs. v. Saint-Gobain Calmar*, __ F. Supp. 2d __, 2011 WL 2268066 (C.D. Cal. June 7, 2011) (finding evidence of lawful activity inadmissible to support monopolization claim).  So is testimony that does nothing more than recast information from testimony and documents that do not require narration by an expert.  *City of Tuscaloosa v. Harcros Chems.*, 158 F.3d 548, 565

-21-

(11th Cir. 1998) ("[C]haracterizations of documentary evidence as reflective of collusion" do not assist jury.).  Apart from conclusory labeling, Dr. Phillips never analyzed whether any of the Clear Channel conduct about which he complains should be viewed as anticompetitive (or entirely legitimate) under any accepted economic principle.  On the contrary, he testified that Clear Channel would have to go out of business to satisfy him that its behavior was not harming consumers.  Ex. 3 at 68:17-22.  This is not the sort of testimony that an expert can be allowed to give.

*Overpaying.*  Dr. Phillips intends to testify that Defendants engaged in "overpaying" any time Clear Channel gave the artist more favorable economic terms than it subjectively thought it should, even if the concert was profitable and even if rival promoters had bid even higher.  Ex. 5 ¶¶ 164-77; Ex. 3 at 25:24-26:4.  That is precisely the standard rejected by the Supreme Court in *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 127 S. Ct. 1069, 166 L. Ed. 2d 911 (2007), where the Court held that "purchas[ing] more . . . than [the defendant] needed, or pa[ying] a higher price . . . than necessary" was not unlawful.  *Id.* at 549 U.S. at 317-18.  His testimony is not only contrary to the command of *Weyerhaeuser* that "overpaying" is exclusionary only if the prices paid result in below-cost pricing; it is also contrary to the holding in *NIPP* to the same effect.  311 F. Supp. 2d at 1108-09.  Dr. Phillips does not even purport to demonstrate below-cost overpaying as *Weyerhaeuser* requires.  Ex. 3 at 36:22-39:17.  To the contrary, he admitted that Clear Channel expected to turn a profit for each concert.  Ex. 5 ¶¶ 169-70.

Dr. Phillips' opinion, moreover, is economically senseless in its own right.  Increasing bids to artists tends to increase the market-wide incentive for artists to perform; it therefore increases the ultimate number of concerts and, thus, market output.  *See* Ex. 7 ¶ 26.  Thus, bidding high to procure talent, absent below-cost overpaying, is affirmatively *pro-competitive*.  *See Chicago Prof. Sports Ltd. P'ship v. NBA*, 95 F.3d 593, 597 (7th Cir. 1996) ("The core question in antitrust is output.

-22-

1  Unless a contract reduces output in some market, to the detriment of consumers,

2  there is no antitrust problem.").

3        Dr. Phillips' testimony about overpaying, if allowed, would mislead the jury

4  significantly.

5        *Radio Synergies.*  Equally defective is Dr. Phillips' testimony attacking as

6  anticompetitive Clear Channel's efforts to achieve synergies between its radio and

7  concert divisions.  *See* Ex. 5 ¶¶ 92-113.  Vertical integration has recognized pro-

8  competitive benefits.  *See Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36,

9  51-57, 97 S. Ct. 2549, 2558-61, 53 L. Ed. 2d 568 (1977) (reviewing efficiencies of

10 vertical integration); *see also* Ex. 7 ¶ 88.  In light of these benefits, the law has long

11 encouraged vertically-integrated firms to take advantage of the synergies offered by

12 such integration, regardless of whether the integration increases the firm's market

13 share as against its competitors.  *See* 3B PHILLIP E. AREEDA, et al., ANTITRUST LAW

14 ¶ 755c, at 6 (3d ed. 2008) ("To be sure, even competitively harmless vertical

15 integration can injure rivals or vertically related firms, but such injuries are not the

16 concern of the antitrust laws.").  But Dr. Phillips undertook no analysis of the effect

17 on competition, if any, of Clear Channel's efforts to achieve synergies, instead

18 deeming any and all such efforts to be anticompetitive on no other basis than that

19 the synergies, if achieved, might increase Clear Channel's market share.  Ex. 5 ¶¶

20 92-104; Ex. 7 ¶ 88 (discussing potential pro-competitive effects); Ex. 8 at 177:18-

21 23.

22       *Venues.*  Dr. Phillips intends to testify that Clear Channel exerted control over

23 artists "by owning or exclusively booking far more venues than competing concert

24 promoters, and then excluding competing promoters from those venues."  Ex. 5

25 ¶ 134.  Once again, Dr. Phillips declined to perform any analysis to try to discern

26 legitimate, pro-competitive effects.  *See* Ex. 7 ¶ 109; Ex. 5 ¶¶ 134-41 (assuming that

27 Clear Channel's access to venues limits competition).  And his claim that Clear

28 Channel owned or controlled enough venues to stifle competition is pure fabrication.

-23-

Ex. 3 at 302:9-20; Ex. 7 ¶¶ 121, 126-27.  The uncontroverted evidence is that Clear Channel operated just one venue in Denver and three in the Los Angeles area for most of the relevant period.  Ex. 7 ¶¶ 113-20, 122-25; Ex. 15 at ex. 3.  Its competitors in Los Angeles and Denver owned or controlled far more.  *See, e.g.*, Masters Decl. ¶¶ 3-8; Ex. 15 at ex. 3; Ex. 7 at Table 10; Ex. 16 at 104:3-11.  In Los Angeles, for example, he attributed the Staples Center, the Forum, and the Anaheim Pond to Clear Channel even though Nederlander held exclusive booking rights at each, Ex. 15 at ex. 3, and he ignored important venues, including Angel Stadium of Anaheim and Dodgers Stadium, entirely.  *See* Ex. 5 at ex. 4.

*Inside Deals*.  Dr. Phillips also criticizes agreements with venues through which Clear Channel (and other promoters) negotiated lower venue costs (either directly or through revenue sharing), if it promoted a certain number of concerts at the venue.  Ex. 5 ¶¶ 142-50.  Again, Dr. Phillips never considers the pro-competitive benefits of these agreements, such as "assurance of supply or outlets, enhanced ability to plan, reduced transaction costs, creation of [fan] loyalty, and the like."  *See U.S. Healthcare v. Healthsource*, 986 F.2d 589, 595 (1st Cir. 1993); *Fedway Assocs. v. United States Treasury*, 976 F.2d 1416, 1418 (D.C. Cir. 1992) (volume discount contracts provide pro-competitive effects); Ex. 7 ¶ 112; *see also W. Parcel Express v. United Parcel Serv. of Am.*, 190 F.3d 974, 976 (9th Cir. 1999) ("[V]olume discount contracts are legal under antitrust law.").  When challenged, Dr. Phillips could not even identify a single concert where an "inside deal" allegedly foreclosed another promoter.  *See* Ex. 3 at 318:24-320:14.  His testimony again is devoid of antitrust economics and fails to fit the facts of the case.

*Claimed Collusion*.  Dr. Phillips asserts that "[t]he evidence in this case is also marked with extensive evidence of collusion between Clear Channel and its primary competitors in the rock-concert-promotion business."  Ex. 5 ¶ 184.  This statement, accompanied only by a narrative pulled almost verbatim from Plaintiffs' interrogatory answers, is purely conclusory and provides no economic analytical

-24-

framework to assist the jury.  *See, e.g.*, *Williamson Oil*, 346 F.3d at 1323.  Dr. Phillips simply condemns without analysis any communication between Clear Channel and another promoter – and without even asking whether the communications reflected legitimate joint efforts to increase output, for example by promoting concerts that otherwise might not have taken place.  *See* Ex. 5 ¶¶ 184-237; *see also* Ex. 6 at 29.  As offered, his testimony would run contrary to well-established legal principles.  *See, e.g.*, *Paladin Assocs. v. Montana Power Co.*, 328 F.3d 1145, 1155-58 (9th Cir. 2003) (approving competitor collaboration); *Texaco Inc. v. Dagher*, 547 U.S. 1, 7-8, 126 S. Ct. 1276, 1280-81, 164 L. Ed. 2d 1 (2006) (distinguishing between anticompetitive and pro-competitive collaborations); *accord* Ex. 7 ¶ 135 (noting pro-competitive reasons for collaboration with artists). [6]

\*     \*     \*     \*

In sum, Dr. Phillips should not be permitted to testify, contrary to the law and the factual record, that Clear Channel engaged in unlawful exclusionary conduct.

## CONCLUSION

Dr. Phillips' testimony should be excluded in its entirety.

Dated:  November 7, 2011          WILSON SONSINI GOODRICH & ROSATI

By: /s/ Jonathan M. Jacobson
Jonathan M. Jacobson

---

[6]   As Defendants will demonstrate in their summary judgment papers, Plaintiffs' collusion arguments are not just baseless; they should not even be considered as they were never alleged in the Complaint.  Plaintiffs never sought to amend their Complaint to include these allegations, and it is certainly too late to do so now. *See Trishan Air v. Fed. Ins. Co.*, 635 F.3d 422, 435 (9th Cir. 2011) (rejecting new claim that was not sufficiently pleaded in complaint); *Wasco Prods. v. Southwall Techs.*, 435 F.3d 989, 992 (9th Cir. 2006) (rejecting allegations of civil conspiracy not pleaded in the complaint).